

**FILED**

DEC 0 3 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

Andriy Lyashchenko
Alexandra Lyashchenko
20119 Sunrise Drive, Redding, CA 96003
alyas77@gmail.com
alexandraed@gmail.com
Plaintiffs *in pro per*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### REDDING COURTHOUSE

ANDRIY LYASHCHENKO and
ALEXANDRA LYASHCHENKO

    Plaintiffs,

v.

SHASTA COUNTY HEALTH AND
HUMAN SERVICES AGENCY;
CRYSTAL NELSON in her official
capacity; JENNIFER SZEPHEGYI-
JOHNSON in her official capacity;
NIKKI QUINTANA in her official
capacity; SHANNON ANDERSON in her
official capacity; JARED FOSTER in his
official capacity; PATRICIA
DOUGHERTY, D.Ed. in her individual
capacity and as *de facto* govt. actor;
MICHELLE A. SAGER, M.D. in her
individual capacity and as *de facto* govt.
actor;  MICHAEL HORAN in his
individual capacity and as *de facto* govt.
actor; MARGARET "MAGGIE"
KENEFICK in her individual capacity and
as *de facto* govt. actor; HON. MOLLY
BIGELOW in her official capacity only;
OFFICE OF THE CALFORNIA
ATTORNEY GENERAL; and DOES 1-
100,

    Defendants.

Case No.
2 25 CU 3494 DAD DMC
(PS)

**VERIFIED COMPLAINT FOR CIVIL
RIGHTS AND TORT CLAIMS SEEKING
DAMAGES, DECLARATORY AND
INJUNCTIVE RELIEF**

1. 42 U.S.C. § 1983 - Substantive Due
   Process (Judicial Deception) and
   Conspiracy

2. 42 U.S.C. § 1983 - Substantive Due
   Process (Policy / Custom / Training)

3. 42 U.S.C. § 1983 - Substantive Due
   Process (Discrimination /National
   Origin)

4. 42 U.S.C. § 1983 – Unreasonable
   Seizure

5. 28 U.S.C. § 2201 - Challenge to Judge
   Bigelow's Blanket Gag Order

6. 28 U.S.C. § 2201 - Challenge to
   Dependency Court

7. 28 U.S.C. § 2201 - Challenge to WIC§
   355

8. 28 U.S.C. § 2201 Challenge to Cal.
   Code Regs. Tit. 22, § 89387(a)(2)(C))

9. Intentional Infliction of Emotional
   Distress

**DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION

1.    When two loving Orthodox Christian parents refuse to "affirm" their 15-year-old daughter in her self-reported belief that she is "Transgender," does this alone constitute "emotional abuse" sufficient for a constitutional government to seize the child?

2.    If this lack of parental "affirmation" alone is not sufficient to seize the child, is it constitutional for government officials to fabricate falsehoods to persuade a Superior Court judge that that removal of the child from the home is necessary?

3.    Is it constitutional when the government changes its story repeatedly, first adding that the immigrant parents' "cultural background" is "emotional abuse," then later entirely dropping the original allegation—that the parents' refusal to "affirm" the child constitutes "emotional abuse"—yet still not returning the child?

4.    Does Defendant Shasta County Health and Human Services Agency ("County") have a policy or custom to detain children based on the parents' refusal to "affirm" a teen's self-reported status of "Transgender?"

5.    Under the accepted standards of evidence-based medicine, are interventions for gender dysphoria such as "social transitioning," "puberty blockers," and "cross-sex hormones" injurious to the point of being disabling, and should Defendants have known this fact?

6.    Did these Defendants plan and act in concert to advance their financial goals, knowing full well—but not caring—that "gender affirming care" is harmful?

7.    Plaintiffs Andriy and Alexandra Lyashchenko ("Plaintiffs," the "Lyashchenkos" or "Parents") are the legally-married, college-educated biological parents of their daughter S.L. The Lyashchenkos are proud legal immigrants from Ukraine.

8.    Born in 2008 in Kyiv, Ukraine, at this writing S.L. is seventeen years old. S.L. has a little brother, M.L., who is currently eight.

9.    One day in June 2024, acting on an anonymous allegation of "emotional abuse," County CPS agent Crystal Nelson came to the Lyashchenkos' house on Sunrise Drive in

1  Redding, CA intending to seize S.L. Responding to Nelson's call, later that day no less
2  than *eight* law enforcement squad cars arrived.

3  10.    In June of 2024, S.L. was a rebellious fifteen-year-old teenager. But the problem
4  goes back in time much further than that. Unfortunately, S.L. has had very troubling
5  mental health problems for years.

6  11.    For instance, in 2019, at age ten, S.L. began self-harming—cutting herself, and
7  threatening to kill herself. At that time, the family lived in Massachusetts.  S.L. was
8  placed on a "5150" hold for 11 days at the Taravista Behavioral Health center in Devens,
9  MA. Of course, S.L.'s Parents were very concerned, and at all times were committed to
10  providing her the very best of mental health care.

11  12.    S.L. had previously been diagnosed and prescribed medication for Attention Deficit
12  Hyperactive Disorder ("ADHD"). Since then, she has been diagnosed with Major
13  Depressive Disorder, Oppositional Defiance Disorder and Borderline Personality
14  Disorder.

15  13.    According to County, while in government custody, S.L. was allegedly diagnosed
16  with gender dysphoria. It is not known who may have diagnosed S.L with gender
17  dysphoria. In fact, with most minors claiming the entirely psychological condition gender
18  dysphoria are essentially self-diagnosed.

19  14.    Plaintiffs are unsure of what S.L.'s current diagnoses may be. She has now been in
20  government custody since June 2024—nineteen months and counting.

21  15.    In around March 2023, at age 14, S.L. began identifying as "Male" or
22  "Transgender."

23  16.    As with most teenage girls who now identify as "Transgender," it is quite likely that
24  this newfound identity began as a Social Contagion, fueled by social media and reinforced
25  by professionals who "affirm" her.

26  17.    In sharp contrast, most boys who identify as "Transgender" began doing so at a
27  much younger age. Such boys most often grow up to be gay men.

28

18.   There is a possibility that S.L. believes she is "really" Male "on the inside," in which case her "Transgender" identity would be a delusion. Regardless of whether S.L. is truly delusional, the notion that she is "really" Male is patently false. S.L.'s mental health requires that reality takes precedence over delusion and/or falsehood.

19.   An internet personality known as "Markymoo" has been highly influential in S.L.'s beliefs. The interaction between S.L. and Markymoo was on Discord, a popular social media and discussion forum site. See http://discord.com. Markymoo is purported to be Male and about two years older than S.L., but Markymoo's true sex and age are unknown.

20.   Also influential in S.L.'s beliefs is Defendant Michelle A. Sager, M.D., a psychiatrist that Plaintiffs hired to treat S.L.'s mental illness. Instead of helping, Sager injured both S.L. and her Parents by "affirming" S.L. as "male," and further alienating S.L. from her Parents.

21.   Sager convinced the then 15-year-old S.L. that her Parents were "emotionally abusive," as they did not "affirm" her.

22.   On information and belief, Sager is the anonymous "Reporting Party" that first made the "emotional abuse" allegation to County.

23.   Like County, Sager has a policy or custom of "affirming" her patients who self-identify as "Transgender."

24.   Also influential in S.L.'s beliefs is Defendant Patricia Dougherty, Ph.D., the CEO and Principal at the Phoenix Charter Academy College View ("PCA"), a publicly funded school that S.L. attends.

25.   Like County and Sager, PCA also has a policy or custom of "affirming" its students who self-identify as "Transgender."

26.   County, Sager, Dougherty and all Defendants knew, or should have known, the facts that (a) "affirming" a "Transgender" child is harmful in and of itself, and (b) "affirming" makes it much more likely that the "Transgender" person will go on to puberty blockers and/or cross-sex hormones, thus compounding the injury. At minimum,

1  all Defendants acted with a reckless disregard for whether "affirming" the status of
2  "Transgender" is harmful to minors or not.

3  27.    Prior to the June 2024 detention by County, S.L. was coached by Markymoo, by
4  Sager, and possibly by unknown others, all of whom instructed S.L. on what to do so as to
5  persuade government officials of her "Transgender" status and of her "emotional abuse"
6  at the hands of her Parents.

7  28.    The coaching aka the "Transgender Playbook" was straightforward: claim a Male
8  "Gender Identity," act afraid of your Parents, and blame your Parents' non-affirmation for
9  your mental health issues.

10  29.    On June 03, 2024, allegedly under authority of Welfare and Institutions Code § 300,
11  County social worker Defendant Crystal Nelson seized S.L. and took her away from her
12  Parents.

13  30.    On June 05, 2024, County filed in the Superior Court a Juvenile Detention Petition
14  and a Detention Report, launching the Dependency Court prosecution. The allegation was
15  that Plaintiffs Andriy Lyashchenko (father) and Alexandra Lyashchenko (mother) have
16  committed "emotional abuse" of S.L. by refusing to affirm her as "Transgender."

17  31.    It is true that the Lyashchenkos do not "affirm" S.L.

18  32.    There are two basic reasons why the Lyashchenkos do not "affirm" their daughter
19  as "Transgender." First, they are Orthodox Christian. Transgender is a disfigurement of
20  the body, and not acceptable. Second, and more importantly, "gender affirming care" is
21  mentally and physically harmful. Indeed, it is disabling.

22  33.    No good parent, aware of the facts regarding social transition, puberty blockers and
23  cross sex hormones will "affirm" their child's false belief that they are "really" the
24  opposite sex.  No good parent will allow their "Transgender" child to subject themselves
25  to the mentally and physically disabling consequences of "gender affirming care."

26  34.    In addition to causing sterility, the use of testosterone causes a great increase in the
27  likelihood of liver cancer.

28

35.    In its papers, County consistently refers to S.L. as "male," using a specific boy's name and Male pronouns. Indeed, Defendant Judge Molly Bigelow also referred to S.L. as Male throughout the Dependency proceedings. Although Defendants all know that S.L. is Female, each persisted with the "Male" "Gender Identity" falsehood. S.L. is Female and always will be. Nothing anyone does can possibly change this fact.

36.    In addition to it simply being false, refusing to "affirm" S.L. as "Transgender" is not "emotional abuse" because there is no California or Federal statute or legal precedent holding so.

37.    As a matter of law, failure to "affirm" is not grounds to seize a child from her parents, and all Defendants knew this. However, as a factual matter, Defendants all knew that County receives federal funding based on every child seized and detained. Additional medical diagnoses mean *more* money. A Forced Adoption means *even more money* yet.

38.    Thus, it became imperative for County and the other Defendants to fabricate and maintain a false pretext on which to seize and detain S.L. indefinitely.

*39.*    As cited below, in cases such as *Troxel v. Granville, Parham v. J.R., Santosky v. Kramer* and many others, the U.S. Supreme Court has long and consistently recognized that there exists a fundamental right to family unity in the Liberty Clause of the Fourteenth Amendment.

40.    The Ninth Circuit in *Benavidez v. County of San Diego* stated in no uncertain terms that judicial deception is grounds for a civil rights case.

41.    In 1978, the U.S. Supreme Court held in *Monell* that a civil rights case may be founded on showing that the County has a policy or custom or improper training that violates a constitutional right.

42.    In its First Amended Petition, County went so far as to state that it was the Lyashchenkos "cultural background which has caused emotional abuse to the minor." The Lyashchenkos are proud *legal* immigrants from Ukraine. This was blatant discrimination based on national origin, a violation of the Civil Rights Act.

43.    All Defendants knew and believed that they were violating the Lyashchenkos rights based on national origin, but they didn't care. Money spoke much louder.

44.    In its Second Amended Petition, County abandoned its contention that the Lyashchenkos were abusive *at all*. And yet, S.L. remains detained in government custody to this day—18 months and counting.

45.    Any adult who has ever had children understands the emotional devastation the Lyashchenkos have suffered and continue to suffer due to all Defendants intentional conduct.

46.    This case arises due to the violations of the Lyashchenkos' fundamental constitutional rights.

47.    A Dependency Court prosecution ensued based on Plaintiffs' refusal to "affirm" S.L. as a purported "Transgender" person, and further based upon the fabricated falsehoods stated below. This constitutes actions taken or decisions made by municipal officials with final decision-making authority, which caused a violation of Plaintiffs' civil rights.

48.    This case also arises under the First Amendment, which guarantees the right to free speech. At numerous times Dependency Court judge Hon. Molly Bigelow admonished the Lyashchenkos "not to discuss these proceedings with anyone."

49.    On information and belief, Judge Bigelow relies on California Rule of Court 8.47 for the idea that the entire Dependency Court proceeding is confidential. This clearly conflicts with the First Amendment and the entirety of U.S. Supreme Court precedent, which holds that any prior restraint of speech must be "narrowly tailored." If protecting S.L.'s privacy is the concern, this may be accomplished with far less restrictive means than the Blanket Gag Order Judge Bigelow purported to issue.

50.    This case also arises to constitutionally challenge Welfare and Institutions Code ("WIC") § 355. First, the statute provides a "preponderance of the evidence" standard. Taking a child away from parents is clearly a criminal matter. The law should presume the

1  Lyashchenkos innocence, while standard of proof should be "beyond a reasonable doubt,"
2  as in all criminal trials in the United States.

3  51.      Moreover, WIC § 355 states that a "social study prepared by the petitioning agency,
4  and hearsay evidence contained in it, is admissible and constitutes competent evidence"
5  on which the state may take a child away from the parents. This presumes that
6  government actors and their agents cannot be dishonest in preparing a report. This a
7  dubious position *at best*. The correct presumption under our justice system is supposed to
8  be that the parents, here the Lyashchenkos, are presumed innocent until proven guilty. The
9  current interpretation has it backwards – guilty until proven innocent.

10  52.      What is more, this case challenges the constitutionality of a criminal prosecution
11  which does not guarantee a jury trial, which does not operate on the "beyond a reasonable
12  doubt" standard of proof.

13  53.      Another bad California law has come to light in this case. Cal. Code Regs. Tit. 22, §
14  89387(a)(2) soundly provides that a foster home must not place opposite-sex teens in the
15  same room. So far, so good.

16  54.      However, subsection (C) of 89387(a)(2) provides an exception, allowing the
17  provider to room minors consistent with their "Gender Identity," regardless of their sex.
18  Gender Identity is a meaningless term (see definitions, *infra*). Here, teenage girl S.L.
19  "identifies" as a boy. According to the State of California, that makes it OK to place her in
20  a room with a boy. Plaintiffs disagree and challenge.

21  55.      The rationale for the State of California to enact any statute is to protect its citizens.
22  Allowing a teenage girl to room with a teenage boy is an unacceptable risk of pregnancy,
23  STDs and sex trafficking. Disallowing opposite sex roommates, regardless of self-
24  reported "Gender Identity," serves California's interest in protecting its citizens far better.

25  56.      This case also arises because Defendants intentionally devastated the Lyashchenkos
26  emotionally. County seized a mentally unhealthy teenage girl from her good parents, for
27  no particular reason other than they will not "affirm" her self-identified status as

28

"Transgender." In other words, the Lyashchenkos are being prosecuted and punished simply for being good parents and trying their best to protect their mentally unhealthy teenage daughter.

57.     Defendants' conduct here is thus outrageous. On that basis Plaintiffs pursue a claim for Intentional Infliction of Emotional Distress. Plaintiffs are injured, both constitutionally and emotionally, by Defendants whose conduct was beyond all bounds of decency.

58.     It is a fact that "gender affirming care" is injurious to the point of being disabling. Defendants will, of course, be free to dispute that fact—and the rest of these facts—if and when they answer the complaint.

59.     At the outset, it is worth noting that this is a jury trial demand. *Only* a jury is competent to weigh the evidence and try the facts.

## II.    JURISDICTION

60.     Original federal subject matter jurisdiction is conferred on this Court by 28 U.S.C. §1343(3) and 1343(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331(a) because claims for relief derive from the United States Constitution and the laws of the United States. Jurisdiction of this Court over any claim for Declaratory Relief is conferred by 28 U.S.C. §2201.

61.     This federal court should assert Supplemental Jurisdiction over the state law claims, as they arise from the same nucleus of operative facts giving rise to the federal Civil Rights and Declaratory Judgment claims.

## III.   VENUE

62.     Venue properly lies in the Eastern District of California, Redding Courthouse, in that the events and circumstances herein alleged occurred in Redding, CA.

## IV.    PARTIES

63.     **Plaintiff Andriy Lyashchenko ("Andriy" or "Father")** – is the husband of Alexandra, the father of S.L. (b. 2008) and M.L. (b. 2017). He is a legal immigrant from Ukraine. He is educated, trained and working as a software engineer.

64.     **Plaintiff Alexandra Lyashchenko ("Alexandra" or "Mother")** – is the wife of Andriy and the mother of S.L. She is a legal immigrant from Ukraine. She is educated, and trained as a linguist. She is a currently a stay-at-home mother.

65.     **Defendant Shasta County Health and Human Services Agency ("County" or "CPS")** – investigates alleged abuse and neglect of children, licenses foster homes, provides child welfare services for families under the jurisdiction of the Juvenile Court and provides adoption services.

66.     **Defendant Crystal Nelson in her official capacity** – the County Senior Social Worker who authorized seizure and detention under the Policy, and who physically seized S.L. from her parents.

67.     **Defendant Jennifer Szephegyi-Johnson in her official capacity** – a County Senior Social Worker who authorized seizure and detention of S.L. under the Policy, and who is involved in the Dependency case prosecution of the Lyashchenkos.

68.     **Defendant Nikki Quintana in her official capacity** - a County Senior Social Worker who authorized seizure and detention of S.L. under the Policy, and who signed the various amended Petitions.

69.     **Defendant Shannon Anderson in her official capacity** – a County Social Worker Supervisor who authorized seizure and detention of S.L. under the Policy.

70.     **Defendant Michelle A. Sager, M.D. her individual capacity and as** *de facto* **govt. actor** – a psychiatrist who treated S.L.

71.     **Defendant Patricia Dougherty, Ed.D. in her individual capacity and as** *de facto* **govt. actor** – the CEO of Phoenix Charter Academy College View school in Shasta County.

72.    **Defendant Michael Horan in his individual capacity and as *de facto* govt. actor** – an attorney and minor's counsel appointed by Judge Bigelow to represent S.L.

73.    **Defendant Margaret "Maggie" Kenefick in her individual capacity and as *de facto* govt. actor** – foster care provider and bio mother of a boy A.K, assigned to share a small room with S.L.

74.    **Defendant Hon. Molly Bigelow in her official capacity only** – a Superior Court Judge who presides over the Dependency Court prosecution of the Lyashchenkos. Judge Bigelow is sued in her official capacity only, i.e. as a figurehead for the State of California.

## V.    DEFINTIONS

75.    **County** - Shasta County Health and Human Services Agency, its employees, agents and assigns.

76.    **The Policy** – County's practice of using parents' refusal to "affirm" a child's status of "Transgender" as a basis to prosecute for emotional abuse under WIC § 300 (c). The Policy also includes instructions to and agreements with agents and *de facto* agents to fabricate, endorse and repeat falsehoods as necessary, particularly such falsehoods as (a) "Transgender" people exist, (b) "Gender Identity" exists, (c) "Gender Affirming Care" is safe and effective, and (d) a trans-identifying child is typically afraid of his or her parents. In short, the Policy includes but is not limited to the entirety of "Gender Ideology."

77.    **CPS** – "Child Protective Services," a widely-understood blanket term for federally-funded child welfare agencies present in every U.S. county, officially known by various other names such as Department of Child and Family Services ("DCFS"), Health and Human Services Agency ("the Agency"), Administration for Children and Families ("ACF"), etc.

78.    **Forced Adoption** – a court-ordered process in dependency cases that permanently severs the legal relationship between a parent and child without the parent's consent.

79.     **Nominally Private Actors** - Patricia Dougherty, D.Ed., Michelle A. Sager, M.D., Margaret "Maggie" Kenefick and Michael Horan, each of whom is a private actor on paper, but each of whom should be held as *de facto* government actor for civil rights purposes under the Joint Action Test.

80.     **Reporting Party** – an anonymous person who first contacts County with an allegation of child abuse.

81.     **Blanket Gag Order** – Judge Bigelow's admonishment that the parties are "not to discuss these proceedings with anyone outside of the Courtroom."

82.     **Social Contagion** – the spontaneous spread of emotions, behaviors, and attitudes among individuals within a group. It occurs without conscious awareness and can lead to the transmission of both positive and negative behaviors. Specific to this case, Social Contagion refers to the spread of Gender Ideology through social media, primarily among teenage girls.

83.     **"Gender Affirming Care"** – social transition (the use of opposite sex name, pronouns, hairstyle and clothing), puberty blockers (GnRH analog drugs), cross-sex hormones (estrogen for boys and testosterone for girls) and various surgeries (double mastectomy, phalloplasty, orchiectomy, penectomy, vaginoplasty); all falsely marketed as safe & effective, in reality experimental and injurious.

84.     **Male** – a human who has or will have the ability to produce sperm.

85.     **Female** – a human who has or will have the ability to produce ova.

86.     **Transgender** – the false belief that a human can change sexes.

87.     **Gender Ideology** – a dangerous mythological belief system teaching, inter alia, that human sex is a "spectrum" (rather than the Male-Female binary); that a human can change sexes (when sex is biological and immutable).

88.     **Gender Identity** – a subjective and ultimately meaningless term defined inconsistently by those who espouse Gender Ideology. See HHS discussion of the term, *infra.*

89.     **Discord** – an internet social media platform at http://discord.com that allows users to communicate by written text, audio and video conferencing, sharing pictures and videos, etc.

90.     **Transgender Playbook** – A political and emotional manipulation strategy under which a "Transgender" person learns to falsely portray himself or herself as a victim of those who refuse to "affirm," distracting from the fact that the "Transgender" person is being used as a "pawn" in a larger battle, here the Policy and Defendants' efforts to maximize their financial take.

## VI.    FACTS COMMON TO ALL CLAIMS

91.     Plaintiffs Andriy Lyashchenko and Alexandra Lyashchenko are proud legal immigrants to the United States from Ukraine. Before S.L. was born, and continuing to the present, the Lyashchenkos are legally married.

92.     In 2008, S.L. was born in Ukraine.

93.     S.L. is mentally unhealthy. At least since she was ten years old in 2019, S.L. has been cutting herself and threatening suicide.

94.     The Lyashchenkos have always been, and continue to be, willing and able to provide mental health care for their daughter S.L.

95.     In or about March of 2023, at the age of fourteen, S.L. began identifying as "Transgender." Unbeknownst to her Parents until over a year later, she chose a boy's name for herself.

96.     At no time did the Lyashchenkos "affirm" S.L. in her status as "Transgender." This is for two reasons. First, the Lyashchenkos are Orthodox Christian. Second, the purported "treatments" for gender dysphoria—including social transition, puberty blockers, and cross-sex hormones—are harmful to the point of being disabling, while never having been proven effective in the treatment of gender dysphoria under the standards of evidence-based medicine.

97.    In or about April 2024, the Lyashchenkos hired psychiatrist Michelle Sager to treat S.L. The teenage girl complained to Sager about how her parents refused to "affirm" her as a boy. Rather than dissuading S.L.'s false belief that she was "really a boy," Sager instead "affirmed" S.L., knowing that such was harmful.

98.    Sager did not care that she was harming S.L. Although fully aware of its false, dangerous and mythological nature, Sager outwardly purported to accept Gender Ideology because she was motivated by money. Sager figured that failing to "affirm" S.L. would make it likely that S.L. would leave Sager and go to a more "affirming" psychiatrist.

99.    No California or Federal statute and no legal precedent exists for the proposition that parents' refusal to "affirm" their teenager's false belief in "Transgender" constitutes "emotional abuse." All Defendants knew this or reasonably should have known this.

100.    Sometime before 06-03-2024, County received an anonymous report that the Lyashchenkos were emotionally abusing their daughter S.L. This accusation was based on the truthful accusation that Lyashchenkos did not "affirm" S.L.

101.    On information and belief, S.L.'s psychiatrist Michelle Sager was the anonymous "Reporting Party."

102.    During April – May 2024, S.L. was spending a lot of time communicating on Discord with a person known on the internet as "Markymoo." The communications were written, audio and videoconference, and sharing pictures and videos, all of which services are provided by Discord.

103.    The Discord communications with Markymoo seem to confirm that it was Sager who is the Reporting Party.

104.    On 06-03-2024, CPS social worker Crystal Nelson arrived at the Lyashchenko house on Sunrise Drive in Redding. S.L. pretended to be scared of her parents, who have never given her any reason to be afraid.

105.    S.L. walked outside barefoot in gravel. S.L.'s mother Alexandra noticed this and brought S.L.'s flip-flops and set them on the steps, so S.L.'s feet would be protected. This would later be falsely characterized by County as "throwing a shoe at her."

106.    Another person involved in corruptly influencing S.L. is Defendant Dr. Patricia Dougherty, CEO of the Phoenix Charter Academy College View ("PCA"). Like County, PCA also has a policy under which they will "affirm" a student who claims to be "Transgender." Like County, Dougherty and others at the school will use "preferred pronouns," an alternative boy's name, etc.

107.    The Lyashchenkos have never abused their daughter S.L. in any way. The only issue is that the Lyashchenkos do not "affirm" their daughter as the boy S.L. now pretends to be.

108.    So-called "Gender Affirming Care," including "social transitioning," is physically and mentally harmful to teenagers such as S.L. who falsely believe they are "Transgender." In fact, there is no such thing as "Transgender." Sex is innate, biological and immutable.

109.    Puberty blockers and cross-sex hormones cause sterility, a lowering of IQ and a loss of bone density, among many other negative effects. Social transitioning, i.e. changing names and pronouns, makes it far more likely for a teenager to go on to puberty blockers and/or cross sex hormones.

110.    On November 19, 2025 the U.S. Department of Health and Human Services published a final, peer reviewed report titled "Treatment for Pediatric Gender Dysphoria—Review of Evidence and Best Practices" ("HHS Report").[1] The Report serves as handy starting point for this Court to consider the factual disputes that may arise in this case.

---

[1] See https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf

111.  According to papers filed in the ensuing Dependency Court prosecution of the Lyashchenkos, social worker Crystal Nelson would testify that S.L. prefers to identify as [boy's name] and would like to "explore transitioning."

112.  It is impossible to "transition" from being one sex to the other. Taken from the Policy and Gender Ideology, to "explore transitioning" is code for using puberty blockers and/or cross-sex hormones. In S.L.'s case "explore transitioning" would mean the use of testosterone and possibly a double mastectomy surgery.

113.  So-called "social transitioning" is the first step in the "Transgender" process. According to recent research, the vast majority of children and teens who socially transition go on to medical intervention, i.e. puberty blockers and cross sex hormones.

114.  S.L. "identifies" as a boy. However, it is not clear whether S.L. actually believes she *is* a boy. S.L.'s "Gender Identity" may be a Social Contagion driven by social media and "affirmed" by social workers, her psychiatrist, her court-appointed lawyer, the officials at her school, and unknown others.

115.  If not "affirmed," most teens who are gender dysphoric and identify as "Transgender" will desist from this false belief by the time they reach age twenty. "Affirming" a gender dysphoric teen, however, makes it far more likely that the teen will persist with the false belief.

116.  On the other hand, if it turns out that S.L. does have a deep-seated and persistent belief that she is really "Male" "on the inside," this would be a delusion. In reality, S.L. is Female. Period. No amount of adult "affirmation" or puberty blockers or hormones can change this biological fact.

117.  S.L. became Female at the moment of conception. Sex – Male *or* Female – is a biological trait and is immutable.

118.  Even in the highly unlikely event that S.L.'s "Transgender journey" is limited to "social transition," "affirming" a "Transgender" identity in a teen is mentally harmful and *not* in the child's best interest.

119.   County and the other Defendants knew or reasonably should have known that "affirming" S.L. is injurious to her.

120.   S.L. needs psychotherapy and possibly appropriate medication to overcome what is troubling her. She most certainly does **_not_** need "affirmation" of her false beliefs. Not by the social workers, not by her psychiatrist, not by school officials, not by her lawyer, not by the Court, and not by her Parents. As a factual matter, "affirming" a falsehood is injurious.

121.   An analogy is appropriate to illustrate the point. Instead of "Transgender" and cutting, suppose hypothetically S.L. was suffering from anorexia and bulimia. Suppose she had a healthy body weight, but her distorted self-image made her falsely believe she was fat, leading her to severely restrict her food intake. Suppose her body-image delusion was so severe she would induce her own vomiting, for fear of gaining a single pound. Should anyone who cared about her "affirm" this delusion? What if this hypothetical anorexic and bulimic S.L. insisted on getting gastric bypass weight loss surgery? Should health care professionals "affirm" her falsehood no matter what?

122.   County and all Defendants knew or should have known that the Lyashchenkos love their daughter S.L. and only want what is best for her.

123.   "Affirming" a teenage girl in the false and unhealthy belief that she is really a boy makes no more sense than "affirming" an anorexic in the false and unhealthy belief that she needs to lose weight.

124.   County and all Defendants knew that refusing to "affirm" S.L. is not "emotional abuse." Rather, it is good parenting in a tough situation.

125.   It was understood by County and all Defendants that, if the seizure and detention of S.L. and the prosecution of her parents was to go forward, lies had to be fabricated and maintained. This understanding was the basis for the formulation of the Policy.

126.  As quoted and discussed below, County stated numerous falsehoods in its 06-05-2024 Petition for Juvenile Dependency, and the other papers filed in conjunction with the ensuing criminal prosecution in Dependency Court.

127.  County's falsehoods include that the Lyashchenkos threatened to harm S.L.'s pet birds, that Alexandra threw a shoe at S.L., that Plaintiffs threatened that S.L. would be made to live in a shed, that S.L. parents abandoned her, that Alexandra threatened to kill herself or harm herself due to S.L. wanting to be "Transgender," or due to S.L. wanting to "explore transitioning," or due to any reason whatsoever.

128.  On 06-05-2024 County filed a Juvenile Dependency Petition, signed by Defendant Nikki Quintana.  The 06-05-2024 Petition states that:

> The child, [S.L.] is at risk of continued emotional abuse by the parents, Alexandra Lyashchenko and Andriy Lyashchenko, due to their inability to support the child in their gender identity exploration causing emotional harm.

129.  "Inability to support" is false.

130.  Under the circumstances, "at risk" and "emotional abuse" are unwarranted and indeed unprecedented conclusions of law.

131.  County's 06-05-2024 Petition goes on to state:

> The child, [S.L.] wants to explore transitioning, but the parents do not support them [sic] and will not use the preferred pronouns.

132.  County contends that "transitioning" from one sex to the other is possible when in fact it is impossible. Of course, the Lyashchenkos do not "support" their daughter S.L. in pretending to be a boy and of course they do not call her "he," "him" or "they." It will be proven, as a factual matter, that such "social transitioning" almost always leads to medical transitioning. The process is injurious to the point of being disabling. "Affirmation" is decidedly _not_ in the child's best interest.

133.  County's 06-05-2024 Petition next states:

> The child, [S.L.], has reported cutting themselves[sic] on their [sic] legs due to the conflict, isolating themselves, and that they[sic] would "kill themselves"[sic] if they had to remain in the home of the parents.

134.    It is true that S.L. has been self-harming and threatening to kill herself for a long time. She is troubled and clearly needs mental health care, which her parents have provided and would continue to provide. It may be true that S.L. *said* it is "due to the conflict" with her parents, but a much better explanation is that that S.L's troubles are due to S.L.'s mental health problems in general. Both government detention and "affirmation" make S.L.'s mental health worse, not better.

135.    County's 06-05-2024 Petition then says:
> On 06/03/2024, the child [S.L.], has reported that they[sic] are called digusting[sic] things such as an "it child," told they are "sick in the head'" and "fucked in the head," is threatened with harm to their[sic] pet birds, is told they[sic] will have to live out in a shed, and that the mother threatens to harm herself due to [S.L.] wanting to be transgender or explore gender identity.

136.    It is categorically false that Plaintiffs ever threatened harm to S.L.'s pet birds. It is categorically false that Plaintiffs ever threatened that S.L. would have to live out in a shed. It is categorically false that Alexandra ever threatened to harm herself due to [S.L.] wanting to be Transgender, explore Gender Identity, or for any reason.

137.    To the extent "explore Gender Identity" means anything, here it means for a physically healthy teenage girl to experiment with the harmful drug testosterone, a fact which County admitted. See *infra*.

138.    It is misleading that Plaintiffs ever called S.L. "it" or an "it child." Neither of S.L.'s Parents are native English speakers. They frequently speak to S.L. in Russian and/or Ukrainian language, which S.L. understands perfectly well, having lived her whole life in a proud legal immigrant family. Phrases that are polite and appropriate in the native language may be translated in a way that sounds offensive in English.

139.    County states:
> The child, [S.L.], was put on a 5150 hold in the past for mental health and is diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

140. The above is true – S.L. was put on a "5150" hold in 2019 because she was already cutting and threatening to kill herself. S.L. was diagnosed with ADHD. This is years prior to her adolescent-onset or Rapid Onset Gender Dysphoria ("ROGD") at the age of 14. ROGD primarily affects teenage girls, and is widely believed among professionals to be a Social Contagion. Most boys with Gender Dysphoria discover this earlier in childhood, and most grow up to be gay.

141. County continues with its diatribe:
> On 06/03/2024, the child [S.L.], was observed to be shaking, nervous, asked the social worker to "help them" [sic] during the interview, and hid behind the social worker.

142. While troubled, S.L. is also highly intelligent. Frankly, she gets her intelligence from her parents. Andriy is a senior software engineer, while Alexandra is a linguist. Both parents hold advanced college degrees. S.L. has a younger brother, M.L. who is also very smart.

143. A highly intelligent 15-year-old girl is more than capable of falsely playing the victim. This is especially true today with social media personalities like Markymoo teaching her the "Transgender Playbook." Sager, Dougherty, Anderson, Horan, and all the County social workers were only too happy to reinforce the coaching and grooming.

144. Andriy sardonically said to a Sheriff's Officer on 06/03/2024 that the only "abuse" S.L. endures is "doing the dishes."

145. Playing the victim and pretending to be afraid of one's parents is part of the Transgender Playbook. Regardless of how she learned, S.L. now knows the Transgender Playbook by heart.

146. S.L.'s purported fear of her Parents is entirely fabricated.

147. County stated:
> On 06/03/2024, the parents became irate with the social worker [Nelson], emotional, started yelling, did not believe the social worker, reported they did not want the child any longer, reported they did want the child, that the child ruined the mothers [sic] life, refused home access, and the child ran out of the home while the mother threw a shoe at the child.

148.  It is categorically false that the Lyashchenkos "reported" that they did not want the child any longer. They love S.L. and are very concerned for her. When Defendant Nelson was seizing S.L. and first accusing her parents of "emotional abuse," the Lyashchenkos were shocked and may have said things in outrage, and/or sadness and/or despair. Any parent would understand this.

149.  Neither S.L. nor Nelson nor anyone at County believed or took seriously the notion that the Lyashchenkos didn't want S.L., and Defendants knew that it was misleading to say so. Yet they did say so, according to the Policy.

150.  At no time did Alexandra throw a shoe at S.L. Alexandra noticed that S.L. was barefoot while Nelson was seizing her. In fact, S.L. had been coached to be barefoot because it "adds to the drama." It's part of the Transgender Playbook. Alexandra brought S.L.'s shoes out and put them on the steps.

151.  County concludes by stating:

> On 06/03/2024, the child [S.L.], reported being connected to an individual on the internet that is a seventeen year old male. The Agency has concerns that the child is being groomed and could be at risk of CSEC [Commercial Sexual Exploitation of Children] activity.

152.  The allegedly seventeen-year-old alleged Male is "Markymoo." Markymoo's identity and true age is not known.  The Lyashchenkos are also concerned that S.L. is being groomed by Markymoo.

153.  In addition to Markymoo, S.L. is also being groomed and/or coached by Sager, Dougherty, and the social worker Defendants. The prospect of sexual grooming is greatly *increased* by S.L.'s current circumstance of being in foster care.

154.  On 06-11-2024, Crystal Nelson filed, i.e. published a "Notice of Child Abuse Central Listing" ("Child Abuse Notice") into the Child Abuse Central Index ("CACI") on each of the Plaintiffs, stating that the "County has determined that the allegation of child abuse or severe neglect against you is substantiated." This statement is false. No child abuse and no severe neglect occurred by the Lyashchenkos.

155.    The Child Abuse Notice states that "County Child Welfare Services agency has completed an investigation of alleged child abuse or severe neglect and determined that the allegations of abuse or severe neglect are substantiated."

156.    The statement "County Child Welfare Services agency has completed an investigation of alleged child abuse or severe neglect and determined that the allegations of abuse or severe neglect are substantiated" is false in multiple respects.

157.    While the Child Abuse Notice was filed a little over one week after the seizure and detainment of S.L., County's investigation lasted at least 6 months. It may be ongoing yet, this is not clear.

158.    What is clear is that County has filed three different Petitions against the Lyashchenkos. The third Petition, filed 02-03-2025, does *not* allege that the Lyashchenkos engaged in "emotional abuse" of S.L. Judge Bigelow ultimately found that the Lyashchenkos were never abusive to S.L. at all, and that S.L.'s mental illness is through **no fault** of the Lyashchenkos.

159.    By 6-11-2024 when it filed the Child Abuse Notice, County's investigation had certainly not been completed.

160.    Moreover, at no time did County find that the allegations against the Lyashchenkos of abuse or severe neglect were substantiated, contrary to the filed Child Abuse Notice. The Child Abuse Notice states that it may be used by "Law enforcement agencies, court Investigators, probation departments and district attorneys."

161.    On 6-11-2024 when Nelson published the multiple false statements in CACI, she knew them to be false. Nelson further knew her false statements would injure the Lyashchenkos reputation and would cause them severe emotional distress. Nelson did not care. She was intent on lying and injuring Plaintiffs because it conforms to the Policy.

162.    On 06-13-2024, Shasta County Sheriff's Office filed a Report by officer Jared Foster, related to the 06-03-2024 seizure of S.L. ("Sheriff's Report"). As to "Offense," the

1  Sheriff's Report states "300 WI," presumably referring to WIC § 300.   Andriy and
2  Alexandra are both listed as "suspects."

3  163.  The Sheriff's Report falsely lists S.L. as being "male." Officer Foster knew that
4  S.L. is female, but he lied on the Report. Foster admits that "S.L. was born a biological
5  female," but then falsely claims that she "is in the process of transitioning into a male."

6  164.  It is impossible for a Female to "transition" into a Male. Foster knew about this
7  falsehood. However, Foster was intent on fabricating falsehoods in concert with County
8  and the other Defendants, and in compliance with the Policy.

9  165.  On 06-27-2024, County conducted a "Child & Family Team Meeting." Under the
10  heading of "worries/questions/things to discuss", County states that "[boys name]" does
11  not want to say the reasons why the Agency is involved at this time."

12  166.  On 06-27-2024, at County's Team Meeting, Andriy and Alexandra asked what
13  exact behavioral changes the Agency is looking for to address the alleged emotional
14  abuse. County Social worker Jennifer Szephegyi-Johnson relied on her training and
15  clearly expressed County's Policy of "affirmation," stating that the CPS is wanting to "see
16  willingness from the parents" to accept "[boys name]" as "he" prefers to "be identified."

17  167.  On 7-02-2024, the Lyashchenkos objected to Nelson's filing of false allegations of
18  child abuse in CACI by filing a Request for Grievance Hearing.

19  168.  On 7-08-2024, CACI Coordinator Katherine Fish wrote the Lyashchenkos a letter
20  stating, "Your request for a grievance hearing is denied due to the pending dependency
21  case in a court of competent jurisdiction."

22  169.  At no time has any government agency offered the Lyashchenkos a hearing
23  regarding CACI. The false allegations of child abuse remain in CACI to this day, causing
24  Plaintiffs extreme mental anguish constantly.

25  170.  "Affirming" S.L. is harmful to S.L. Ms. Szephegyi-Johnson knows or reasonably
26  should know this. Ms. Szephegyi-Johnson is acting according to County's Policy or

27

28

custom to "affirm" teens who say they are "Transgender," and this is the basis to seize children from parents who are normal good parents.

171.    In Kenefick's foster house, S.L. was made to live with a Male roommate, Kenefick's teenage son A.F. On 07-24-2024 Alexandra asked if there was a foster placement for S.L. without males being present. Social Worker Ms. Szephegyi-Johnson explained that "California law" allows [S.L.] to be placed with "other males" if "he" identifies as a "male," regardless of "his biological sex." The term "biological sex" is redundant—"sex" will suffice because sex is a biological trait.

172.    Defendant Shannon Anderson plays a crucial role in executing the Policy, that of alienating children from their Parents.

173.    Here, Anderson alienated S.L. from her Parents by acting much like a gestapo worker, or gatekeeper between S.L. and her Parents.

174.    Anderson was instrumental in cancelling scheduled visits. Anderson would always take sides with S.L. regarding visits. Anderson knew, or should have known, that giving a teenage girl everything she wants is not in her best interest.

175.    In another incident, Anderson was observed to physically block S.L. from coming towards her Parents.

176.    Anderson openly discriminates against the Lyashchenkos based on national origin, language and culture.

177.    Anderson outwardly espouses Gender Ideology, consistently referring to S.L. as "he/him" and using her fictitious boy's name. Inside, however, Anderson knows or reasonably should know that "affirming" the falsehood is intentionally harmful to S.L., and therefore intentionally harmful to her Parents.

178.    Anderson is therefore lying, but she perpetrates the lies for the same reason as do the other Defendants: it serves the Policy.

179.   Margaret "Maggie" Kenefick is the foster care provider with the house where S.L. was placed. Kenefick has a biological son "A.F." who is about S.L.'s age. A.F. and S.L. share a room together, over Plaintiffs' objections.

180.   Kenefick wants to adopt S.L., because it is in her financial interest to do so. Adoption is also in County's financial interest. However, because (like most parents) the Lyashchenkos will never allow S.L. to be adopted, the Policy dictates that this must be a Forced Adoption.

181.   On 07-24-2024, Social Worker Jennifer Szephegyi-Johnson confirmed that, now that she is in government custody, S.L. is at-risk for CSEC (Commercial Sexual Exploitation of Child).

182.   Since the beginning, all Defendants have openly desired a Forced Adoption. This was intended to cause, and did cause, great emotional distress upon the Lyashchenkos.

183.   On 08-13-2024, County filed a Disposition Report. Among other things, this Disposition Report stated:

> [Forced] **Adoption** is expected to be recommended as the permanent plan.
>
> The option to participate in **adoption planning** and to voluntarily relinquish the child for adoption has been discussed with the parents.
>
> The identified concurrent **plan is adoption**.
>
> The caregiver [Maggie Kenefick and her husband Walter Albert] is **open to adoption** if Family Reunification is unsuccessful.
>
> That the permanent **plan could be adoption**, a legal guardianship, or another planned permanent living arrangement.
>
> That if the permanent **plan is adoption, parental rights will be terminated**.
>
> [S.L.] seems particularly interested in starting hormones. "He" asked if "he" were to be **adopted could "his" new parent agree to hormones**.

184.   By "hormones," County specifically refers to the use of testosterone.

185.   It is a fact that the use of testosterone by girls and women has never been proven effective in treating gender dysphoria. All Defendants knew this, or reasonably should have known this.

186.   It is a fact that the use of testosterone by girls and women greatly increases the risk of liver cancer. All Defendants knew this, or reasonably should have known this.

187.   All Defendants were too motivated by money and advancing the Policy to care about the harm inflicted on S.L. or her Parents (the Lyashchenkos) by S.L. using testosterone. The harm inflicted by Defendants was therefore intentional. At minimum, Defendants and each of them acted with a reckless disregard for whether the use of testosterone for treating gender dysphoria was harmful or not.

188.   On 09-05-2024, County filed an Amended Juvenile Dependency Petition. This Petition was again signed by Defendant Nikki Quintana, another County social worker. The 09-05-2024 Petition was a duplicate of the 06-05-2024 Petition except that the first paragraph of the supporting facts section is crossed out, and instead states:

> The child, [S.L.], is unable to be maintained in the home of the parents, Alexandra Lyashchenko and Andriy Lyashchenko, as the minor's gender identity is in conflict with the parents' fundamental values **reflecting their cultural background**, which has caused emotional abuse to the minor.

189.   The 09-05-2024 Petition contends that S.L. claims the reason "he" is self-harming is because "he" fears going back to "his" parents. This is quite odd, considering S.L. has been self-harming since at least 2019, when she was ten, while only claiming to be "Transgender" since 2023, when she was fourteen.

190.   Further, S.L.'s contention that her Parents' refusal to "affirm" her is the cause of her self-harming is also belied by the fact that her cutting and self-harming continue in government custody. Clearly the Lyashchenkos are not the cause of S.L.'s cutting and self-harming

191.   During the 10-08-2024 Child and Family Team (CFT) meeting, S.L. alleges that if "he" did not have "his" friend Markymoo to talk to for support when "he" was in the care of "his" parents, "he" probably would have killed "himself".

192.   On 01-08-2025, at a doctor's appointment, County alleged that S.L. "did begin to hyperventilate, cry and shake." According to County, this was due to Alexandra coming

too close to "him." This is false. Neither of S.L.'s parents have ever given her any reason to fear them. S.L. has been coached to behave this way. County knew the statement was false.

193.    On 02-03-2025, County filed yet another Juvenile Dependency Petition, the Second Amended Petition and third overall. Again it was signed by social worker Nikki Quintana. This time, much of the previous version was crossed out, including the part blaming Andriy and Alexandra's "cultural background."

194.    Indeed, the Second Amended Petition has completely deleted "emotional abuse" and deleted *all* blame attributed to the Lyashchenkos. Now, the Petition states:

> The child, [S.L.], is unable to be maintained in the home of the parents, Alexandra Lyashchenko and Andriy Lyashchenko, due to the minor's severe anxiety, depression, withdrawal, and untoward aggressive behavior toward self and others.

> The child, [S.L.] was put on a 5150 hold in the past for mental health. The child has had one psychiatric assessment in which the child was found to meet the criteria for Borderline Personality Disorder (BPD), and is diagnosed with Gender Dysphoria (GD), Oppositional Defiant Disorder (ODP), and Generalized Anxiety Disorder (GAD).

> Due to the child's struggles with severe mental illness, the parents are not capable of providing appropriate care.

195.    Curiously, this version of the Petition no longer blames Andriy and Alexandra for their daughter's mental health issues, but nevertheless contends they are not capable of providing appropriate care.

196.    On 01-02-2025, County Social Worker Jennifer Szephegyi-Johnson filed a JV-220 requesting the Superior Court approve S.L. taking psychotropic medications, particularly the anti-depressant Seroquel, in addition to refilling S.L.'s Methylphenidate for ADHD, which goes by various brand names including Ritalin.

197.    On 03-08-2025, the Superior Court Granted County's JV-220.

198.    On 05-05-2025 a Dispositional hearing took place at which the Lyashchenkos' attorney Leesa Webster offered into evidence at Exhibits M45 and M46 the federal government report "Treatment for Pediatric Gender Dysphoria; Review of Evidence and

1  Best Practices." The Report was not entered into evidence.  The Court stated only "that it
2  will retain Mothers **Exhibits M45 and M46** with the Court file for the Courts
3  consideration."

4  199.    It is worth noting that under Cal. Evidence Code § 452, official acts of the executive
5  department of the United States are judicially noticeable. The relevance of a Report on
6  treatment for gender dysphoria is obvious – County's agents diagnosed S.L. with gender
7  dysphoria, are affirming her "social transition," and are treating her mental health in a
8  multitude of ways.

9  200.    For example, in or about January 2025, County sent S.L. to the BNI Treatment
10  Center in Agoura Hills, CA. While there, S.L. was prescribed various psychotropic
11  medications.

12  201.    Also, S.L. was prescribed birth control pills. Why would S.L. need birth control
13  pills if she is "really" male? S.L was a virgin in June 2024 when she was taken from her
14  parents. Who is S.L. having sex with now? Is it Kenefick's teenage son A.F., with whom
15  S.L. is allowed to share a bunkbed in a small room? Does S.L. have an STD, or did she? Is
16  S.L. pregnant? Did S.L. have an abortion or take the "morning after pill?" Given S.L. was
17  prescribed birth control pills, these are reasonable factual questions about the now 17-
18  year-old teenage girl.

19  202.    Defendant Michael Horan was appointed as minor's counsel to represent the
20  interest of S.L. Horan manifestly failed to do so. In fact, Horan deliberately worked
21  against S.L.'s interest from his appointment to the present.

22  203.    Horan was motivated by money, and not the least bit concerned with S.L.'s best
23  interest.

24  204.    In addition to social transition, "affirming" S.L., includes supporting her use of
25  testosterone.

26  205.    Horan "affirms" S.L. in the false belief that she is Male or "Transgender." Horan
27  refers to S.L. using the boy's name, and using he/him pronouns. Horan knows this to be

28

1    false, but he "affirms" because it is in conformity with the Policy, and in his own financial

2    interest.

3    206.    Social transitioning is not in S.L.'s best interest because, among other things, it

4    greatly increases the likelihood of the use of puberty blockers and testosterone, both of

5    which are ineffective and harmful.

6    207.    At all relevant times, Horan knew and believed that social transitioning is not in

7    S.L.'s best interest.

8    208.    At all relevant times, Horan knew the following facts: that the use of testosterone by

9    a physically healthy teenage girl is extremely dangerous, that testosterone causes sterility,

10   that testosterone greatly increases the likelihood of liver cancer, that there is no high-

11   quality evidence that testosterone benefits the purely psychological condition of gender

12   dysphoria. At minimum, Horan acted with a reckless disregard for the whether

13   testosterone is or is not safe and effective for use by a physically healthy teenage girl such

14   as S.L.

15   209.    Horan knew that using the false boy's name and pronouns referring to S.L. in the

16   presence of her Parents would cause them severe emotional distress. He did so anyway,

17   because he intended to harm, and was successful in harming Andriy and Alexandra.

18   210.    Horan encouraged then 16-year-old S.L. to share bedroom with A.F., a 16-year-old

19   unrelated male. As such, Horan disregarded S.L.'s safety and health, posing a grave risk

20   of harm to her.

21   211.    All of Horan's challenged actions were in conformance with County's Policy.

22   212.    On 06-02-2025, the Judge Bigelow stated that the "Court takes the matter UNDER

23   SUBMISSION as of June 02, 2025 regarding Disposition. A written ruling shall issue."

24   213.    On 08-29-2025 Judge Bigelow issued "Disposition Findings and Orders." This

25   Order appears self-contradictory and confusing. First, Judge Bigelow Ordered that S.L.

26   "be declared a dependent of the Shasta County Juvenile Court pursuant to §300 W&I

27

28

1    Code Subsection (c)." But Judge Bigelow also Ordered that "physical custody be returned

2    to the parents, Andriy Lyashchenko and Alexandra Lyashchenko."

3    214.    Plaintiffs do not understand how physical custody is returned to them, and yet S.L.

4    is a dependent of the government. How can both be true?

5    215.    Judge Bigelow's 08-29-2025 Order states that "The parents have the capacity and

6    means of providing appropriate care for the physical and mental wellbeing of the child,"

7    and that "No evidence suggests that the parents intentionally harmed the child." And yet,

8    S.L. remains in government custody. Why?

9    216.    Judge Bigelow's 08-29-2025 Order also states that "The parents have **continuously**

10    engaged, mental health professionals to support the mental health needs of the child," that

11    S.L. has been diagnosed with "Borderline Personality Disorder, Gender Dysphoria,

12    Oppositional Defiant Disorder, Generalized Anxiety Disorder, and Attention Deficit

13    Hyperactivity Disorder," and that "the parents are committed to obtaining all necessary

14    mental health services for the child to address the child's known mental health

15    conditions."

16    217.    Nothing in Judge Bigelow's 08-29-2025 Order suggests that the Lyashchenkos are

17    at fault for any of S.L.'s problems. And yet, S.L. remains in government custody. Why?

18    The false and defamatory "Child Abuse Notice" remains on file, despite the

19    Lyashchenkos' diligent efforts to expunge it. Why?

20    218.    Both of S.L.'s parents are in tremendous emotional pain, day and night, as a direct

21    and proximate result of Defendants' intentional actions.

22    219.    Judge Bigelow's 08-29-2025 Order contains this bizarre statement:
              The likely date by which [S.L.] may be returned to and safely
23            maintained in the home or placed for adoption, appointed a legal
              guardian, placed permanently with a relative, or placed in an identified
24            placement with a specific goal: August 15, 2025.

25

26    220.    First, apart from "safely maintained in the home," this statement directly contradicts

27    the order of physical custody returned to the Lyashchenkos. Second, August 15, 2025 is

28    two weeks *before* the date of the Order.

221.  The true meaning of the 08-29-2025 Order is twofold. One, the Defendants will detain S.L. for as long as possible, regardless of the facts, because it is in their financial interest to do so. Two, the Defendants will inflict as much emotional distress upon the Lyashchenkos as possible.

222.  On 11-25-2025, Szephegyi-Johnson stated that:
> [County] is recommending that Reunification Services be terminated to both [Andriy and Alexandra Lyashchenko] and that [S.L.] remain in [government custody].

223.  "Reunification Services" is a euphemism for the false pretense that County ever intended to "reunify" S.L. with the Lyashchenkos. In fact, at no time did any of these Defendants ever intend to "reunify" the child they took in the first place, unless and until the Lyashchenkos would begin to "affirm" S.L. in the false belief that she is Male, and otherwise completely submit to the falsehoods of Gender Ideology, i.e. submit to the Policy.

224.  If the Lyashchenkos submitted to the Policy, it would constitute a coerced confession. They are not about to do that.

225.  Not only do Defendants and each of them obtain money by executing the Policy, but in fact Defendants and each of them derive personal gratification and enjoyment knowing that they have inflicted and continue to inflict brutal emotional pain upon other people, including the Lyashchenkos.

226.  At this writing, 543 days have passed since S.L. was taken. Despite having dropped all claims of "abuse," Defendants nevertheless contend that the Lyashchenkos are not capable of providing S.L. with the mental health care she needs, so she remains in government custody. This, despite the fact that S.L. has engaged in self-harm by cutting herself on at least two occasions during this time.

## VII.    JOINT ACTION TEST - ARGUMENT WHY THESE NOMINALLY PRIVATE ACTORS SHOULD BE SHOULD BE HELD AS *DE FACTO* STATE ACTORS FOR CIVIL RIGHTS PURPOSES

227.    The U.S. Supreme Court established precedent under which private actors will be held as *de facto* state actors, such that a § 1983 claim will lie against them. *Adickes v. S.H. Kress & Co.* 398 U.S. 144 (1970) ("*Adickes*"), and see also *Smith v. Brookshire Bros.*, 519 F.2d 93 (5th Cir. 1975); *Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999).

228.    Where "the state has so far insinuated itself into a position of interdependence with the [defendant] that it was a joint participant in the enterprise." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1267 (11th Cir. 2003) ("*Focus*"), citing *Willis v. Univ. Health Servs.*, 993 F.2d 837 (11th Cir. 1993), quoting *National Broad. Co., Inc. ("NBC") v. Communications Workers of Am.*, AFL-CIO, 860 F.2d 1022, 1026-27 (11th Cir. 1988)) (other citations omitted). A court will examine whether the government and the acting party are "intertwined in a symbiotic relationship," as well as whether the relationship involves "the specific conduct of which plaintiff complains." *Id.*

229.    The U.S. Supreme Court has found that under the "joint action" test a private party can be fairly said to be a state actor where a private party is a "willful participant in joint action with the State or its agents." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 923, 102 S. Ct. 2744, 2746 (1982) ("*Lugar*").

230.    Under the "symbiotic relationship" test a private party can be fairly said to be a state actor where "the state has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

231.    Here, all Defendants are intertwined in a symbiotic relationship to promote Gender Ideology. All Defendants are intertwined in a symbiotic relationship to advance their individual financial interests while promoting County's Policy of harming children and fabricating falsehoods.

232. All Defendants' actions are mutually beneficial. County needs the Policy because obtaining Title IV-D federal funding depends on the number of children seized. The more falsehoods, the more children seized and therefore, the more money received.

233. However, County's Policy is dependent on the coordinated actions of others who are nominally private actors – Defendants Sager, Dougherty, Horan, Kenefick and unknown others.

234. As a psychiatrist, Defendant Sager knew that "affirming" a teenage girl in the false belief that she is Male is harmful to her. However, "affirming" makes it far more likely that S.L. will continue to be detained, and thus the execution of the Policy will be more profitable all the way around.

235. Similarly, as the CEO of a school, Defendant Dougherty knew that "affirming" a teenage girl in the false belief that she is Male is harmful to her. However, "affirming" makes it far more likely that S.L. will continue to be detained, and thus the execution of the Policy will be more profitable all the way around.

236. As a provider of a house for foster care, and a parent, Defendant Kenefick knew that allowing her own teenage son to room with a teenage girl is extremely dangerous for the girl. Kenefick knew that a Forced Adoption was never in S.L.'s best interest, but she advocated for it anyway. Kenefick knew that Gender Ideology is nonsense.

237. The Policy favors Gender Ideology, even though it is false. The Policy favors Forced Adoption, whether it is in the child's best interest or not.

238. As an attorney and minor's counsel, Defendant Horan owes a duty of candor to the tribunal, and owes S.L. a duty to act in her best interest. Horan intentionally failed both.

239. Defendant Horan maintained the falsehood that "affirming" is good for S.L. Horan knows perfectly well that testosterone is ineffective at treating gender dysphoria, that it causes sterility, and greatly increases the risk of liver cancer. Horan does not care.

240. Horan, Sager, Horan and Kenefick each could and should have spoken up at any point and said, "S.L. is forever female. Affirming is not in the child's best interest.

1    Testosterone is harmful. Forced Adoption is harmful." But none of them said anything.

2    Instead, they each played their role, conforming to Gender Ideology, because it was in

3    each one's financial interest to do so. That is the Policy. In each case, the Policy requires

4    conspiratorial cooperation with nominally private actors, here Sager, Dougherty,

5    Kenefick, Hogan and others unknown.

6    241.    The Nominally Private Actor Defendants were and are willful participants in

7    County's Policy.

8    242.    Therefore, the Nominally Private Actors should be held as *de facto* government

9    actors for civil rights purposes.

10

11

12    **VIII.  CAUSES OF ACTION**

13    **CAUSE OF ACTION No.**

14    **42 U.S.C. § 1983 – Violation of Substantive Due Process**
     **Judicial Deception and Civil Conspiracy**

15    **(Plaintiffs v. Shasta County Health and Human Services Agency, Patricia**

16    **Dougherty, D.Ed. as *de facto* govt. actor, Michelle A. Sager, M.D. as *de facto* govt.**

17    **actor, Margaret "Maggie" Kenefick as *de facto* govt. actor and Michael Horan as**
     ***de facto* govt. actor)**

18

19    243.    Plaintiffs repeat and incorporate by reference the facts stated above.

20    244.    Substantive due process protects individuals from the arbitrary deprivation of their

21    liberty by government. *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006); see also

22    *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (stating that substantive

23    due process "forbids the government from depriving a person of life, liberty, or property

24    in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept

25    of ordered liberty'").

26    245.    The U.S. Supreme Court has long ago and consistently found that the Liberty

27    Clause in the Fourteenth Amendment provides the parents have a clearly established

28    fundamental right to direct the upbringing of their children, including the right to make

medical decisions for their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

246.    The U.S. Supreme Court has noted the "historic respect—indeed, sanctity would not be too strong a term—traditionally accorded to the relationships that develop within the unitary family." *Michael H. v. Gerald D.*, 491 U.S. 110, 123 (1989). The Due Process Clause protects parents' "fundamental liberty interest … in the care, custody, and management of [their] child[ren]." *Santosky v. Kramer*, 455 U.S. 745 at 753. "Parents and children have a well-elaborated constitutional right to live together without governmental interference," a "liberty interest protected by the Fourteenth Amendment." *Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126 at 1136.

247.    A substantive due process claim requires proof of two elements. "To make out a substantive due process claim, [plaintiff] must show two elements: a protectible interest and egregious official conduct". *Emmert Indus. Corp. v. City of Milwaukie*, 450 F. Supp. 2d 1164, 1175 (D. Or. 2006). First, "because there is no general liberty interest in being free from capricious government action," "a plaintiff must show a government deprivation of life, liberty, or property." *Brittain v. Hansen*, 451 F.3d 982 at 991. Second, only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846, citing *Collins v. Harker Heights*, 503 U.S. at 129.

248.    A substantive due process claim requires conduct that shocks the conscience. The shock-the-conscience standard sets an extremely high bar, reserved for only the most egregious official conduct. A conduct shocks the conscience when it is so brutal and offensive as to not comport with traditional ideas of fair play and decency. *Beecham v. Roseville City Sch. Dist.*, 2018 U.S. Dist. LEXIS 69876, *1

249.    To support a 42 U.S.C. § 1983 claim of judicial deception, the plaintiffs must show that defendants deliberately or recklessly made false statements or omissions that were material to a finding involving child custody. A plaintiff who provides direct evidence of

1 false statements can allege deliberate fabrication of evidence in violation of constitutional

2 due process guarantees. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1140 (9th Cir.

3 2021).

4 250.    The *only* reason that Defendants seized S.L. and took her away from her parents and

5 her little brother was that her parents did not "affirm" S.L.'s status as "Transgender." All

6 the other purported and ever-changing reasons are false and fabricated.

7 251.    Defendants and each of them knew, or reasonably should have known, that "gender

8 affirming care," including but not limited to "social transitioning," is harmful to teenagers.

9 At minimum, Defendants and each of them acted with a reckless disregard for whether

10 their own conduct was harmful or not.

11 252.    Defendants deliberately or recklessly stated that Plaintiffs threatened to harm S.L.'s

12 pet birds. This is false, and Defendants knew or reasonably should have known it was

13 false.

14 253.    Defendants deliberately or recklessly stated that Plaintiff Alexandra Lyashchenko

15 threw a shoe at S.L. This is false, and Defendants knew or reasonably should have known

16 it was false.

17 254.    Defendants deliberately or recklessly stated that Plaintiffs abandoned S.L. This is

18 false, and Defendants knew or reasonably should have known it was false.

19 255.    Defendants' conduct shocks the conscience in the constitutional sense. There is no

20 California or Federal legal precedent for CPS social workers acting in concert with a

21 psychiatrist, a school CEO, attorneys, health care professionals and others to seize a child

22 from her parents because the parents do not "affirm" their child's opposite-sex "Gender

23 Identity."

24 256.    There is no legal precedent for the idea that parents' failure to "affirm" the child's

25 opposite-sex "Gender Identity" constitutes "emotional abuse," or any kind of abuse.

26 257.    This complaint is *verified* under penalty of perjury, thus constituting direct

27 evidence, i.e. sworn testimony by Andriy and Alexandra Lyashchenko.

28

258.   Defendants and each of them knew, or reasonably should have known, that no California or Federal legal precedent holds that parents' failure to "affirm" their child constitutes "emotional abuse."

259.   Over the course of a year and a half, from April 2024-November 2024, Defendants communicated with each other and agreed do whatever it takes to detain S.L. and keep her detained. This agreement included fabricating and telling whatever lies were necessary. The story kept changing, as evidenced within the three Petitions brought against the Lyashchenkos (Original, First Amended and Second Amended). The third Petition (Second Amended) does not even allege that Plaintiffs committed emotional abuse, but S.L. remains in government custody to this day.

260.   Defendants, and each of them, had a financial incentive to conspire with the others. This conspiracy was partially funded by federal money under Title IV-D of the Social Security Act.

261.   As Plaintiffs understand it, the State of California must spend money in order to receive federal funding for CPS operations, which is then matched by the federal government. For every dollar a state spends on Title IV-D expenditures, it is generally reimbursed 66 cents by the federal government. This reimbursement requirement is "open ended," meaning there is no ceiling on the federal government's match of those expenditures.

262.   There are additional matching funds available, thus additional incentive, for a health care diagnosis.

263.   There are additional matching funds available, thus additional incentive, for a Forced Adoption.

264.   States finance the remaining 34 percent of CPS expenditures through various revenue streams, including Federal Incentive Payments and retained TANF Collections.

265.   The Nominally Private Actor Defendants, may or may not be directly compensated via Title IV-D. Even if not, they continue to have a financial interest in this conspiracy.

But for the plan to seize S.L., it becomes much less likely for their professional services to be required, and they each knew that.

266.  The Nominally Private Actor Defendants were each aware of the Policy. Each of them agreed to participate with County in executing the Policy.

267.  In particular, each Nominally Private Actor Defendant consistently perpetrated the key falsehoods of the Policy, collectively defined above as Gender Ideology. Each pretended that it is possible for a girl to change into a boy, knowing that it is not. Each pretended that Gender Affirming Care—including but not limited to social transitioning—is in S.L.'s best interest, knowing that it is not.

268.  In fact, Gender Affirming Care is harmful and ineffective, not safe and effective. Each Defendant knew that. At minimum, each Defendant acted with a reckless disregard for whether Gender Affirming Care is harmful and/or ineffective.

269.  At any point in time, each of the Nominally Private Actor Defendants could have spoken the truth—that S.L. was being intentionally harmed and therefore her Parents were being intentionally harmed. None of them did so.

270.  As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have suffered constitutional injury and severe emotional distress. The emotional distress is likely permanent.

271.  As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have paid over $130,000 in attorney fees, in an amount to be documented at trial.

272.  Therefore, Defendants and each of them are liable to Plaintiffs for a Substantive Due Process Claim, as they infringed on Plaintiffs' fundamental right to parent. Defendants   collectively are liable to Plaintiffs for a civil conspiracy to deprive Plaintiffs of their fundamental constitutional parental rights.

**CAUSE OF ACTION No.**
**42 U.S.C. § 1983 – Substantive Due Process**
*Monell* **Claim**

**(Plaintiffs v. Shasta County Health and Human Services Agency, Patricia Dougherty, D.Ed. as *de facto* govt. actor, Michelle A. Sager, M.D. as *de facto* govt. actor, Margaret "Maggie" Kenefick as *de facto* govt. actor and Michael Horan as *de facto* govt. actor)**

273.    Plaintiffs repeat and incorporate by reference the facts stated above.

274.    The elements for a Substantive Due Process claim are stated above in Cause of Action No. 1, *supra.* Many U.S. Supreme Court cases stand for the proposition that parents have the fundamental constitutional right to direct the upbringing of their children. *Supra.*

275.    To succeed on a *Monell* claim, Plaintiffs must establish that County had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation they suffered. Municipalities are subject to damages under § 1983 in three situations: when the plaintiff was injured pursuant to an expressly adopted official policy, a longstanding practice or custom, or the decision of a 'final policymaker.' *Ellins v. City of Sierra Madre,* 710 F.3d 1049, 1066 (9th Cir. 2013), citing *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 694-95 (1978) ("*Monell*").

276.    Here, County had a policy or custom under which they seize children from parents who do not "affirm" a child who asserts he or she is "Transgender."

277.    On information and belief, Michelle Sager is the anonymous "Reporting Party" who first complained to County about the Lyashchenkos' refusal to "affirm" S.L. Regardless of who the anonymous "Reporting Party" was, the initial allegation occurred *before* June 3, 2024.

278.    It stands to reason that, at the time the Reporting Party made the initial allegation, County must have already had a policy or custom to characterize a parent's failure to affirm "Transgender" as "emotional abuse."

279.    But for such a policy or custom, County would have informed the Reporting Party that the Lyashchenkos' refusal to "affirm" was insufficient. But for such a policy or

custom, County's Crystal Nelson would not have come to the house on Sunrise Drive on June 3, 2024, or ever.

280.   Crystal Nelson, and/or Jennifer Szephegyi-Johnson, and/or Nikki Quintana; and/or Shannon Anderson, individually or collectively, made the decision to seize and detain S.L. Such was the decision of a final policy-maker at Shasta County. At minimum, the decision to seize and detain S.L. was subordinate conduct which County ratified.

281.   *Monell* emphasized the importance of training social workers regarding the constitutional rights of parents being investigated. *Monell, supra*, 436 U.S. 658.

282.   Despite its utter falsehood, County trained its social workers, including Nelson, Szephegyi-Johnson Quintana and Anderson that Gender Ideology trumps the Lyashchenkos parental rights. Otherwise, County would not have seized S.L.

283.   The Nominally Private Actor Defendants were each aware of the Policy. Each of them agreed to participate with County in executing the Policy.

284.   In particular, each Nominally Private Actor Defendant consistently perpetrated the key falsehoods of the Policy, collectively defined above as Gender Ideology. Each pretended that it is possible for a girl to change into a boy, knowing that it is not. Each pretended that Gender Affirming Care—including social transitioning and testosterone—is in S.L.'s best interest, knowing that it is not.

285.   In fact, Gender Affirming Care is harmful and ineffective, not safe and effective. Each Defendant knew that. At minimum, each Defendant acted with a reckless disregard for whether Gender Affirming Care is harmful and/or ineffective.

286.   At any point in time, each of the Nominally Private Actor Defendants could have spoken the truth—that S.L. was being intentionally harmed and therefore her Parents were being intentionally harmed. None of them did so.

287.   County's decision to intentionally harm the Lyashchenkos by affirming S.L. was consistent with the Policy. At minimum, subordinates intentionally harmed the Lyashchenkos, and County ratified that decision.

288.    As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have suffered constitutional injury and severe emotional distress. The emotional distress is likely permanent.

289.    As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have paid over $130,000 in attorney fees, in an amount to be documented at trial.

290.    Therefore, Defendants and each of them are liable to Plaintiffs for a Substantive Due Process Claim under *Monell*, as they infringed on Plaintiffs' fundamental right to parent. Defendants collectively are liable to Plaintiffs for a civil conspiracy to deprive Plaintiffs of their fundamental constitutional parental rights.

**CAUSE OF ACTION No.**
**42 U.S.C. § 1983 – Equal Protection**
**Discrimination Based on National Origin**
**(Plaintiffs v. Shasta County Health and Human Services Agency)**

291.    Plaintiffs repeat and incorporate by reference the facts stated above.

292.    The Equal Protection Clause of the Fourteenth Amendment holds that County shall not:

> …deprive any person of life, liberty, or property, without…the equal protection of the laws.

293.    Defendant County clearly violated the Lyashchenkos' right to Equal Protection as it seized and detained S.L. due to the Lyashchenkos' national origin and "cultural background." County stated:

> The child, [S.L.], is unable to be maintained in the home of the parents, Alexandra Lyashchenko and Andriy Lyashchenko, as the minor's gender identity is in conflict with the parents' fundamental values **reflecting their cultural background**, which has caused emotional abuse to the minor.

294.    The protected characteristic is the Lyashchenkos' national and cultural background as being from Ukraine.

295. County simply defined the Lyashchenkos' Ukrainian nationality and "cultural background" as "emotional abuse." Andriy and Alexandra are not free to change where they are from, nor do they want to. They are very proud Ukrainians, now living in the United States as legal immigrants.

296. There is no dispute that County and its agents are government actors. County seized and detained S.L. because of the Lyashchenkos' "fundamental values" and their "cultural background," i.e. the fact that they will not "affirm" S.L. as "Transgender."

297. In addition to the overt and explicit statement regarding "cultural values," County agents repeatedly issued slurs against Andriy and Alexandra, indicating their discriminatory intent.

298. In a visitation with S.L. in November 2024, County agent Viktoriya Lazurenko forbid the Lyashchenkos from speaking their native language to their daughter, even though S.L. speaks and understands Ukrainian language just fine. County allowed the Lyashchenkos to speak "only English" to their daughter so that social worker Anderson "writes good reports to the Court."

299. In a Disposition Report, County agent Jennifer Szephegyi-Johnson referred to Alexandra as "Russian," knowing that she is Ukrainian, and knowing that there is a brutal war of aggression by Russia against Ukraine, and knowing that Alexandra would feel additional anger.

300. At all relevant times County knew, or reasonably should have known, that there is no such thing as "Gender Identity" or "Transgender."

301. As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have suffered constitutional injury and severe emotional distress. The emotional distress is likely permanent.

302. As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have paid over $130,000 in attorney fees, in an amount to be documented at trial.

303.   Therefore, County is liable to Plaintiffs for violating their fundamental constitutional parental rights based solely on national origin.

### CAUSE OF ACTION No.
### 42 U.S.C. § 1983 – Fourth Amendment
### Unreasonable Seizure
**(Plaintiffs v. Shasta County Health and Human Services Agency, Jared Foster in his official capacity, and Michelle A. Sager, M.D. as *de facto* govt. actor)**

304.   Plaintiffs repeat and incorporate by reference the facts stated above.

305.   There is no dispute that County and its agents are government actors. Defendant Michelle A. Sager M.D. should be held as a *de facto* government agent under the Joint Action Test.

306.   On June 3, 2024, acting on a false allegation of abuse by Sager, Social Worker Crystal Nelson seized S.L. from the Lyashchenkos' family home on Sunrise Drive in Redding, CA. Also present were at least 8 law enforcement officers, including Sheriff Deputy Jared Foster.

307.   No warrant and no court order was presented to the Lyashchenkos because none had been issued.

308.   No probable cause or exigent circumstances existed for seizure or detention of S.L.

309.   County and Sheriffs were operating on an anonymous tip of "emotional abuse" by a Reporting Party. On information and belief, the anonymous Reporting Party was S.L.'s psychiatrist Michelle Sager.

310.   The purported basis for seizing and detaining S.L. was that the Lyashchenkos' admitted refusal to "affirm" S.L. as "Transgender" and to acknowledge her supposed "Gender Identity" constitutes "emotional abuse."

311.   There is no such thing as "Transgender." It is impossible for a person to change from one sex into the other. The government's purported basis for seizing and detaining S.L. was false and inadequate because County and Sheriffs knew, or reasonably should have known, the fact that "Transgender" does not exist.

312. There is no such thing as "Gender Identity." At most, "Gender Identity" is an unfalsifiable subjective notion. The government's purported basis for seizing and detaining S.L. was false and inadequate because County and Sheriffs knew, or reasonably should have known, that "Gender Identity" does not exist.

313. All other purported justifications for seizing and detaining S.L. are false and fabricated.

314. There is no statutory justification for seizing and detaining a child based on the Parents' refusal to "affirm" the child's purported status as "Transgender." At all relevant times, County knew that no statutory justification existed.

315. There is no case law standing for the proposition that a child may be seized and detained based on the Parents' refusal to "affirm" the child's purported status as "Transgender." At all relevant times, County knew that no case law justification existed.

316. As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have suffered constitutional injury and severe emotional distress. The emotional distress is likely permanent.

317. As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have paid over $130,000 in attorney fees, in an amount to be documented at trial.

318. Therefore, County is liable to the Lyashchenkos for a Fourth Amendment claim of Unreasonable Seizure.

## CAUSE OF ACTION No.
### 28 U.S.C. § 2201 – Declaratory Judgment Re First Amendment Free Speech
### Facial and As-Applied Challenge to Judge Bigelow's Blanket Gag Order
### (Plaintiffs v. Hon. Molly Bigelow in her official capacity)

319. Plaintiffs repeat and incorporate by reference the facts stated above.

320. The Lyashchenkos say that the Blanket Gag Order has caused them to suffer constitutional injury under the First Amendment. The State of California disagrees. In California's view, the Blanket Gag Order represents a necessary exception to the First

1    Amendment's guarantee of free speech. Thus, an actual legal controversy exists between
2    the State of California and the Lyashchenkos.

3    321.    Over and over again, in hearing after hearing, Judge Bigelow stated, "the Court
4    admonishes the parties not to discuss these proceedings with anyone outside of the
5    Courtroom."

6    322.    The Lyashchenkos have published, and will continue to publish, their experiences
7    in Dependency Court and with Defendants, and about their case. They have published,
8    and will continue to publish, their opinions regarding Dependency Court in general, and
9    regarding the entire "Transgender" issue in general.

10   323.    On or about 11-07-2025, the Lyashchenkos received a threatening "Cease and
11   Desist"  letter from Phoenix Charter Academy's attorney Lee Rosenberg. The letter
12   alleges that the Lyashchenkos are engaging in publishing on social media "false and
13   highly inflammatory claims" about Defendant Dougherty. Rosenberg demanded the
14   Lyashchenkos stop posting, and immediately take down the previous posts.

15   324.    In fact, the posts in question are not false, nor do they reveal any confidential
16   information. Defendants may or may consider them "inflammatory," but all of the
17   Lyashchenkos' statements and postings are constitutionally protected speech under
18   *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (the "Brandenburg Test").

19   325.    On 11-10-2025, the Lyashchenkos responded to Rosenberg with a detailed 5-page
20   letter. The Lyashchenkos made legal arguments, and specifically requested that Rosenberg
21   provide quotations of any material that he contended was defamatory and/or
22   inflammatory. To date, Rosenberg has completely ignored the Lyashchenkos request for
23   quotations.

24   326.    The Lyashchenkos have not, and do not intend to take down any posts.

25   327.    Gag orders on trial participants are unconstitutional unless:

26          a. the speech sought to be restrained poses a clear and present danger or serious
27             and imminent threat to a protected competing interest;

28

1          b.  the order is narrowly tailored to protect that interest; and

2          c.  no less restrictive alternatives are available.

3    328.   A trial court **must** make express findings showing it applied this standard, and

4    considered and weighed the competing interests.

5    [*Hurvitz v. Hoefflin*, 84 Cal. App. 4th 1232, 1235, emphasis added]

6    329.   Judge Bigelow ordered the Lyashchenkos "not to discuss these proceedings with

7    anyone outside of the Courtroom." "These proceedings" defines the content that the

8    Lyashchenkos are purportedly disallowed from speaking. Thus, Judge Bigelow's Blanket

9    Gag Order is the very essence of a content-based prior restraint of free speech.

10   330.   At no time did Judge Bigelow consider or weigh any "competing interests"

11   regarding the Blanket Gag Order, i.e. the content-based prior restraint.

12   331.   Gag orders are not an appropriate method to protect confidential information from

13   disclosure, no matter how damaging or private that information may be. *Maggi v.*

14   *Superior Court*, 119 Cal. App. 4th 1218, 1219

15   332.   Prior restraints on speech are the most serious and the least tolerable infringement

16   on First Amendment rights. Orders enjoining the right to speak on a particular topic (here,

17   the Dependency Court proceedings] are disfavored and ***presumptively invalid***. However,

18   courts have recognized a prior restraint may be permissible under certain limited

19   circumstances. *Molinaro v. Molinaro*, 33 Cal. App. 5th 824, 825-826, emphasis added.

20   333.   The legal presumption is that this Blanket Gag Order is invalid. The burden is on

21   Judge Bigelow and the State of California to demonstrate its constitutionality.

22   334.   To establish a valid prior restraint under the federal Constitution, a proponent has

23   the heavy burden to show the countervailing interest is compelling, the prior restraint is

24   necessary and would be effective in promoting this interest, and less extreme measures are

25   unavailable. A permissible order restraining future speech must be couched in the

26   narrowest terms that will accomplish the pin-pointed objective permitted by constitutional

27   mandate and the essential needs of the public order. *Id.*

28

335.   Here, Judge Bigelow did not attempt, let alone succeed, to explain California's interest in the Blanket Gag Order, nor did she explain how this prior restraint was couched in the narrowest terms possible. This lawsuit represents her opportunity to now do so.

336.   The California Constitution is more protective of free speech rights than the federal Constitution, and California courts require extraordinary circumstances before a prior restraint may be imposed. Nonetheless, in determining the validity of a prior restraint, California courts engage in an analysis of various factors similar to the federal constitutional analysis, and injunctive relief restraining speech under the California Constitution may be permissible where the relief is necessary to protect private rights and further a sufficiently strong public policy. *Id.*

337.   At no time did Judge Bigelow or anyone explain what private rights are at issue, or what strong public policy is served by the Blanket Gag Order.

338.   Judge Bigelow issued the Blanket Gag Order upon no stated legal authority or reasoning whatsoever, and has effectively transformed the Shasta County Superior Court into a top-secret tribunal just like the infamously tyrannical Star Chamber of medieval England.

339.   The public have a strong interest in learning what takes place in a California Dependency Case. The public have a strong interest in learning what takes place at the Phoenix Charter Academy, a publicly funded school. The public are interested to learn the extent to which Gender Ideology has in our institutions become a "woke mind virus," to use Elon Musk's phrase.

340.   The State of California may have an interest in protecting the privacy of S.L., a minor child, but a minor's privacy may be accomplished by far less restrictive means that Judge Bigelow's Blanket Gag Order prohibiting the Lyashchenkos from discussing the Dependency proceedings at all.

341.   Narrow tailoring would consist of an order that, until she reaches the age of majority, S.L.'s name and her photograph are not to be published or discussed with anyone outside the courtroom. In other words, S.L. must be "de-identified."

342.   Narrow tailoring might also consist of a discussion of S.L's medical records, which are covered by the California Confidentiality of Medical Information Act ("CMIA") and by the federal Health Insurance Privacy and Portability Act ("HIPPA").

343.   However, there are __no__ restrictions on the use or disclosure of de-identified health information. See e.g. 45 C.F.R. §§ 164.502(d)(2), 164.514(a) and (b).

344.   Similarly, there are __no__ restrictions on the use or disclosure of de-identified educational information either.

345.   As to the rest of the "proceedings" — those consist of protected speech, and this Court should so find.

346.   Furthermore, the Sixth Amendment guarantees the right to a "public trial." The proceedings in Judge Bigelow's court are certainly not public. Rather, Judge Bigelow's courtroom is top-secret.

347.   Currently, Judge Bigelow's courtroom is highly reminiscent of the "Star Chamber" from medieval England. An act of the British Parliament abolished the Star Chamber in the year 1641. This is because it was widely appreciated that secrecy leads to tyranny.

348.   Like all United States citizens who have been prosecuted, hailed into court and forced to stand trial, the Lyashchenkos have a right to a fair and *public* trial. Those two terms – "fair" and "public" – are deeply related. The entirety of American jurisprudence holds that for a trial to be fair, it *must* be public.

349.   U.S. Supreme Court Justice Oliver Wendell Holmes wrote that public access to judicial proceedings was "of vast importance" because of "the security which publicity gives for the proper administration of justice." Trials "should take place **under the public eye**," continued Justice Holmes, "because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that

1   every citizen should be able to satisfy himself with his own eyes as to the mode in
2   which a public duty is performed." *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court*,
3   20 Cal. 4th 1178, 1198 (1999), bolding added, quoting *Cowley v. Pulsifer*, 137 Mass. 392
4   (1884).

5   350.   Judge Bigelow has thus failed in her public duty.

6   351.   Due to its constitutional significance and difficulty in proving prejudice, when a
7   violation of the right to a public trial has occurred, as here, there is no requirement to
8   prove any specific prejudice to the defendants. "The right to an open public trial is not the
9   right of only the criminal defendant, but is rather a shared right of the accused and the
10  public, the common concern being the assurance of fairness." *People v. Esquibel*, 143 Cal.
11  App. 4th 645, 646

12  352.   The Lyashchenkos are criminal defendants in Dependency Court and thus have a
13  fundamental right to an open, public trial.

14  353.   Therefore, Judge Bigelow's Blanket Gag Order is unconstitutional under both the
15  U.S and California constitutions. The Court should issue a Declaratory Judgment that the
16  Lyashchenkos and all persons have the right to speak freely about these Dependency
17  Court proceedings, so long as they de-identify S.L., i.e. do not mention S.L.'s name,
18  publish her photograph, or publish identifying information.

19                        **CAUSE OF ACTION No.**
20  **28 U.S.C. § 2201 - Facial and As-Applied Challenges to Dependency Court**
    **(Plaintiffs v. Hon. Molly Bigelow in her official capacity)**
21
22  354.   Plaintiffs repeat and incorporate by reference the facts stated above.

23  355.   The Lyashchenkos say that Dependency Court has caused them to suffer
24  constitutional injury under both the U.S. Constitution and the California Constitution. The
25  State of California disagrees. In California's view, Dependency Court represents a
26  necessary exception to Defendants' ordinary rights in a criminal prosecution. Thus, an
27  actual legal controversy exists between the State of California and the Lyashchenkos.
28

356.    To start with, a Dependency Court prosecution and its ability to take a child from parents is clearly a *criminal* matter. Thus, the law should presume the Parents' innocence. Presently it does not. Currently a Dependency Court prosecution proceeds unless and until the parents prove their innocence. This is wrong.

357.    As with any criminal case, in Dependency Court the prosecutors should bear the burden of proof, while the standard of proof should be "beyond a reasonable doubt." Under current law, the standard appears to be "preponderance of the evidence," as with a civil case. This too is wrong.

358.    It is Plaintiffs' understanding that the State of California believes there is no right to a jury trial in a California Dependency Case. Plaintiffs find no statutory or case law precedent for that notion. What Plaintiffs do find is that:

> The **right to a trial by jury** as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties **inviolate**.

[Cal. Code Civ. Pro. § 661, bolding added]

359.    What is more, the Sixth Amendment to the U.S. Constitution states, in relevant part, that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by **an impartial jury**...

360.    At present, Judge Bigelow's courtroom is not speedy, it is not public, and it is not a jury trial. Rather, it is a very slow top-secret judge trial. This is blatantly unconstitutional. *Supra*.

361.    Under the Confrontation Clause it is also unconstitutional to maintain the anonymity of the "Reporting Party," i.e. the person or persons who made the initial allegations. If the Confrontation Clause means *anything*, it means knowing the identity of one's accuser.

362.    Therefore, the Court should issue a Declaratory Judgment that the Lyashchenkos and all Defendants in Dependency Court have right to the presumption of innocence, the right to confront their accuser (including the Reporting Party), and the right to a jury trial where the standard of proof is "beyond a reasonable doubt."

# CAUSE OF ACTION No.
## 28 U.S.C. § 2201 - Facial and As-Applied Challenges to WIC § 355
### (Plaintiffs v. Hon. Molly Bigelow in her official capacity)

363. Plaintiffs repeat and incorporate by reference the facts stated above.

364. The Lyashchenkos say that WIC § 355 has caused them to suffer constitutional injury under the Sixth Amendment. The State of California disagrees. In California's view, WIC § 355 represents a necessary exception to the hearsay rule. Thus, an actual legal controversy exists between the State of California and the Lyashchenkos.

365. WIC § 355 states in its entirety:

(a) At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300. Objections that could have been made to evidence introduced shall be deemed to have been made by a parent or guardian who is present at the hearing and unrepresented by counsel, unless the court finds that the parent or guardian has made a knowing and intelligent waiver of the right to counsel. Objections that could have been made to evidence introduced shall be deemed to have been made by an unrepresented child.

(b) A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d).

(1) For purposes of this section, "social study" means any written report furnished to the juvenile court and to all parties or their counsel by the county probation or welfare department in any matter involving the custody, status, or welfare of a minor in a dependency proceeding pursuant to Article 6 (commencing with Section 300) to Article 12 (commencing with Section 385), inclusive.

(2) The preparer of the social study shall be made available for cross-examination upon a timely request by a party. The court may deem the preparer available for cross-examination if it determines that the preparer is on telephone standby and can be present in court within a reasonable time of the request.

(3) The court may grant a reasonable continuance not to exceed 10 days upon request by any party if the social study is not provided to the parties or their counsel within a reasonable time before the hearing.

(c)(1) If a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based, unless the petitioner establishes one or more of the following exceptions:

(A) The hearsay evidence would be admissible in any civil or criminal proceeding under any statutory or decisional exception to the prohibition against hearsay.

(B) The hearsay declarant is a minor under 12 years of age who is the subject of the jurisdictional hearing. However, the hearsay statement of a minor under 12 years of age shall not be admissible if the objecting party establishes that the statement is unreliable because it was the product of fraud, deceit, or undue influence.

(C) The hearsay declarant is a peace officer as defined by Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, a health practitioner described in paragraphs (21) to (28), inclusive, of subdivision (a) of Section 11165.7 of the Penal Code, a social worker licensed pursuant to Chapter 14 (commencing with Section 4991) of Division 2 of the Business and Professions Code, or a teacher who holds a credential pursuant to Chapter 2 (commencing with Section 44200) of Part 25 of Division 3 of Title 2 of the Education Code. For the purpose of this subdivision, evidence in a declaration is admissible only to the extent that it would otherwise be admissible under this section or if the declarant were present and testifying in court.

(D) The hearsay declarant is available for cross-examination. For purposes of this section, the court may deem a witness available for cross-examination if it determines that the witness is on telephone standby and can be present in court within a reasonable time of a request to examine the witness.

(2) For purposes of this subdivision, an objection is timely if it identifies with reasonable specificity the disputed hearsay evidence and it gives the petitioner a reasonable period of time to meet the objection prior to a contested hearing.

(d) This section shall not be construed to limit the right of a party to the jurisdictional hearing to subpoena a witness whose statement is contained in the social study or to introduce admissible evidence

relevant to the weight of the hearsay evidence or the credibility of the hearsay declarant.

366.    WIC § 355 is unconstitutional under the Sixth Amendment, which holds, in part, that "in all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him…" This has come to be known as the Confrontation Clause.

367.    Having one's child taken away is most certainly a criminal punishment, thus a Dependency Court proceeding is a criminal prosecution. Therefore, the Lyashchenkos and all Dependency Court defendants shall enjoy the right to be confronted with the witnesses against them.

368.    The Hearsay Rule is law throughout the U.S. It is rooted in the Confrontation Clause. In California, Hearsay is defined under Evidence Code § 1200 to mean a statement made by someone other than the witness who is testifying, which is offered to prove the truth of the matter stated. In simpler terms, hearsay refers to statements made outside of court that are presented in court to establish a fact.

369.    Similarly, Hearsay is defined under the Federal Rules of Evidence as an out-of-court statement offered in court to prove the truth of the matter asserted in the statement. Fed. Rule Evid. 801.

370.    In both State and Federal Court, Hearsay is generally inadmissible, and for good reason—it violates the Confrontation Clause.

371.    A "social study prepared by the petitioning agency," is Hearsay by definition. It is a written document containing many out-of-court statements by various persons and offered for its truth.

372.    In fact, such a study is often double hearsay or even triple hearsay. The person who prepared the study is the declarant. For example, any time the study alludes to "it was reported that…," or "so-and-so said…," the declarant is admitting that they do not have personal knowledge of the facts, but are presenting a statement made by someone else and offering it for its truth, i.e. attempting to establish a fact.

1  373.   Therefore, the Court should issue a Declaratory Judgment that WIC § 355 is facially

2  unconstitutional under the Sixth Amendment. At minimum, it is unconstitutional as

3  applied to the Lyashchenkos.

**CAUSE OF ACTION No.**

**28 U.S.C. § 2201 - Facial and As-Applied Challenges to**

**Cal. Code Regs. Tit. 22, § 89387(a)(1)(C)**

**Allowing S.L. to Room with a Male**

**(Plaintiffs v. Hon. Molly Bigelow in her official capacity)**

8  374.   Plaintiffs repeat and incorporate by reference the facts stated above.

9  375.   The Lyashchenkos contend that it is an unacceptable risk to house a teenage girl

10  with a teenage boy. The State of California disagrees. California says that it is perfectly

11  acceptable to house a teenage girl with a teenage boy, so long as it is consistent with her

12  "Gender Identity," i.e. so long as the girl says she is a boy. Presumably, the reverse also

13  applies, i.e. when the teenage boy "identifies" as a girl. Thus, an actual legal controversy

14  exists between the State of California and the Lyashchenkos.

15  376.   The term "Gender Identity" is meaningless. As the U.S. Department of Health and

16  Human Services explained on 11-19-2025 in its Report "Treatment for Pediatric Gender

17  Dysphoria – Review of Evidence and Best Practices," ("HHS"):

> The term "gender identity" is an especially important example of how
> words can sow confusion. When first introduced in the 1960s, it meant
> "the sense of knowing to which sex one belongs, that is, the awareness
> 'I am a male' or 'I am a female'." Almost everyone has a gender
> identity in this sense, and moreover one that is congruent with their sex:
> males know that they are male, and females know that they are female.

> However, today the phrase "gender identity" is used in a significantly
> different way. For example, WPATH defines "gender identity" in the
> glossary to their current clinical practice guideline (SOC-8) as: "A
> person's deeply felt, internal, intrinsic sense of their own gender."

> This new definition is unclear. For instance, what does "gender" mean
> in this context? The glossary in SOC-8 offers little
> clarification—though it does correctly acknowledge that the word is
> highly ambiguous. One meaning of "gender" given in the glossary is
> "gender identity." But "gender" in the definition above cannot mean
> "gender identity," otherwise the definition would be circular. Another

meaning provided is "gender expression," but this too leads to
circularity, because "gender expression" is itself defined in the same
glossary in terms of "gender."

[HHS, pp. 34-35]

377.    Here, Plaintiff Alexandra expressed concern that her teenage daughter S.L. was roommates in foster care with an older teenage boy, the boy who happens to be Kenefick's son. However, at the 7-24-2024 Child & Team Meeting:

SW Jennifer [Szephegyi-Johnson] explains California law allows
[boy's name] to be placed with "other males" if "he" identifies as a
male, regardless of "his" biological sex.

378.    By "California law," Plaintiffs believe that Szephegyi-Johnson refers to Cal. Code Regs. Tit. 22, § 89387, which states, in relevant part:

(a) The caregiver shall provide bedrooms in the home which shall meet,
at a minimum, the following requirements unless a Documented
Alternative Plan (LIC 973) is approved:

(1) No more than two children shall share a bedroom.

(2) **Children of different sexes shall not share a bedroom unless**:

(A) A minor parent may share a bedroom with the minor parent's child
of a different sex.

(B) Each child is under 5 years of age, or:

(C) A Caregiver is **permitting a child to share a bedroom consistent
with their gender identity** regardless of the gender or sex listed on the
court or child welfare documents.

[22 CCR 89387, bolding added]

379.    Plaintiffs have an interest in protecting their teenage daughter from an unreasonable risk of pregnancy, STDs, and/or sexual exploitation because she shares a room with a teenage boy at the foster house operated by Margaret "Maggie" Kenefick.

380.    Until recently, Cal. Code Regs. Tit. 22, § 89387 stated that children of different sexes shall not share a bedroom. There was nothing about "Gender Identity." The wisdom of this is obvious to any parent, and should be obvious to any lawmaker.

381.    Plaintiffs are unable to find any legislative history regarding when and why Cal. Code Regs. Tit. 22, § 89387 was amended to include now "Gender Identity."

382.   According to HHS, the term "Gender Identity" is meaningless. To the extent the term has any meaning, it is entirely subjective. There is no test or measurement that can possibly be made to ascertain a teenager's "Gender Identity." If a teenager says they are "male," then their "Gender Identity" is male, and that is that.

383.   It is dangerous to allow a teenager the mere possibility of manipulating California law this way. If a teenage boy is in the foster care system and wants to be roommates with a teenage girl, and wants the possibility of having sex with a her, all he would have to do is claim a "Female" "Gender Identity." Such a claim is not falsifiable—there is no way to prove or disprove this type of claim one way or the other.

384.   The wisdom in the original law remains. It said that "Children of different sexes shall not share a bedroom." The reasoning does not change simply because a teenager now claims to "identify" as the opposite sex. Famously, teenagers are hormonal and known to frequently desire having sexual relations. However, teenagers generally lack the maturity to make sound decisions about such things.

385.   The use of testosterone by a teenage girl is known to increase her libido dramatically.

386.   Under the Liberty Clause, Parents have a fundamental constitutional right to control the upbringing of their child, including prohibiting a teenage girl from rooming with a teenage boy. By inserting "Gender Identity," Cal. Code Regs. Tit. 22, § 89387(a)(1)(C) now infringes on the Lyashchenkos rights.

387.   Therefore, the Court should issue a declaratory judgment that, when their child is in foster care, a parent has the right for their child to be housed only with members of the same sex, regardless of any claimed "Gender Identity."

**CAUSE OF ACTION No.**
**Intentional Infliction of Emotional Distress and Civil Conspiracy**
**(Plaintiffs v. Shasta County Health and Human Services Agency, Patricia Dougherty, D.Ed. in her individual capacity, Michelle A. Sager, M.D. in her individual capacity, Margaret "Maggie" Kenefick in her individual capacity, and Michael Horan in his individual capacity)**

388.   Plaintiffs repeat and incorporate by reference the facts stated above.

389.   Outrageous conduct is a factual question. *Cross v. Bonded Adjustment Bureau* (1996) 48 Cal. App. 4th 266, 283 (outrageous conduct is a fact question where reasonable minds may differ); *So v. Shin* (2013) 212 Cal.App.4th 652, 672 ("whether conduct is 'outrageous' is usually a question of fact.").

390.   Here, each Defendant knew that human sex is an immutable biological trait, yet each pretended to believe that S.L. is "Transgender." Each Defendant helped fabricate multiple falsehoods. At minimum, each Defendant knew that falsehoods had been fabricated.

391.   Because the falsehoods were fabricated in order to (a) seize and detain S.L. and (b) to make money, Defendants' conduct was outrageous.

392.   Defendants and each of them intended to cause the Lyashchenkos emotional distress; or Defendants acted with reckless disregard of the probability that the Lyashchenkos would suffer emotional distress.

393.   The Lyashchenkos have suffered and continue to severe emotional distress over Defendants' seizing of S.L. They suffer depression, anger, and mental anguish, among other symptoms. The severe emotional distress may be permanent.

394.   Defendants' conduct was a substantial factor in causing the Lyashchenkos severe emotional distress.

395.   Therefore, Defendants are jointly and severally liable to the Lyashchenkos for Intentional Infliction of Emotional Distress, and a civil conspiracy to same.

## IX.   PRAYER FOR RELIEF

396.   Wherefore, Plaintiffs pray for relief jointly and severally against all Defendants except Judge Bigelow / State of California, as follows:

      a.   General Damages – to compensate Plaintiffs for pain and suffering, in an amount deemed reasonable, but not less than $20,000,000.

b. Money Damages – to compensate Plaintiffs for money out-of-pocket and in the future for medical expenses, in an amount to be documented at trial, but not less than $500,000.

c. Punitive Damages – in an amount determined by the jury, calculated to punish and deter Defendants

397.  As against Judge Bigelow / State of California, Plaintiffs pray for:

a. **Declaratory Judgment** – that defendants to Dependency Court proceedings shall hereafter be presumed innocent and offered a trial by jury; that the standard of proof shall hereafter be "beyond a reasonable doubt;" that the name of the "Reporting Party" shall be made known from the inception; that Welfare and Institutions Code § 355 violates the Confrontation Clause by allowing hearsay and by automatically construing the hearsay as reliable;

b. **Declaratory Judgment** - that Cal. Code Regs. Tit. 22, § 89387(a)(2)(C) violates California's duty to protect its citizens, that the term "Gender Identity" is meaningless, and that subsection (C) is therefore deleted entirely;

c. **Declaratory Judgment** – that Judge Bigelow's Blanket Gag Order constitutes an impermissible prior restraint and violates the First Amendment's guarantee of free speech; that all persons are prohibited from publishing a minor child's name, photo or identifying information, but that all other speech about a Dependency case is a matter in the public interest, and therefore protected speech.

d. **Permanent Prohibitory Injunction** – prohibiting the State of California from conducting a court trial in a Dependency Court prosecution, unless and until Defendant has waived the right to a jury trial. The injunction should also include prohibitions against enforcement of anonymity of the Reporting Party.

e. **Permanent Prohibitory Injunction** – prohibiting the State of California from enforcing the accusatory hearsay exception found in Welfare and Institutions Code § 355.

f. **Permanent Prohibitory Injunction** – prohibiting the State of California from enforcing Cal. Code Regs. Tit. 22, § 89387(a)(2)(C) to the extent that it allows a minor Male to share a room with a minor female, regardless of how anybody "identifies."

g. **Permanent Prohibitory Injunction** – prohibiting the State of California from enforcing Judge Bigelow's Blanket Gag Order.

h. **Permanent Mandatory Injunction** – ordering the California Attorney General and the California Department of Justice to remove Andriy Lyashchenko and Alexandra Lyashchenko from its Child Abuse Central Index ("CACI").

398. Plaintiffs pray for reasonable attorney fees as allowed by statute, in an amount to be documented at trial.

399. Plaintiffs pray to recover the cost of the suit.

400. Plaintiffs pray for all other relief the Court or the jury deems appropriate.

## X.    DEMAND FOR JURY TRIAL

401. Plaintiffs hereby demand a trial by jury on all issues so-triable.

Respectfully submitted on 12/1/2025,

*Andriy Lyashchenko*
Andriy Lyashchenko
Plaintiff *in pro per*

*Alexandra Lyashchenko*
Alexandra Lyashchenko
Plaintiff *in pro per*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

XI.   **VERIFICATIONS**

**ANDRIY LYASHCHENKO**

I am a Plaintiff to this lawsuit, the husband of Alexandra. S.L. is our daughter. I have made a thorough review of all the factual allegations stated in the above complaint. These facts are within my personal knowledge, and I each attest to the accuracy thereof. As to those facts alleged on information and belief, I believe those things to be true, as reasonable inferences from the facts which are within my personal knowledge. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted on 12/1/2025,

_Andriy Lyashchenko_

Andriy Lyashchenko

**ALEXANDRA LYASHCHENKO**

I am a Plaintiff to this lawsuit, the wife of Andriy. S.L. is our daughter. I have made a thorough review of all the factual allegations stated in the above complaint. These facts are within my personal knowledge, and I each attest to the accuracy thereof. As to those facts alleged on information and belief, I believe those things to be true, as reasonable inferences from the facts which are within my personal knowledge. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted on 12/1/2025,

_Alexandra Lyashchenko_

Alexandra Lyashchenko

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Andriy Lyashchenko
Alexandra Lyashchenko

**DEFENDANTS**

SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY, et. al.

**(b)** County of Residence of First Listed Plaintiff **Shasta**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Shasta**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Numbers)*

In pro per

Attorneys *(If Known)*

n/a

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | Liability / ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 340 Marine / Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / Liability | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | | **PERSONAL PROPERTY** | | (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Product Liability / ☐ 380 Other Personal | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| | ☐ 360 Other Personal / Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | Exchange |
| **REAL PROPERTY** | Injury / ☐ 385 Property Damage | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 362 Personal Injury - / Product Liability | Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | Medical Malpractice | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☒ 440 Other Civil Rights / **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 442 Employment / ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party 26 USC 7609 | Agency Decision |
| | ☐ 443 Housing/ / Sentence | | | ☐ 950 Constitutionality of State Statutes |
| | Accommodations / ☐ 530 General | | | |
| | ☐ 445 Amer. w/Disabilities- / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities- / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | Other / ☐ 550 Civil Rights | | | |
| | ☐ 448 Education / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - | | | |
| | / Conditions of | | | |
| | / Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983, S. 28 U.S.C. § 2201

Brief description of cause:
County seized and detained minor child for Parents' failure to "affirm" transgender

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$20,000,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
12/3/2025

SIGNATURE OF ATTORNEY OF RECORD
/Andriy Lyashchenko  in pro per/

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____