Andriy Lyashchenko
Alexandra Lyashchenko
20119 Sunrise Drive, Redding, CA 96003
508-250-8597
alyas77@gmail.com
alexandraed@gmail.com
Plaintiffs *in pro per*

**FILED**

JAN 15 2026

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### REDDING COURTHOUSE

| | |
|---|---|
| Andriy Lyashchenko and Alexandra Lyashchenko<br><br>Plaintiffs,<br><br>v.<br><br>Shasta County Health and Human Services Agency; Shasta County Sheriff's Office; Crystal Nelson; Jennifer Szephegyi-Johnson; Nikki Quintana; Shannon Anderson; Jared Foster; Patricia Dougherty, D.Ed.; Michelle A. Sager, M.D. as an individual, and as *de facto* government actor; Michael Horan; Margaret "Maggie" Kenefick; The Office of The California Attorney General; and Does 1-100,<br><br>Defendants. | Case No. 2:25-CV-03494-DAD-DMC-PS<br><br>VERIFIED FIRST AMENDED COMPLAINT<br><br>Claim 1: 42 U.S.C. § 1983 (Unwarranted Seizure)<br><br>Claim 2: 42 U.S.C § 1983 (Judicial Deception / Excessive Duration of Continued Detention)<br><br>Claim 3: 42 U.S.C. § 1983 (Discrimination Based on National Origin)<br><br>Claim 4: 42 U.S.C. § 1983 (Unwarranted Medical Interventions)<br><br>Claim 5: 42 U.S.C. § 1983 – *Monell*-Related Claims<br><br>Claim 6: Intentional Infliction of Emotional Distress<br><br>Claim 7: 28 U.S.C. § 2201 – Constitutional Challenge to Gag Orders<br><br>JURY TRIAL DEMANDED |

## I.    INTRODUCTION

1.    When two loving Orthodox Christian parents refuse to "affirm" their 15-year-old daughter in her self-reported belief that she is "Transgender," does this constitute "emotional abuse" sufficient for County to seize and detain the child?

2.    Does it violate civil rights when County alleges that the parents' "cultural background has caused emotional abuse" to the 15-year-old girl?

3.    Does the 15-year-old girl's contention that her parents will make her "live out in a shed" justify a warrantless removal, when a reasonable investigation would have shown that "the shed" is actually a nice 3-bed, 2-bath guest house with a full kitchen, heating, air conditioning and Wi-Fi?

4.    Does it constitute judicial deception when County falsely contends there is such a thing as a "Transgender" child, knowing that there is not?

5.    Is it constitutional when the government changes its story repeatedly, first adding that the immigrant parents' "cultural background" is "emotional abuse," then later entirely dropping the original allegation—that the parents' refusal to "affirm" the child constitutes "emotional abuse"—yet still not returning the child?

6.    Does Shasta County have a policy or custom to seize and detain children based on the parents' refusal to "affirm" a teen's self-reported status of "Transgender?"

7.    Under the accepted standards of evidence-based medicine, are interventions for Gender Dysphoria such as "social transitioning," "puberty blockers," and "cross-sex hormones" injurious to the point of being disabling, and should Defendants have known this fact?

8.    Did these Defendants plan and act in concert to advance their financial goals, knowing full well—but not caring—that "gender affirming care" is harmful?

9.    Plaintiffs Andriy and Alexandra Lyashchenko ("Plaintiffs," the "Lyashchenkos" or "Parents") are the legally-married, college-educated biological parents of their daughter S.L. The Lyashchenkos are proud legal immigrants from Ukraine.

2

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT

10.    Born in 2008 in Kyiv, Ukraine, at this writing S.L. is seventeen years old. S.L. has a little brother, M.L., who is currently eight.

11.    One day in June 2024, acting on an anonymous allegation of "emotional abuse," County CPS agent Crystal Nelson came to the Lyashchenkos' house on Sunrise Drive in Redding, CA intending to seize S.L. Responding to Nelson's call, later that day no less than *eight* law enforcement squad cars arrived.

12.    In June of 2024, S.L. was a rebellious fifteen-year-old teenager. But the problem goes back in time much further than that. Unfortunately, S.L. has had very troubling mental health problems for years.

13.    For instance, in 2019, at age ten, S.L. began self-harming—cutting herself, and threatening to kill herself. At that time, the family lived in Massachusetts. S.L. was placed on a "5150" hold for 11 days at the Taravista Behavioral Health center in Devens, MA. Of course, S.L.'s Parents were very concerned, and at all times were committed to providing her the very best of mental health care.

14.    S.L. had previously been diagnosed and prescribed medication for Attention Deficit Hyperactive Disorder ("ADHD"). Since then, she has been diagnosed with Major Depressive Disorder, Oppositional Defiance Disorder and Borderline Personality Disorder.

15.    According to County, while in government custody, S.L. was allegedly diagnosed with Gender Dysphoria. It is not known who may have diagnosed S.L with Gender Dysphoria. In fact, with most minors claiming the entirely psychological condition Gender Dysphoria are essentially self-diagnosed.

16.    Plaintiffs are unsure of what S.L.'s current diagnoses may be. She has now been in government custody since June 2024—twennty months and counting.

17.    In around March 2023, at age 14, S.L. began identifying as "Male" or "Transgender."

18.    As with most teenage girls who now identify as "Transgender," it is quite likely that this newfound identity began as a Social Contagion, fueled by social media and reinforced by professionals who "affirm" her.

3

19.    In sharp contrast, most boys who identify as "Transgender" began doing so at a much younger age. Such boys most often grow up to be gay men.

20.    There is a possibility that S.L. believes she is "really" Male "on the inside," in which case her "Transgender" identity would be a delusion. Regardless of whether S.L. is truly delusional, the notion that she is "really" Male is patently false. S.L.'s mental health requires that reality takes precedence over delusion and/or falsehood.

21.    An internet personality known as "Markymoo" has been highly influential in S.L.'s beliefs. The interaction between S.L. and Markymoo was on Discord, a popular social media and discussion forum site. See http://discord.com. Markymoo is purported to be Male and about two years older than S.L., but Markymoo's true sex and age are unknown.

22.    Also influential in S.L.'s beliefs is Defendant Michelle A. Sager, M.D. the Director of Psychiatry for Children's Legacy Center ("CLC") in Shasta County. On many occasions, Dr. Sager treated S.L. for her mental illness. Instead of helping, Dr. Sager injured both S.L. and her Parents by "affirming" S.L. as "male," and further alienating S.L. from her Parents.

23.    Dr. Sager convinced S.L. that her Parents were "emotionally abusive" because they did not "affirm" her.

24.    On information and belief, Dr. Sager is the anonymous "Reporting Party" that first made the "emotional abuse" allegation to County.

25.    Like County, Dr. Sager has a policy or custom of "affirming" her patients who self-identify as "Transgender."

26.    Also influential in S.L.'s beliefs is Defendant Patricia Dougherty, D.Ed., the CEO and Principal at the Phoenix Charter Academy College View ("PCA"), a publicly funded school that S.L. attended at the relevant time.

27.    Like County and Dr. Sager, Dr. Daugherty and PCA also have a policy or custom of "affirming" students who self-identify as "Transgender."

28.    County, Sager, Dougherty and all Defendants knew, or should have known, the facts that (a) "affirming" a "Transgender" child is harmful in and of itself, and (b) "affirming" makes it much more likely that the "Transgender" person will go on to take puberty blockers

4

and/or cross-sex hormones, thus compounding the injury. At minimum, all Defendants acted with a reckless disregard for whether "affirming" the status of "Transgender" is harmful to minors or not.

29. Prior to the June 2024 detention by County, S.L. was coached by Markymoo, by Sager, and possibly by unknown others, all of whom instructed S.L. on how to persuade government officials of her "Transgender" status and of her "emotional abuse" at the hands of her Parents.

30. This coaching (aka the "Transgender Playbook") was straightforward: claim a Male "Gender Identity," act afraid of your Parents, and blame your Parents' non-affirmation for your mental health issues.

31. On June 03, 2024, allegedly under authority of Welfare and Institutions Code § 300, County social worker Crystal Nelson and law enforcement officers seized S.L. and took her away from her Parents.

32. On June 05, 2024, County filed in the Superior Court a Juvenile Detention Petition and a Detention Report, launching the Dependency Court prosecution. The allegation was that Plaintiffs Andriy Lyashchenko (father) and Alexandra Lyashchenko (mother) have committed "emotional abuse" of S.L. by refusing to affirm her as "Transgender."

33. It is true that the Lyashchenkos do not "affirm" S.L.

34. There are two basic reasons why the Lyashchenkos do not "affirm" their daughter as "Transgender." First, they are Orthodox Christian. Under this religious belief system, "Transgender" is a disfigurement of the body, and not acceptable. Second, and more importantly, "Gender Affirming Care" is mentally and physically harmful to children and teens. Indeed, it is disabling.

35. No good parent, aware of the facts regarding social transition, puberty blockers and cross sex hormones will "affirm" their child's false belief that they are "really" the opposite sex. No good parent will allow their "Transgender" child to subject themselves to the mentally and physically disabling consequences of "Gender Affirming Care."

36.    In addition to causing sterility, the use of testosterone by Females causes a great increase in the likelihood of liver cancer. There are many other detrimental health consequences of these drugs.

37.    In its papers, County consistently refers to S.L. as "male," using a specific boy's name and Male pronouns. Indeed, Dependency Court Judge Molly Bigelow, the social workers, and minor's counsel have all referred to S.L. as "Male" throughout the Dependency proceedings.

38.    Defendants all know that S.L. is Female, yet each persisted with the "Gender Identity" falsehood. S.L. is Female and always will be. Nothing anyone does can possibly change this fact.

39.    In addition to it simply being false, refusing to "affirm" S.L. as "Transgender" is not "emotional abuse" or any kind of abuse because there is no California or Federal statute or any legal precedent holding so.

40.    As a matter of law, failure to "affirm" is not grounds to seize a child from her parents, and all Defendants knew this. However, as a matter of fact, Defendants all knew that County receives federal funding based on every child seized and detained. Additional medical diagnoses mean *more* money. A Forced Adoption means *even more money* yet.

41.    Thus, it became imperative for County and the other Defendants to fabricate and maintain a false pretext on which to seize and detain S.L. indefinitely.

*42.*    As cited below, in cases such as *Troxel v. Granville, Parham v. J.R., Santosky v. Kramer* and many others, the U.S. Supreme Court has long and consistently recognized that there exists a fundamental right to family unity in the Liberty Clause of the Fourteenth Amendment.

43.    The Ninth Circuit in *Benavidez v. County of San Diego* stated in no uncertain terms that judicial deception is grounds for a civil rights case.

44.    In 1978, the U.S. Supreme Court held in *Monell* that a civil rights case may be founded on showing that the County has a policy or custom or improper training that violates a constitutional right.

6

45.    County's 6-5-2024 Original Petition was already unconstitutional. On 9-5-2024, County filed its First Amended Petition, going so far as to state that it was the **Lyashchenkos' "cultural background which has caused emotional abuse to the minor."** The Lyashchenkos are proud *legal* immigrants from Ukraine. This was blatant discrimination based on national origin, a violation of Fourteenth Amendment Equal Protection and of the Civil Rights Act of 1964.

46.    All Defendants knew and believed that they were violating the Lyashchenkos' constitutional rights, but they didn't care. Money spoke much louder.

47.    On 02-03-2025 County filed its Second Amended Petition, in which County **abandoned its contention that the Lyashchenkos were abusive *at all*.** And yet, S.L. remains detained in government custody to this day—20 months and counting.

48.    From the outset, the seizure and detention of S.L. constitutes actions taken or decisions made by municipal officials with final decision-making authority, which caused a violation of Plaintiffs' civil rights.

49.    In addition to Fourteenth Amendment liberty and equal protection, this case also arises under the First Amendment, which guarantees the right to freedom of association and to free speech. At numerous times Dependency Court judge Hon. Molly Bigelow admonished the Lyashchenkos "not to discuss these proceedings with anyone." In response to a published article, Judge Bigelow ordered Plaintiff not to publish court documents.

50.    On information and belief, Judge Bigelow relies on California Rule of Court 8.47 for the idea that the entire Dependency Court proceeding is confidential. This clearly conflicts with the First Amendment and the entirety of U.S. Supreme Court precedent, which holds that any prior restraint of speech must be "narrowly tailored." Protecting S.L.'s privacy may be accomplished with far less restrictive means than the Gag Orders Judge Bigelow purported to issue.

51.    On a theory of County's vicarious liability, this case also arises because Defendants intentionally devastated the Lyashchenkos emotionally. County seized and detained a

mentally unhealthy teenage girl from her good parents, for no particular reason other than they will not "affirm" her self-identified status as "Transgender."

52. Defendants' conduct here is thus outrageous. On that basis Plaintiffs pursue a claim for Intentional Infliction of Emotional Distress. Plaintiffs are injured, both constitutionally and emotionally, by Defendants whose conduct was beyond all bounds of decency.

## II. JURISDICTION

53. Original federal subject matter jurisdiction is conferred on this Court by 28 U.S.C. §1343(3) and 1343(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331(a) because claims for relief derive from the United States Constitution and the laws of the United States. Jurisdiction of this Court over any claim for Declaratory Relief is conferred by 28 U.S.C. §2201.

54. This federal court should assert Supplemental Jurisdiction over the state law claim, as it arises from the same nucleus of operative facts giving rise to the federal Civil Rights and Declaratory Judgment claims.

## III. VENUE

55. Venue properly lies in the Eastern District of California, Redding Courthouse, in that the events and circumstances herein alleged occurred in Redding, CA.

## IV. PARTIES

56. **Plaintiff Andriy Lyashchenko ("Andriy" or "Father")** – the husband of Alexandra, the father of S.L. (b. 2008) and M.L. (b. 2017). He is a legal immigrant from Ukraine. He is educated, trained and working as a software engineer.

57. **Plaintiff Alexandra Lyashchenko ("Alexandra" or "Mother")** – the wife of Andriy and the mother of S.L. She is a legal immigrant from Ukraine. She is educated, and trained as a linguist. She is a currently a stay-at-home mother.

58. **Defendant Shasta County Health and Human Services Agency ("County" or "CPS")** – investigates alleged abuse and neglect of children, licenses foster homes,

8

provides child welfare services for families under the jurisdiction of the Juvenile Court and provides adoption services.

59.    **Defendant Shasta County Sheriff's Office -** a law enforcement agency responsible for maintaining public safety and order in Shasta County, California.

60.    **Defendant Michelle A. Sager, M.D. her individual capacity and as** *de facto* **govt. actor –** a psychiatrist who treated S.L. At the relevant times, Dr. Sager was Director of Psychiatry for Children's Legacy Center ("CLC") in Shasta County. CLC is a nongovernment agency partnering with multiple government agencies.

61.    **Defendant Patricia Dougherty, Ed.D.** – the CEO of Phoenix Charter Academy College View school in Shasta County.

62.    **Defendant Michael Horan** – an attorney and minor's counsel appointed by Judge Bigelow to represent S.L.

63.    **Defendant Margaret "Maggie" Kenefick** – foster care provider and bio mother of a teenage boy A.K, assigned to share a small room with S.L.

64.    **Defendant Office of the California Attorney General -** the chief legal office of the State of California, providing legal services to state agencies and litigating on behalf of the people of California.

## V.    DEFINTIONS

65.    **County -** Shasta County Health and Human Services Agency, its employees, agents and assigns.

66.    **The Policy –** County's practice of seizing and detaining children absent a court order, without a reasonable investigation and when no exigent circumstances exist. Here, County used parents' refusal to "affirm" a child's status of "Transgender" as a basis to prosecute for emotional abuse under WIC § 300 (c). The Policy also includes instructions to and agreements with agents and *de facto* agents to fabricate, endorse and repeat falsehoods as necessary, particularly such falsehoods as (a) "Transgender" people exist, (b) "Gender Identity" exists, (c) "Gender Affirming Care" is safe and effective, and (d) a trans-

9

identifying child is typically afraid of his or her parents. In short, the Policy includes but is not limited to the entirety of "Gender Ideology."

67.    **CPS** – "Child Protective Services," a widely-understood blanket term for federally-funded child welfare agencies present in every U.S. county, officially known by various other names such as Department of Child and Family Services ("DCFS"), Health and Human Services Agency ("the Agency"), Administration for Children and Families ("ACF"), etc.

68.    **Forced Adoption** – a court-ordered process in dependency cases that permanently severs the legal relationship between a parent and child without the parent's consent.

69.    **Nominally Private Actor** – Michelle A. Sager, M.D. who is a private actor on paper but a *de facto* government actor under one of the four applicable tests.

70.    **Reporting Party** – an anonymous person who first contacts County with an allegation of child abuse.

71.    **Blanket Gag Order** – Judge Bigelow's admonishment that the parties are "not to discuss these proceedings with anyone outside of the Courtroom."

72.    **January 2026 Gag Order** – Judge Bigelow's written order prohibiting the publication of court documents from the Dependency case, in reaction to the Lyashchenkos' participation in a January 7, 2026 article on reduxx.com by Anna Slatz entitled "California Family Loses Custody Of Daughter After Refusing To Medically 'Affirm' Her Transgender Identity," published at https://reduxx.info/california-family-loses-custody-of-daughter-after-refusing-to-medically-affirm-her-transgender-identity/.

73.    **Social Contagion** – the spontaneous spread of emotions, behaviors, and attitudes among individuals within a group. It occurs without conscious awareness and can lead to the transmission of both positive and negative behaviors. Specific to this case, Social Contagion refers to the spread of Gender Ideology through social media, primarily among teenage girls.

74.    **"Gender Affirming Care"** – social transition (the use of opposite sex name, pronouns, hairstyle and clothing), puberty blockers (GnRH analog drugs), cross-sex

10

hormones (estrogen for boys and testosterone for girls) and various surgeries (double mastectomy, phalloplasty, orchiectomy, penectomy, vaginoplasty); all falsely marketed as safe & effective, in reality experimental and injurious.

75.    **Male** – a human who has or will have the ability to produce sperm.

76.    **Female** – a human who has or will have the ability to produce ova.

77.    **Transgender** – the false belief that a human can change sexes.

78.    **Gender Ideology** – a dangerous mythological belief system teaching, inter alia, that human sex is a "spectrum" (rather than the Male-Female binary); that a human can change sexes (when sex is biological and immutable).

79.    **Gender Dysphoria** – a purely psychological condition in which a person's "Gender Identity" does not match their sex.

80.    **Gender Identity** – a subjective and ultimately meaningless term defined inconsistently by those who espouse Gender Ideology. See HHS discussion of the term, *infra.*

81.    **Discord** – an internet social media platform at http://discord.com that allows users to communicate by written text, audio and video conferencing, sharing pictures and videos, etc.

82.    **Transgender Playbook** – A political and emotional manipulation strategy under which a "Transgender" person learns to falsely portray himself or herself as a victim of those who refuse to "affirm," distracting from the fact that the "Transgender" person is being used as a "pawn" in a larger battle, here the Policy and Defendants' efforts to maximize their financial take.

## VI.    FACTS

### Background Facts About the Lyashchenko Family

83.    Plaintiffs Andriy Lyashchenko and Alexandra Lyashchenko are proud legal immigrants to the United States from Ukraine. Before S.L. was born, and continuing to the present, the Lyashchenkos are legally married.

11

84.    S.L. is a girl. In 2008, S.L. was born in Ukraine. Shortly afterwards, the Lyashchenkos immigrated to the U.S. In fact, Alexandra was nursing baby S.L. on the airplane.

85.    Unfortunately, S.L. is mentally unhealthy. At least since she was ten years old in 2019, S.L. has been cutting herself and threatening suicide. First diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), S.L. has since been diagnosed with Borderline Personality Disorder ("BPD"), and Oppositional Defiance Disorder ("ODD").

86.    The Lyashchenkos have always been, and continue to be, willing and able to provide mental health care for their daughter S.L.

87.    The Lyashchenkos have never abused their daughter S.L. in any way. The only issue is that the Lyashchenkos do not "affirm" their daughter as the boy S.L. now pretends to be.

88.    At no time did the Lyashchenkos "affirm" S.L. in her status as "Transgender." This is for two reasons. First, the Lyashchenkos are Orthodox Christian. Second, the purported "treatments" for Gender Dysphoria—including social transition, puberty blockers, and cross-sex hormones—are harmful to the point of being disabling, while never having been proven effective in the treatment of Gender Dysphoria under the standards of evidence-based medicine.

### General Facts About "Transgender" and "Gender Affirming Care"

89.    No California or Federal statute and no legal precedent exists for the proposition that parents' refusal to "affirm" their teenager's false belief in "Transgender" constitutes "emotional abuse." All Defendants knew this or reasonably should have known this.

90.    So-called "Gender Affirming Care," including "social transitioning," is physically and mentally harmful to teenagers such as S.L. who falsely believe they are "Transgender." In fact, there is no such thing as "Transgender." Sex is innate, biological and immutable.

91.    Puberty blockers and cross-sex hormones cause sterility, a lowering of IQ and a loss of bone density, among many other negative effects. Social transitioning, i.e. changing names and pronouns, makes it far more likely for a teenager to go on to puberty blockers and/or cross sex hormones.

92.    It is impossible to "transition" from being one sex to the other. Taken from County's Policy and Gender Ideology, to "explore transitioning" is code for using puberty blockers and/or cross-sex hormones. In S.L.'s case "explore transitioning" would mean the use of testosterone and possibly a double mastectomy surgery. These are not in the best interest of the child.

93.    So-called "social transitioning" is the first step in the "Transgender" process. According to recent research, the vast majority of children and teens who socially transition go on to medical intervention, i.e. puberty blockers and cross sex hormones.

94.    S.L. "identifies" as a boy. However, it is not clear whether S.L. actually believes she *is* a boy. S.L.'s "Gender Identity" may be a Social Contagion driven by social media and "affirmed" by social workers, her psychiatrist, her court-appointed lawyer, the officials at her school, and unknown others.

95.    If not "affirmed," most teens who are gender dysphoric and identify as "Transgender" will desist from this false belief by the time they reach age twenty. "Affirming" a gender dysphoric teen, however, makes it far more likely that the teen will persist with the false belief.

96.    On the other hand, if it turns out that S.L. does have a deep-seated and persistent belief that she is really "Male" "on the inside," this would be a delusion. In reality, S.L. is Female. Period. No amount of adult "affirmation" or puberty blockers or hormones can change this biological fact.

97.    S.L. became Female at the moment of conception. Sex – Male *or* Female – is a biological trait and is immutable.

98.    Even in the highly unlikely event that S.L.'s "Transgender journey" is limited to "social transition," "affirming" a "Transgender" identity in a teen is mentally harmful and *not* in the child's best interest.

99.    Under the standards of evidence-based medicine, the use of testosterone by girls and women has never been proven effective in treating Gender Dysphoria.

100.    The use of testosterone by girls and women greatly increases the risk of liver cancer.

13

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT

101. On November 19, 2025 the U.S. Department of Health and Human Services published a final, peer reviewed report titled "Treatment for Pediatric Gender Dysphoria—Review of Evidence and Best Practices" ("HHS Report").[1] This Report serves as handy starting point to consider the factual disputes that may arise in this case.

### Events Prior to County's Prosecution

102. In 2022, S.L. and her mother Alexandra attended a "well visit" with a doctor at Children's Legacy Center ("CLC"). Then age 13, S.L. asked for a referral for mental health. Although it took time, a referral was made to psychiatrist Michelle A. Sager, M.D.

103. In or about March 2023, both S.L. and her mother visited Dr. Sager at CLC. Although Alexandra came only one more time, S.L. continued to see Dr. Sager at CLC on a regular basis.

104. Also in or about March of 2023, then age 14, S.L. began identifying as "Transgender." Unbeknownst to her Parents until over a year later, she had chosen a boy's name for herself.

105. The 14-year-old girl S.L. complained to Dr. Sager about how her parents refused to "affirm" her as a boy. Rather than dissuading S.L.'s false belief that she was "really a boy," Dr. Sager instead "affirmed" S.L., knowing that such was harmful.

106. Dr. Sager did not care that she was harming S.L. Although fully aware of its false, dangerous and mythological nature, Dr. Sager outwardly purported to accept Gender Ideology because she was motivated by money. Dr. Sager figured that failing to "affirm" S.L. would make it likely that S.L. would leave Dr. Sager and go to a more "affirming" psychiatrist.

107. Sometime before 06-03-2024, County received an anonymous report that the Lyashchenkos were emotionally abusing their daughter S.L. This accusation was based on the truthful accusation that Lyashchenkos did not "affirm" S.L.

108. On information and belief, Dr. Sager was the anonymous "Reporting Party."

---

[1] See https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf

14

109.    During April – May 2024, S.L. was spending a lot of time communicating on Discord with a person known on the internet as "Markymoo." The communications were written, audio and videoconference, and sharing pictures and videos, all of which services are provided by Discord.

110.    The Discord communications with Markymoo seem to confirm that it was Dr. Sager who is the Reporting Party.

111.    Another person involved in corruptly influencing S.L. is Defendant Dr. Patricia Dougherty, CEO of the Phoenix Charter Academy College View ("PCA"). Like County, PCA also has a policy under which they will "affirm" a student who claims to be "Transgender." Like County, Dr. Dougherty and others at the school will use "preferred pronouns," an alternative boy's name, etc.

**Facts About County's Prosecution of the Lyashchenkos**

112.    On 06-03-2024, CPS social worker Crystal Nelson arrived at the Lyashchenko house on Sunrise Drive in Redding.

113.    S.L. pretended to be scared of her parents, who have never given her any reason to be afraid.

114.    S.L. walked outside barefoot in gravel. S.L.'s mother Alexandra noticed this and brought S.L.'s flip-flops and set them on the steps, so S.L.'s feet would be protected. This would later be falsely characterized by County as "throwing a shoe at her." The incident with the shoes was captured on surveillance video.

115.    County and the other Defendants knew or reasonably should have known that "affirming" S.L. is injurious to her.

116.    S.L. needs psychotherapy and possibly appropriate medication to overcome what is troubling her. She most certainly does *not* need "affirmation" of her false beliefs. Not by the social workers, not by her psychiatrist, not by school officials, not by her lawyer, not by the Court, and not by her Parents. As a factual matter, "affirming" any falsehood—let alone "Gender Identity"— is injurious.

15

117.    County and all Defendants knew or should have known that the Lyashchenkos love their daughter S.L. and only want what is best for her.

118.    County and all Defendants knew that refusing to "affirm" S.L. is not "emotional abuse." Rather, it is good parenting in a tough situation.

119.    It was understood by County and all Defendants that, if the seizure and detention of S.L. and the prosecution of her parents was to go forward, lies had to be fabricated and maintained. This understanding was the basis for the formulation of the Policy.

120.    As quoted and discussed below, County stated numerous falsehoods in its 06-05-2024 Petition for Juvenile Dependency, and the other papers filed in conjunction with the ensuing criminal prosecution in Dependency Court.

121.    County's falsehoods include that the Lyashchenkos threatened to harm S.L.'s pet birds, that Alexandra threw a shoe at S.L., that Plaintiffs threatened that S.L. would be made to live in a shed, that S.L. parents abandoned her, that Alexandra threatened to kill herself or harm herself due to S.L. wanting to be "Transgender," or due to S.L. wanting to "explore transitioning," or due to any reason whatsoever.

122.    While these falsehoods likely originated with S.L., County failed to reasonably investigate.

123.    On 06-05-2024 County filed a Juvenile Dependency Petition, signed by Defendant Nikki Quintana.  The 06-05-2024 Petition states that:

> The child, [S.L.] is at risk of continued emotional abuse by the parents, Alexandra Lyashchenko and Andriy Lyashchenko, due to their inability to support the child in their gender identity exploration causing emotional harm.

124.    "Inability to support" is false.

125.    Under the circumstances, "at risk" and "emotional abuse" are unwarranted and indeed unprecedented conclusions of law.

126.    County's 06-05-2024 Petition goes on to state:

> The child, [S.L.] wants to explore transitioning, but the parents do not support them [sic] and will not use the preferred pronouns.

16

127. County contends that "transitioning" from one sex to the other is possible when in fact it is impossible. Of course, the Lyashchenkos do not "support" their daughter S.L. in pretending to be a boy and of course they do not call her "he," "him" or "they." It will be proven, as a factual matter, that such "social transitioning" almost always leads to medical transitioning. The process is injurious to the point of being disabling. "Affirmation" is decidedly _not_ in the child's best interest.

128. County's 06-05-2024 Petition next states:

> The child, [S.L.], has reported cutting themselves[sic] on their [sic] legs due to the conflict, isolating themselves, and that they[sic] would "kill themselves"[sic] if they had to remain in the home of the parents.

129. It is true that S.L. has been self-harming and threatening to kill herself for a long time. She is troubled and clearly needs mental health care, which her parents have provided and would continue to provide. It may be true that S.L. _said_ it is "due to the conflict" with her parents, but a much better explanation is that that S.L's troubles are due to S.L.'s mental health problems in general. Both government detention and "affirmation" make S.L.'s mental health worse, not better.

130. County's 06-05-2024 Petition then says:

> On 06/03/2024, the child [S.L.], has reported that they[sic] are called digusting[sic] things such as an "it child," told they are "sick in the head'" and "fucked in the head," is threatened with harm to their[sic] pet birds, is told they[sic] will have to live out in a shed, and that the mother threatens to harm herself due to [S.L.] wanting to be transgender or explore gender identity.

131. It is categorically false that Plaintiffs ever called S.L. an "it child" or said she was "sick in the head" or "fucked in the head." It is categorically false that Plaintiffs ever threatened harm to S.L.'s pet birds. In fact, for months after S.L. was taken, her parents and her little brother M.L. all cared for the birds—buying food, feeding them, changing the water and vacuuming under the cage.

132. It is categorically false that Alexandra ever threatened to harm herself due to S.L. wanting to be Transgender, explore Gender Identity, or for any reason.

17

133. Regarding "live out in a shed," the "shed" on the Lyashchenkos' Sunrise Drive property is a beautifully remodeled guest house. It has three bedrooms, two bathrooms, a kitchen with an island and breakfast nook. It features a double-door entry off a large redwood deck. It has heating, air conditioning and wifi.



134. It is true that the Lyashchenkos refer to this as "*the* shed" (not "*a* shed"), but the true nature of the space can be seen in the photos provided.



135. The Lyashchenkos *offered* (not threatened) to move S.L. from her bedroom inside the main house out to "the shed," believing that giving S.L. some privacy and distance would help her de-escalate when she became volatile. This offer was discussed with Dr. Sager.

136. At no time did County investigate "the shed" to find out what it actually is.

137. At no time did County investigate or inquire as to the pet birds' welfare.

138. To the extent "explore Gender Identity" means anything, here it means for a physically healthy teenage girl to experiment with the harmful drug testosterone.

139. It is misleading that Plaintiffs ever called S.L. "it" or an "it child." Neither of S.L.'s Parents are native English speakers. At home, they speak to S.L. in Russian and/or Ukrainian language, which S.L. speaks and understands perfectly, having lived her whole life in this proud legal immigrant family. Phrases that are polite and appropriate in the native language may be translated in a way that sounds offensive in English.

140. County states:

> The child, [S.L.], was put on a 5150 hold in the past for mental health and is diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

141.   The above is true – S.L. was put on a "5150" hold in 2019 because she was already cutting and threatening to kill herself. S.L. was diagnosed with ADHD. This is years prior to her adolescent-onset or Rapid Onset Gender Dysphoria ("ROGD") at the age of 14. ROGD primarily affects teenage girls, and is widely believed among professionals to be a Social Contagion. Most boys with Gender Dysphoria discover this earlier in childhood, and most grow up to be gay.

142.   County continues with its diatribe:

> On 06/03/2024, the child [S.L.], was observed to be shaking, nervous, asked the social worker to "help them" [sic] during the interview, and hid behind the social worker.

143.   While troubled, S.L. is also highly intelligent. Frankly, she gets her intelligence from her parents. Andriy is a senior software engineer, while Alexandra is a linguist. Both parents hold advanced college degrees. S.L. has a younger brother, M.L. who is also very smart.

144.   A highly intelligent 15-year-old girl is more than capable of falsely playing the victim. This is especially true today with social media personalities like Markymoo teaching her the "Transgender Playbook." Sager, Dougherty, Anderson, Horan, and all the County social workers were only too happy to reinforce the coaching and grooming.

145.   Andriy sardonically said to a Sheriff's Officer on 06/03/2024 that the only "abuse" S.L. endures is "doing the dishes."

146.   Playing the victim and pretending to be afraid of one's parents is part of the Transgender Playbook. Regardless of how she learned, S.L. now knows the Transgender Playbook by heart.

147.   S.L.'s purported fear of her Parents is entirely fabricated.

148.   County stated:

> On 06/03/2024, the parents became irate with the social worker [Nelson], emotional, started yelling, did not believe the social worker, reported they did not want the child any longer, reported they did want the child, that the child ruined the mothers[sic] life, refused home access, and the child ran out of the home while the mother threw a shoe at the child.

149. It is categorically false that the Lyashchenkos "reported" that they did not want the child any longer. They love S.L. and are very concerned for her. When Defendant Nelson was seizing S.L. and first accusing her parents of "emotional abuse," the Lyashchenkos were shocked and may have said things in outrage, and/or sadness and/or despair. Any parent would understand this.

150. Neither S.L. nor Nelson nor anyone at County believed or took seriously the notion that the Lyashchenkos didn't want S.L., and Defendants knew that it was misleading to say so. Yet they did say so, according to the Policy.

151. At no time did Alexandra throw a shoe at S.L. Alexandra noticed that S.L. was barefoot while Nelson was seizing her. In fact, S.L. had been coached to be barefoot because it "adds to the drama." It's part of the Transgender Playbook. Alexandra brought S.L.'s shoes to her.

152. There exists surveillance video which depicts what actually occurred regarding the shoes at the relevant time. County did not investigate the video.

153. County concludes by stating:

> On 06/03/2024, the child [S.L.], reported being connected to an individual on the internet that is a seventeen year old male. The Agency has concerns that the child is being groomed and could be at risk of CSEC [Commercial Sexual Exploitation of Children] activity.

154. The allegedly seventeen-year-old alleged Male is "Markymoo." Markymoo's true identity and true age are not known. The Lyashchenkos are also concerned that S.L. is being groomed by Markymoo.

155. In addition to Markymoo, S.L. is also being groomed and/or coached by Dr. Sager, Dr. Dougherty, and the County social workers. The prospect of sexual grooming is greatly *increased* by S.L.'s current circumstance of being in foster care.

156. On 06-11-2024, social worker Crystal Nelson filed, i.e. published a "Notice of Child Abuse Central Listing" ("Child Abuse Notice") into the Child Abuse Central Index ("CACI") on each of the Plaintiffs, stating that the "County has determined that the allegation of child abuse or severe neglect against you is substantiated." This statement is

false. No child abuse and no severe neglect occurred by the Lyashchenkos, and nothing of the sort was ever substantiated by County.

157.    The Child Abuse Notice states that "County Child Welfare Services agency has completed an investigation of alleged child abuse or severe neglect and determined that the allegations of abuse or severe neglect are substantiated."

158.    The statement "County Child Welfare Services agency has completed an investigation of alleged child abuse or severe neglect and determined that the allegations of abuse or severe neglect are substantiated" is false in multiple respects.

159.    While the Child Abuse Notice was filed a little over one week after the seizure and detention of S.L., County's investigation lasted at least 6 months. Investigation may be ongoing yet, this is not clear. As of this writing, the Dependency Case is still pending.

160.    What is clear is that County has filed three different Petitions against the Lyashchenkos. The third Petition, filed 02-03-2025, does *not* allege that the Lyashchenkos engaged in "emotional abuse" of S.L. *at all.* Judge Bigelow ultimately found that the Lyashchenkos were never abusive to S.L., and that S.L.'s mental illness is through **no fault** of the Lyashchenkos.

161.    By 6-11-2024 when it filed the Child Abuse Notice, County's investigation had certainly not been completed.

162.    Moreover, at no time did County find that the allegations against the Lyashchenkos of abuse or severe neglect were substantiated, contrary to the filed Child Abuse Notice. The Child Abuse Notice states that it may be used by "Law enforcement agencies, court Investigators, probation departments and district attorneys."

163.    At the time Nelson issued the statements in the CACI Child Abuse Notice, she knew them to be false. Nelson further knew her false statements would injure the Lyashchenkos reputation and would cause them severe emotional distress. Nelson did not care. She was intent on lying and injuring Plaintiffs because it conforms to the Policy.

164.    On 06-13-2024, Shasta County Sheriff's Office filed a Report by officer Jared Foster, related to the 06-03-2024 seizure of S.L. ("Sheriff's Report"). As to "Offense," the Sheriff's

21

Report states "300 WI," presumably referring to WIC § 300. Andriy and Alexandra are both listed as "suspects."

165. The Sheriff's Report falsely lists S.L. as being "male." Officer Foster knew that S.L. is female, but he lied on the Report. Foster admits that "S.L. was born a biological female," but then falsely claims that she "is in the process of transitioning into a male."

166. Foster knew that it is impossible for a Female to "transition" into a Male. However, Foster was intent on fabricating falsehoods in concert with County and the other Defendants, and in compliance with the Policy.

167. On 06-25-2024 County filed a Jurisdiction Report in which social worker Crystal Nelson stated that S.L. prefers to identify as [boy's name] and would like to "explore transitioning." Nelson knew that it is impossible for a girl like S.L. to "transition" into a boy.

168. On 06-27-2024, County conducted a "Child & Family Team Meeting." Under the heading of "worries/questions/things to discuss," County states that "[boys name]" does not want to say the reasons why the Agency is involved at this time."

169. On 06-27-2024, at County's Team Meeting, Andriy and Alexandra asked what exact behavioral changes the Agency is looking for to address the alleged emotional abuse. County Social worker Jennifer Szephegyi-Johnson relied on her training and clearly expressed County's Policy of "affirmation," stating that CPS is wanting to "see willingness from the parents" to accept "[boys name]" as "he" prefers to "be identified."

170. On 7-02-2024, the Lyashchenkos objected to Nelson's filing of false allegations of child abuse in by filing a Request for Grievance Hearing.

171. On 7-08-2024, CACI Coordinator Katherine Fish wrote the Lyashchenkos a letter stating, "Your request for a grievance hearing is denied due to the pending dependency case in a court of competent jurisdiction."

172. At no time has any government agency offered the Lyashchenkos a hearing regarding CACI. The false allegations of child abuse remain in CACI to this day, causing Plaintiffs extreme mental anguish constantly.

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT

173. "Affirming" S.L. is harmful to S.L. Ms. Szephegyi-Johnson knows or reasonably should know this. Ms. Szephegyi-Johnson is acting according to County's Policy or custom to "affirm" teens who say they are "Transgender," and this is the basis to seize children from parents who are normal good parents.

174. Social worker Shannon Anderson plays a crucial role in executing the Policy, that of alienating children from their Parents.

175. Here, Ms. Anderson alienated S.L. from her Parents by acting much like a gestapo worker, or gatekeeper between S.L. and her Parents.

176. Ms. Anderson was instrumental in cancelling scheduled visits. Ms. Anderson would always take sides with S.L. regarding visits. Ms. Anderson knew, or should have known, that giving a teenage girl everything she wants is not in the child's best interest.

177. In another incident, Ms. Anderson was observed to physically block S.L. from coming towards her Parents.

178. Ms. Anderson openly discriminates against the Lyashchenkos based on national origin, language and culture.

179. Ms. Anderson outwardly espouses Gender Ideology, consistently referring to S.L. as "he/him" and using her fictitious boy's name. Inside, however, Ms. Anderson knows or reasonably should know that "affirming" the falsehood is intentionally harmful to S.L., and therefore intentionally harmful to her Parents.

180. Ms. Anderson is therefore lying, but she perpetrates the lies for the same reason as do the other Defendants: it serves the Policy.

**Facts About the Foster Home and Forced Adoption**

181. Margaret "Maggie" Kenefick is the foster care provider with the house where S.L. was placed. In Ms. Kenefick's foster house, S.L. was made to live with a Male roommate, Ms. Kenefick's teenage son A.F.

182. On 07-24-2024 Alexandra asked if there was a foster placement for S.L. without males being present. Social Worker Jennifer Szephegyi-Johnson explained that California law allows [S.L.] to be placed with "other males" if "he" identifies as a "male," regardless

23

of "his biological sex." The term "biological sex" is redundant—"sex" will suffice because sex is a biological trait.

183.    Ms. Kenefick wants to adopt S.L. because it is in her financial interest to do so. Adoption is also in County's financial interest. However, because (like most parents) the Lyashchenkos will never allow S.L. to be adopted, the Policy dictates that this must be a Forced Adoption.

184.    On 07-24-2024, Social Worker Jennifer Szephegyi-Johnson confirmed that, now that she is in government custody, S.L. is at-risk for CSEC (Commercial Sexual Exploitation of Child).

185.    Since the seizure and detention began, County, its social workers and Ms. Kenefick have openly desired a Forced Adoption of S.L. This was intended to cause, and did cause, great emotional distress upon the Lyashchenkos.

186.    On 08-13-2024, County filed a Disposition Report. Among other things, this Disposition Report stated:

> [Forced] **Adoption** is expected to be recommended as the permanent plan.

> The option to participate in **adoption planning** and to voluntarily relinquish the child for adoption has been discussed with the parents.

> The identified concurrent **plan is adoption**.

> The caregiver [Maggie Kenefick and her husband Walter Albert] is **open to adoption** if Family Reunification is unsuccessful.

> That the permanent **plan could be adoption**, a legal guardianship, or another planned permanent living arrangement.

> That if the permanent **plan is adoption, parental rights will be terminated**.

### Facts About the Use of Testosterone by Females

187.    By "hormones," County and S.L mean the use of testosterone.

188.    It is a fact that the use of testosterone by girls and women has never been proven effective in treating Gender Dysphoria. All Defendants knew this, or reasonably should have known this.

24

189. It is a fact that the use of testosterone by girls and women greatly increases the risk of liver cancer. All Defendants knew this, or reasonably should have known this.

190. All Defendants were too motivated by money and advancing the Policy to care about the harm inflicted on S.L. or her Parents (the Lyashchenkos) by S.L. using testosterone. The harm inflicted by Defendants was therefore intentional. At minimum, Defendants and each of them acted with a reckless disregard for whether the use of testosterone for treating Gender Dysphoria was harmful or not.

### The Second (First Amended) Petition and Afterwards

191. On 09-05-2024, County filed an Amended Juvenile Dependency Petition. This Petition was again signed by Nikki Quintana, another County social worker. The 09-05-2024 Petition was a duplicate of the 06-05-2024 Petition except that the first paragraph of the supporting facts section is crossed out, and instead states:

> The child, [S.L.] is unable to be maintained in the home of the parents, Alexandra Lyashchenko and Andriy Lyashchenko, as the minor's gender identity is in conflict with the parents' fundamental values **reflecting their cultural background**, which has caused emotional abuse to the minor.

192. The 09-05-2024 Petition contends that S.L. claims the reason "he" is self-harming is because "he" fears going back to "his" parents. This is quite odd, considering S.L. has been self-harming since at least 2019, when she was ten, while only claiming to be "Transgender" since 2023, when she was fourteen.

193. Further, S.L.'s contention that her Parents' refusal to "affirm" her is the cause of her self-harming is also belied by the fact that her cutting and self-harming continue in government custody. Clearly the Lyashchenkos are not the cause of S.L.'s cutting and self-harming.

194. During the 10-08-2024 Child and Family Team (CFT) meeting, S.L. alleges that if "he" did not have "his" friend Markymoo to talk to for support when "he" was in the care of "his" parents, "he" probably would have killed "himself".

25

195.    On 01-08-2025, at a doctor's appointment, County alleged that S.L. "did begin to hyperventilate, cry and shake." According to County, this was due to Alexandra coming too close to "him." This is false. Neither of S.L.'s parents have ever given her any reason to fear them. S.L. has been coached to behave this way. County knew the statement was false.

### The Third (Second Amended) Petition

196.    On 02-03-2025, County filed yet another Juvenile Dependency Petition, the Second Amended Petition and third overall. Again, it was signed by social worker Nikki Quintana. This time, much of the previous version was crossed out, including the part blaming Andriy and Alexandra's "cultural background."

197.    Indeed, the Second Amended Petition has completely deleted "emotional abuse" and deleted *all* blame attributed to the Lyashchenkos. Now, the Petition states:

> The child, [S.L.], is unable to be maintained in the home of the parents, Alexandra Lyashchenko and Andriy Lyashchenko, due to the minor's severe anxiety, depression, withdrawal, and untoward aggressive behavior toward self and others.

> The child, [S.L.] was put on a 5150 hold in the past for mental health. The child has had one psychiatric assessment in which the child was found to meet the criteria for Borderline Personality Disorder (BPD), and is diagnosed with Gender Dysphoria (GD), Oppositional Defiant Disorder (ODP), and Generalized Anxiety Disorder (GAD).

> Due to the child's struggles with severe mental illness, the parents are not capable of providing appropriate care.

198.    Curiously, this version of the Petition no longer blames Andriy and Alexandra for their daughter's mental health issues, but nevertheless contends they are not capable of providing appropriate care.

### The JV-220 Request for Psychotropic Meds

199.    On 01-02-2025, County Social Worker Jennifer Szephegyi-Johnson filed a JV-220 requesting the Superior Court approve S.L. taking psychotropic medications, particularly the anti-depressant Seroquel, in addition to refilling S.L.'s Methylphenidate for ADHD, which goes by various brand names including Ritalin.

26

200.    On 03-08-2025, the Superior Court Granted County's JV-220.

**The Lyashchenkos' Request to Introduce the HHS Report**

201.    On 05-05-2025 a Dispositional hearing took place at which the Lyashchenkos' attorney Leesa Webster offered into evidence at Exhibits M45 and M46 the federal government report "Treatment for Pediatric Gender Dysphoria; Review of Evidence and Best Practices." The Report was not entered into evidence.  The Court stated only "that it will retain Mothers **Exhibits M45 and M46** with the Court file for the Courts consideration."

202.    It is worth noting that under Cal. Evidence Code § 452, official acts of the executive department of the United States are judicially noticeable. The relevance of a Report on treatment for Gender Dysphoria is obvious – County's agents diagnosed S.L. with Gender Dysphoria, are affirming her "social transition," and are treating her mental health in a multitude of ways.

**Birth Control Pills**

203.    For example, in or about January 2025, County sent S.L. to the BNI Treatment Center in Agoura Hills, CA. While there, S.L. was prescribed various psychotropic medications.

204.    Also, S.L. was prescribed birth control pills. Why would S.L. need birth control pills if she is "really" male? S.L was a virgin in June 2024 when she was taken from her parents. Who is S.L. having sex with now? Is it Kenefick's teenage son A.F., with whom S.L. is allowed to share a bunkbed in a small room? Does S.L. have an STD, or did she? Is S.L. pregnant? Did S.L. have an abortion or take the "morning after pill?" Given S.L. was prescribed birth control pills, these are reasonable factual questions about the now 17-year-old teenage girl.

205.    Regardless of the answers to the above questions, S.L.'s parents did not consent to birth control pills.

**Minor's Counsel Michael Horan**

206. Defendant Michael Horan was appointed as minor's counsel to represent the interest of S.L. Horan manifestly failed to do so. In fact, Horan deliberately worked against S.L.'s interest from his appointment to the present.

207. Horan was motivated by money, and not the least bit concerned with S.L.'s best interest.

208. In addition to social transition, "affirming" S.L., includes supporting her use of testosterone.

209. Horan "affirms" S.L. in the false belief that she is Male or "Transgender." Horan refers to S.L. using the boy's name, and uses he/him pronouns. Horan knows this to be false, but he "affirms" because it is in conformity with the Policy, and in his own financial interest.

210. Horan figures that if he does not "affirm" S.L., he will be removed and replaced as minor's counsel.

211. Social transitioning is not in S.L.'s best interest because, among other things, it greatly increases the likelihood of the use of puberty blockers and testosterone, both of which are ineffective and harmful.

212. At all relevant times, Horan knew and believed that social transitioning is not in S.L.'s best interest.

213. At all relevant times, Horan knew the following facts: that the use of testosterone by a physically healthy teenage girl is extremely dangerous, that testosterone causes sterility, that testosterone greatly increases the likelihood of liver cancer, that there is no high-quality evidence that testosterone benefits the purely psychological condition of Gender Dysphoria. At minimum, Horan acted with a reckless disregard for the whether testosterone is or is not safe and effective for use by a physically healthy teenage girl such as S.L.

214. Horan knew that using the false boy's name and pronouns referring to S.L. in the presence of her Parents would cause them severe emotional distress. He did so anyway, because he intended to harm, and was successful in harming Andriy and Alexandra.

215. Horan encouraged then 16-year-old S.L. to share bedroom with A.F., a 16-year-old unrelated male. As such, Horan disregarded S.L.'s safety and health, posing a grave risk of harm to her.

216. All of Horan's challenged actions were in conformance with County's Policy.

### The 06-02-2025 Order

217. On 06-02-2025, the Judge Bigelow stated that the "Court takes the matter UNDER SUBMISSION as of June 02, 2025 regarding Disposition. A written ruling shall issue."

218. On 08-29-2025 Judge Bigelow issued "Disposition Findings and Orders." This Order appears self-contradictory and confusing. First, Judge Bigelow Ordered that S.L. "be declared a dependent of the Shasta County Juvenile Court pursuant to §300 W&I Code Subsection (c)." But Judge Bigelow also Ordered that "physical custody be returned to the parents, Andriy Lyashchenko and Alexandra Lyashchenko."

219. Plaintiffs do not understand how physical custody is returned to them, and yet S.L. is a dependent of the government. How can both be true?

220. Judge Bigelow's 08-29-2025 Order states that "The parents have the capacity and means of providing appropriate care for the physical and mental wellbeing of the child," and that "No evidence suggests that the parents intentionally harmed the child." And yet, S.L. remains in government custody. Why?

### The 08-29-2025 Order

221. Judge Bigelow's 08-29-2025 Order also states that "The parents have **continuously** engaged, mental health professionals to support the mental health needs of the child," that S.L. has been diagnosed with "Borderline Personality Disorder, Gender Dysphoria, Oppositional Defiant Disorder, Generalized Anxiety Disorder, and Attention Deficit Hyperactivity Disorder," and that "the parents are committed to obtaining all necessary mental health services for the child to address the child's known mental health conditions."

222. Nothing in Judge Bigelow's 08-29-2025 Order suggests that the Lyashchenkos are at fault for any of S.L.'s problems. And yet, S.L. remains in government custody. Why? The

29

false and defamatory "Child Abuse Notice" remains on file, despite the Lyashchenkos' diligent efforts to expunge it. Why?

223. Both of S.L.'s parents are in tremendous emotional pain, day and night, as a direct and proximate result of Defendants' intentional actions.

224. Judge Bigelow's 08-29-2025 Order contains this bizarre statement:

> The likely date by which [S.L.] may be returned to and safely maintained in the home or placed for adoption, appointed a legal guardian, placed permanently with a relative, or placed in an identified placement with a specific goal: August 15, 2025.

225. First, apart from "safely maintained in the home," this statement directly contradicts the order of physical custody returned to the Lyashchenkos. Second, August 15, 2025 is two weeks *before* the date of the Order.

226. The true meaning of the 08-29-2025 Order is twofold. One, the Defendants will detain S.L. for as long as possible, regardless of the facts, because it is in their financial interest to do so. Two, the Defendants will inflict as much emotional distress upon the Lyashchenkos as possible.

### The 11-25-2025 Email

227. On 11-25-2025, Szephegyi-Johnson stated that:

> [County] is recommending that Reunification Services be terminated to both [Andriy and Alexandra Lyashchenko] and that [S.L.] remain in [government custody].

228. "Reunification Services" is a euphemism for the false pretense that County ever intended to "reunify" S.L. with the Lyashchenkos. In fact, at no time did any of these Defendants ever intend to "reunify" the child they took in the first place, unless and until the Lyashchenkos would begin to "affirm" S.L. in the false belief that she is Male, and otherwise completely submit to the falsehoods of Gender Ideology, i.e. submit to the Policy.

229. If the Lyashchenkos submitted to the Policy, it would constitute a coerced confession. They are not about to do that.

### The 11-19-2025 HHS Report

30

230.   As the U.S. Department of Health and Human Services explained on 11-19-2025 in its Report "Treatment for Pediatric Gender Dysphoria – Review of Evidence and Best Practices," ("HHS"):

> The term "gender identity" is an especially important example of how words can sow confusion. When first introduced in the 1960s, it meant "the sense of knowing to which sex one belongs, that is, the awareness 'I am a male' or 'I am a female'." Almost everyone has a gender identity in this sense, and moreover one that is congruent with their sex: males know that they are male, and females know that they are female.
>
> However, today the phrase "gender identity" is used in a significantly different way. For example, WPATH defines "gender identity" in the glossary to their current clinical practice guideline (SOC-8) as: "A person's deeply felt, internal, intrinsic sense of their own gender."
>
> This new definition is unclear. For instance, what does "gender" mean in this context? The glossary in SOC-8 offers little clarification—though it does correctly acknowledge that the word is highly ambiguous. One meaning of "gender" given in the glossary is "gender identity." But "gender" in the definition above cannot mean "gender identity," otherwise the definition would be circular. Another meaning provided is "gender expression," but this too leads to circularity, because "gender expression" is itself defined in the same glossary in terms of "gender."

[HHS, pp. 34-35]

**Conclusion to Facts**

231.   At no time did the Lyashchenkos "affirm" S.L. in her status as "Transgender." This is for two reasons. First, the Lyashchenkos are Orthodox Christian. Second, the purported "treatments" for Gender Dysphoria—including social transition, puberty blockers, and cross-sex hormones—are harmful to the point of being disabling, while never having been proven effective in the treatment of Gender Dysphoria under the standards of evidence-based medicine.

232.   An analogy is appropriate to illustrate the point. Instead of "Transgender" and cutting, suppose hypothetically S.L. was suffering from anorexia and bulimia. Suppose she had a healthy body weight, but her distorted self-image made her falsely believe she was fat, leading her to severely restrict her food intake. Suppose her body-image delusion was so

31

severe she would induce her own vomiting, for fear of gaining a single pound. Should anyone who cared about her "affirm" this delusion? What if this hypothetical anorexic and bulimic S.L. insisted on getting gastric bypass weight loss surgery? Should health care professionals "affirm" her falsehood no matter what?

233.   "Affirming" a teenage girl in the false and unhealthy belief that she is really a boy makes no more sense than "affirming" an anorexic in the false and unhealthy belief that she needs to lose weight.

234.   At the writing of this First Amended Complaint, at least 582 days have passed since S.L. was taken.

235.   Despite having dropped *all* claims of "abuse," Defendants nevertheless contend that the Lyashchenkos are not capable of providing S.L. with the mental health care she needs, so she remains in government custody. This, despite the fact that S.L. has engaged in self-harm by cutting herself on at least two occasions during this time of detention.

## VII.   CLAIMS FOR RELIEF

### CLAIM FOR RELIEF No. 1. (42 U.S.C. § 1983)
*Violation of Plaintiffs' Rights to Substantive and*
*Procedural Due Process in the Seizure and Detention of S.L.*
(Plaintiffs v. Shasta County Health and Human Services Agency; Shasta County Sheriff's Office; Crystal Nelson; Jennifer Szephegyi-Johnson; Nikki Quintana; Shannon Anderson; and Jared Foster)

236.   Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

237.   At all times relevant herein, the right to familial association guaranteed under the First and Fourteenth Amendments to the United States Constitution was clearly established, such that any reasonable "child welfare" services agent in Defendants' position and circumstances, as alleged above, would have known that it was unlawful to seize S.L. from the care, custody, and control of Plaintiffs without first obtaining a warrant.

238.   On June 3, 2024, when CPS and Sheriffs seized and detained S.L., no serious bodily injury was about to happen, no serious bodily injury was immediate, no serious bodily

injury was threatening, no serious bodily injury was ready to take place, no serious bodily injury was near at hand, and there was no serious bodily injury that would occur unless speedy, swift prompt government action was taken.

239.    Here, there was never reasonable cause to believe that S.L. was in imminent danger of serious bodily injury, or any injury, from her parents.

240.    When County first received the allegation of "emotional abuse" by the Reporting Party, they refrained from undertaking a reasonable investigation prior to making the decision to seize S.L. from Plaintiffs' care.

241.    For example, County based its WIC § 300(c) Petition, in part, on S.L.'s allegation that she would be "made to live out in a shed." A reasonable investigation would have revealed that "the shed" was the Lyashchenkos family's name for a 3 bed, 2 bath guest house with a full kitchen, heating, air conditioning and Wi-Fi.

242.    The stated reason S.L. was seized and detained was that the Lyashchenkos refuse to "affirm" their daughter S.L. as the boy she pretends to be. Refusal to "affirm" is not any sort of "abuse," emotional or otherwise. As her father stated on June 3, 2024, the only "abuse" S.L. suffered at the hands of her parents was that she was made to do the dishes.

243.    The claim that Alexandra threw a shoe at S.L. is false. The claim that the Lyashchenkos threatened to harm S.L.'s pet birds is false. The claim that the Lyashchenkos threatened to force S.L. to live in "a shed" is false.

244.    The Lyashchenkos were entitled to an investigation into the claims of "emotional abuse" prior to S.L. being seized and detained. *Bosisto v. Freeman*, 2017 U.S. Dist. LEXIS 75620, *17 ("A state actor may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse .... Moreover, the police cannot seize children suspected of being abused or neglected **unless reasonable avenues of investigation are first pursued**, particularly where it is not clear that a crime has been— or will be—committed.")

33

245.   A reasonable investigation would have shown County that Plaintiffs never harmed S.L.'s pet birds. In fact, they cared for the birds for months in S.L.'s absence.

246.   A reasonable investigation would have shown County that Plaintiff Alexandra Lyashchenko never threw a shoe at S.L. Security video clearly shows that Alexandra brought the flip-flop shoes to S.L. because she was barefoot.

247.   A reasonable investigation would have shown County that Plaintiffs never abandoned S.L. Indeed, judge Bigelow would ultimately find, after over one year of listening to County, that Plaintiffs "have **continuously** engaged mental health professionals to support the mental health needs of the child." Judge Bigelow would also state that the Lyashchenkos "have the capacity and means of providing appropriate care for the physical and mental wellbeing of the child," and that "No evidence suggests that the parents intentionally harmed the child."

248.   County seized S.L. without a warrant or other similar court order, under non-exigent circumstances, over Plaintiffs' strenuous objections – all in violation of Plaintiffs' rights arising under the United States Constitution's Fourteenth Amendment.

249.   Defendants, and each of them, were at all times acting under color of state law when they seized C.H. from Plaintiffs' care, custody, and/or control without a warrant when there was no legal or legitimate basis to do so.

250.   Prior to S.L.'s unwarranted seizure, these Defendants, and each of them discussed the proposed unwarranted seizure. As a result of that discussion, each Defendant knew or should have known all facts relevant to their joint decision to forego warrant requirements, including the fact that the child was not under imminent threat of serious bodily harm at the hands of her parents.

251.   Moreover, these Defendants, and each of them, knew definitively that S.L. was in no danger of suffering severe bodily injury or death in the short time it would have taken for them to obtain a warrant.

252.  Nonetheless, these Defendants, and each of them, agreed and/or approved of the decision to forgo obtaining judicial authorization prior to seizing S.L. from Plaintiffs' care, custody, and/or control.

253.  As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have economic injury, physical and/or mental anxiety and anguish and emotional distress according to proof at trial.

254.  In doing the things alleged herein above, these Defendants, and each of them, acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of the intentional and willful conduct of these defendants in effectuating the knowing and wanton violation of Plaintiffs' constitutional rights, Plaintiffs are entitled to recover punitive damages against these individual defendants in an amount according to proof at trial.

### CLAIM FOR RELIEF No. 2. (42 U.S.C. § 1983)
***Deception By Material Omission in the Presentation of Evidence***
(Plaintiffs v. Shasta County Health and Human Services Agency; Shasta County Sheriff's Office; Crystal Nelson; Jennifer Szephegyi-Johnson; Nikki Quintana; Shannon Anderson; Jared Foster and Michelle A. Sager M.D. in her *de facto* government capacity)

255.  Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

256.  The right to familial association guaranteed under the Constitution's Fourteenth Amendment is so "clearly established" such that any reasonable social worker and/or child abuse investigator, or other governmental agent, or person acting in an investigatory capacity – including these Defendants, and each of them, would know it is unlawful to continue to detain a child from the care, custody and control of its parents based on a knowingly false position regarding the medical treatment of the child.

257.  S.L. was diagnosed with "Gender Dysphoria," a purely psychological condition presented in the DSM-5. Essentially "Gender Dysphoria" refers to the condition in which a

person's internal "gender identity" does not match their external "sex assigned at birth." While the diagnosis is dubious regarding S.L., for purposes of this complaint, we shall presume it to be correct. There certainly are other people who suffer from this condition.

258.   Regardless of whether the diagnosis of "Gender Dysphoria" is correct in S.L.'s particular case or not, the standard medical treatment for Gender Dysphoria is puberty blockers and/or cross-sex hormones. Since S.L. is a girl, cross-sex hormones would consist of testosterone.

259.   Under the accepted standards of evidence-based medicine, the use of puberty blockers and cross-sex hormones has never been proven effective at treating the mental health condition of Gender Dysphoria.

260.   Meanwhile, the use of both puberty blockers and cross sex hormones is positively harmful to teenagers. First and foremost, the use of testosterone by a Female will case sterility, i.e. the biological impossibility of conceiving a baby. The use of testosterone by a girl greatly increases the risk of liver cancer. There are many other known and suspected dangers associated with use of testosterone by Females.

261.   In short, "Gender Affirming Care" is not safe or effective, it is unsafe and ineffective.

262.   All Defendants knew, or reasonably should have known, that the use of testosterone by S.L. was unsafe and ineffective.

263.   And yet, County stated that S.L. "seems particularly interested in starting hormones. He [sic] asked if he[sic] were to be adopted could his[sic] new parent agree to hormones."

264.   When a child is seized and detained, County enters into a "special relationship" with that child, triggering an affirmative duty to exercise reasonable care for their safety. This duty necessarily encompasses protecting the child from foreseeable and preventable harms like dangerous drug use and self-harm, which are well-known risks for children within the dependency system.

265.   Sterility and liver cancer are foreseeable and preventable harms.

266.   In May 2025, the U.S. Department of Health and Human Services ("HHS") issued its report titled "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best

36

Practices." In November 2025, HHS published the final version of the report. HHS confirmed and detailed what is stated above, i.e. that the use of testosterone by teenage girls is unsafe and ineffective at treating Gender Dysphoria.

267. The Lyashchenkos presented the HHS Report to County and to Judge Bigelow.

268. County and Judge Bigelow completely ignored the HHS Report, and generally ignored the facts about the use of testosterone to treat Gender Dysphoria. This constitutes a material omission of exculpatory evidence.

269. Plaintiffs are further informed and believe and thereon allege that the right of a parent to remain free of the government's suppressed material exculpatory evidence in juvenile court proceedings is so clearly established that any government agent or person acting in an investigatory capacity faced with these Defendants' circumstances would know it is a violation of the constitution to either create, or present deceptive evidence against a parent in juvenile court proceedings. *Hardwick v. Cty. of Orange*, (9th Cir. 2017) 844 F.3d 1112, 1118-19 ("No official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law").

270. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever Plaintiffs' protected relationship with their daughter S.L.

271. The reason that Defendants seized S.L. and took her away from her parents and her little brother was that her parents did not "affirm" S.L.'s status as "Transgender," and did not endorse their daughter's use of any puberty blockers or testosterone.

272. Likewise, Plaintiffs did not endorse their daughter taking birth control pills. And yet, S.L. was prescribed birth control pills by a doctor at B.N.I. treatment center while in detention. This fact was only discovered later, by examining an insurance bill.

273. It is unknown who S.L. may be having sex with, or why she would need birth control pills. According to Defendants, S.L. is "really" a boy anyway. While the use of birth control

pills without parental consent is problematic in and of itself, the potential combination with testosterone is even more so.

274. Taking birth control pills (combined oral contraceptives, or COCs) alongside testosterone poses significant health risks for a teenage girl, primarily due to opposing hormonal effects and **amplified cardiovascular dangers**, though direct studies on this specific combination in adolescents are limited.

275. This detention is highly dangerous to S.L.

276. Defendants' conduct shocks the conscience in the constitutional sense. There is no California or Federal legal precedent for the idea that Parents' failure to "affirm" their child as "Transgender" constitutes "emotional abuse."

277. Over the course of a year and a half, from April 2024-December 2025, Defendants communicated with each other and agreed do whatever it takes to detain S.L. and keep her detained. The story kept changing, as evidenced within the three Petitions brought against the Lyashchenkos (Original, First Amended and Second Amended). The third Petition (Second Amended) does not even allege that Plaintiffs committed emotional abuse, but S.L. remains in government custody to this day.

278. At all relevant times alleged herein, Defendants, and each of them, were acting under color of state law when they acted, agreed, and/or conspired to employ fraudulent tactics to remove and detain, and continue to detain, C.H. from Plaintiffs' custody first by creating a false pretext on which to seize S.L., then later by failing to present material exculpatory evidence to the Juvenile Court.

279. The actions of these Defendants, and each of them, as alleged herein above were undertaken with a knowing and deliberate indifference to Plaintiffs' rights, and/or with the specific intention of harming them both personally and in their relationship with their child, S.L.

280. These Defendants, and each of them, maliciously conspired to violate Plaintiffs' constitutional rights including their rights arising under the First and Fourteenth Amendments to the United States Constitution – and did violate their rights by, but not

limited to: The creation and propagation of false information in Defendant Quintana's 06-05-2024 Petition with the intention that said information be incorporated into later Court Reports by others; and the 06-11-2024 Child Abuse Civil Index (CACI") Report by Defendant Nelson which was knowingly false; and the intentional material omission of exculpatory evidence.

281.    All Defendants intended that these falsehoods and material omissions would be presented to the Dependency Court, accepted into evidence, and relied upon by the Dependency Court in making its decisions.

282.    The aforementioned deceptions and omissions, and others, were material to the outcome of the Dependency Court proceedings, as alleged herein above, Judge Bigelow accepted them into evidence and relied upon them in making each and every one of its findings and orders.

283.    The aforementioned conduct by these Defendants, and each of them, was malicious and had the effect of denying Plaintiffs their right to a fair hearing as well as their rights to continued custody of their daughter, S.L., for an unnecessary and excessive period of time. By knowingly spreading falsehoods, maliciously refusing to provide exculpatory evidence, by failing to meaningfully investigate the claims of S.L. and then presenting all of this to Judge Bigelow in the protracted Dependency Court proceedings these Defendants, and each of them, knowingly and intentionally violated Plaintiffs' rights arising under the First and Fourteenth Amendments to the United States Constitution.

284.    As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have suffered constitutional injury, financial injury and severe emotional distress in amounts and degrees subject to proof at trial.

285.    Punitive damages are authorized because the Defendants' conduct constituted malice, fraud and/or oppression as defined in Cal. Civ. Code § 3294. This conduct involves reckless or callous indifference to the Plaintiffs' federally protected rights, and/or was motivated by evil intent. *Smith v. Wade*, 461 U.S. 30.

**CAUSE OF ACTION No. 3. (42 U.S.C. § 1983)**

39

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT

## *Discrimination Based on National Origin*

**(Plaintiffs v. Shasta County Health and Human Services Agency; Crystal Nelson; Jennifer Szephegyi-Johnson; Nikki Quintana; Shannon Anderson)**

286.    Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

287.    The Equal Protection Clause of the Fourteenth Amendment holds that County shall not:

> …deprive any person of life, liberty, or property, without…the equal protection of the laws.

288.    Title VI of the Civil Rights Act prohibits discrimination on the basis of national origin in programs and activities receiving federal financial assistance, including child welfare agencies.

289.    County clearly violated the Lyashchenkos' rights as it seized and detained S.L. due to the Lyashchenkos' national origin and "cultural background." County stated:

> The child, [S.L.], is unable to be maintained in the home of the parents, Alexandra Lyashchenko and Andriy Lyashchenko, as the minor's gender identity is in conflict with the parents' fundamental values **reflecting their cultural background**, which has caused emotional abuse to the minor.

290.    The protected characteristic is the Lyashchenkos' national and cultural background as being from Ukraine.

291.    County simply defined the Lyashchenkos' Ukrainian nationality and "cultural background" as "emotional abuse." Andriy and Alexandra are not free to change where they are from, nor do they want to. They are very proud Ukrainians, living for the past 17 years in the United States as legal immigrants.

292.    There is no dispute that County and its agents are government actors acting under color of law. County seized and detained S.L. because of the Lyashchenkos' "fundamental values" and their "cultural background," i.e. the fact that they will not "affirm" S.L. as "Transgender."

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT

293. In addition to the overt and explicit statement regarding "cultural values," County agents repeatedly issued slurs against Andriy and Alexandra, indicating their discriminatory intent.

294. In a visitation with S.L. in November 2024, County agent Viktoriya Lazurenko forbid the Lyashchenkos from speaking their native language to their daughter, even though S.L. speaks and understands Ukrainian and Russian language just fine. County allowed the Lyashchenkos to speak "only English" to their daughter so that social worker Anderson "writes good reports to the Court."

295. In a Disposition Report, County agent Jennifer Szephegyi-Johnson referred to Alexandra as "Russian," knowing that she is Ukrainian, and knowing that there is a brutal war of aggression by Russia against Ukraine, and knowing that Alexandra would feel additional anger.

296. At all relevant times County knew, or reasonably should have known, that there is no such thing as "Gender Identity" or "Transgender."

297. As a direct and proximate result of County's seizure and detention of S.L. the Lyashchenkos have suffered constitutional injury, financial injury and severe emotional injury, in amounts and extents to be documented at trial.

298. Punitive damages are authorized because the Defendants' conduct constituted malice, fraud and/or oppression as defined in Cal. Civ. Code § 3294. This conduct involves reckless or callous indifference to the Plaintiffs' federally protected rights, and/or was motivated by evil intent. *Smith v. Wade*, 461 U.S. 30.

## CLAIM FOR RELIEF No. 4. (42 U.S.C. § 1983)
### *Non-Consensual, Unwarranted Medical Interventions*
(Plaintiffs v. Shasta County Health and Human Services Agency; Crystal Nelson; Jennifer Szephegyi-Johnson; Nikki Quintana; Shannon Anderson)

299. Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

300. At all relevant times, the constitutional right to remain free of non-consensual intrusive medical interventions and to make decisions regarding the medical care of one's

41

child has been so "clearly established" that any reasonable social worker in Defendants' circumstances would know that it is a violation of Plaintiffs' constitutional rights to subject their child to "gender affirming care," psychotropic meds, or birth control pills without just cause, parental consent, or a court order/warrant authorizing the intervention.

301.    These Defendants, and each of them, violated said rights first when they directed that such medical interventions be performed without first obtaining a court order or knowing and voluntary parental consent. Defendants compounded their wrongdoing by excluding the Lyashchenkos from meaningful participation in the consent process, without any just or legal cause.

302.    In addition to the foregoing, parents also have a guaranteed constitutional right arising from the liberty interest in family association to be with their children while they are receiving medical attention. *Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1141-1142 (9th Cir. 1999). This right includes the right of parents to make important medical decisions for their children. *Id.* at 1141

303.    No reasonable County agent in these Defendants' position could have believed that the above-mentioned conduct was lawful or even abstractly justifiable. In fact it was not.

304.    These Defendants, and each of them, had an affirmative duty and obligation to recognize, acknowledge, and respect Plaintiffs' constitutional rights and to conduct themselves in a manner that confirms to, provides for the preservation of, and does not violate those rights. These rights include, without limitation, the right to privacy, family integrity and the right to remain free of non-consensual unwarranted medical interventions, the right to be present at any examinations absent an affirmative showing of good cause for exclusion, the right to control and participate in medical decisions relative to their children – all arising under the First and Fourteenth Amendments to the United States Constitution.

305.    These Defendants, and each of them, were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, the performance of unwarranted and non-consensual medical interventions and

procedures on Plaintiffs' child as described in detail herein above, and specifically as to "gender affirming care," psychotropic meds, and birth control pills.

306.    As a direct and proximate consequence of said misconduct, Plaintiffs have suffered, and will continue to suffer economic damages as well as but not limited to physical and/or mental anxiety and anguish and other emotional injury according to proof at trial.

307.    In doing the things alleged herein, these Defendants, and each of them, acted intentionally and/or with a conscious and callous disregard for Plaintiffs' constitutional rights. As a result, Plaintiffs are entitled to recover punitive damages against these individual Defendants, and each of them, according to proof at trial.

## CLAIM FOR RELIEF No. 5. (42 U.S.C. § 1983)
### *Monell Related Claims*
(Plaintiffs v. Shasta County Health and Human Services Agency and Shasta County Sheriff's Office)

308.    Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

309.    Defendant County of Shasta, including through its entities Shasta County Health and Human Services Agency and Shasta County Sheriff's Office, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiffs and those similarly situated to establish, implement and follow policies, procedures, customs and/or practices which conform with, and provide for the protections guaranteed Plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, protection of the right to substantive and procedural due process and to be free of unwarranted governmental interference in the custody of their child, S.L.

310.    Defendant County of Shasta also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within Shasta County Health and Human Services Agency, so as to protect these constitutional rights; and to refrain from acting with

43

deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

## *Monell* Claim - Count One
### *Unwarranted Seizure of a Child*

311.   Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

312.   Based on the duties charged to the County and delegated to its social workers, including the powers to seize children from their parents' custody, the County knew or should have known of the need to establish policies, practices, and customs required to protect the civil rights of parents and children with whom their agents regularly came into contact – and to adequately train its social workers and sheriffs.

313.   At the time of the underlying events, the County's customs and practices relating to the removal of a child from its parent's custody included, but were not limited to:

  a. The custom and/or practice of removing children from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury).

  b. The custom and/or practice of removing children from their parent's custody without first performing a reasonable investigation.

  c. The custom and/or practice of seizing children from their parent's custody without consent, court order, and/or exigency, based on a hope that further investigation would turn up facts suggesting the seizure was justified.

  d. The custom and/or practice of continuing the detention of children from their parents in spite of the fact that there was no known legitimate or legal basis to do so.

  e. The custom and/or practice of requiring a social worker to follow written policies, procedures, and/or practices, when seizing a child from their parents'

44

custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury.

f. The custom and/or practice of requiring non-offending parents to conform to gender ideology as a pre-condition of reunification with the child.

g. The custom and/or practice of removing children from a parent's custody without consent or a court order, and in the absence of specific, articulable evidence that a particular parent was likely to cause serious physical bodily injury to that child.

314. At the time of the underlying events, the County failed to promulgate sufficient and/or adequate policies, processes, and procedures relating to the removal of a child from its parent's custody.

315. When Defendants Nelson and Foster seized S.L. from Plaintiffs' custody, they were acting pursuant to and in accordance with the County's child removal customs, polices, and practices. Defendants Nelson's and Foster's decision to seize of S.L. was within the training and standards Defendants received from the County.

316. The County never investigates or disciplines its social workers (including those named as Defendants in the lawsuits identified above) who seize children from their parents' custody without consent, court order, and in the absence of exigency.

317. The County did not investigate or discipline Defendants for their unwarranted seizure of S.L. – even though Defendant Quintana essentially admitted that the seizure of S.L. was unwarranted because she filed a third Petition in which the Lyashchenkos are not accused of being abusive *at all.*

318. Nor has the County disciplined any of the individual Defendants for failing to intervene to stop S.L.'s unwarranted seizure and continued detention (more than 20 months at this writing), even though it was obvious the seizure and detention was unlawful. The County did not discipline any of the individual Defendants for as a result of S.L.'s unwarranted seizure and continued detention from Plaintiffs' custody.

319. Thus, through its action or inaction, the County ratified and/or approved of these Defendants' unwarranted seizure and continued unjustifiable detention of S.L.

320. The County has consistently failed to adequately train its social workers and agents on the constitutional rights of a parent and child, including but not limited to:

    a. The circumstances under which a court order must be obtained prior to removing a child from the custody of its parent(s).

    b. The fact that a court order or parental consent must be obtained prior to removing a child from the custody of its parent(s), when there is no exigency.

    c. That a child cannot be removed without a court order or parental consent, unless there is "specific, articulable evidence" that a child is in imminent danger of suffering serious bodily injury.

    d. That a social worker cannot remove a child without a court order or consent, based on the hope that further investigation could turn up facts suggesting that an exigency existed.

    e. That a child cannot be removed from their parent's custody without first performing a reasonable investigation.

321. The County does not adequately train its social workers on how to complete a proper child abuse investigation, how to make a proper determination regarding detention of a child, or on a parent-and-child's Constitutional Rights. The County does not provide training on all policy updates, and does not expect its social workers to know every policy or procedure.

322. The County's deliberate failure to train its agents on these established constitutional rights, and to avoid violating them, was a substantial factor and moving force in causing Plaintiffs' harm. Without adequate training, the individual Defendants were unfamiliar with and oblivious to Plaintiffs' rights when they seized S.L. – without consent, court order, or exigency.

323. The County knew or should have known that a parent and child cannot be separated without consent, court order, and/or exigency. But, the County has knowingly refrained

46

from (1) revising and/or implementing its child removal customs and protocols, and (2) from training its social workers that a child cannot be removed without consent, court order, and/or exigency. In addition, the County has consistently refused and refrained from investigating and/or disciplining its social workers for removing a child without consent, court order, and/or exigency including the individual Defendants in this case.

324.    These actions, and/or inactions, of the County were the moving force behind the Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, in an amount to be proven at trial.

***Monell* Claim - Count 2**

***Judicial Deception***

325.    Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

326.    The County and its policymaking officials knew, or in the exercise of reasonable care, should have known of the need to establish customs, policies, and practices required to protect the aforementioned civil rights of children with whom their agents regularly came into contact – and to adequately train its social workers and sheriffs regarding constitutionally appropriate policies and practices.

327.    Defendant County of Shasta established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the individual Defendants, and each of them when they violated Plaintiffs' constitutional rights by engaging in deception in the presentation of evidence to the Dependency Court, among other things.

328.    At the time of the underlying events, the regularly established customs and practices of the County of Shasta and the Shasta County Health and Human Services Agency were followed, adhered to, complied with, and carried out by the individual Defendants, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to:

47

a. The custom and/or practice of including false, inaccurate, exaggerated, misleading, and/or untrue factual statements in the documents and/or reports filed with the Dependency Court.

b. The custom and/or practice of suppressing and/or omitting known exculpatory evidence from documents and/or reports filed with the Dependency Court.

c. The custom and/or practice of permitting a supervisor to sign a document and/or court report without personal knowledge as to whether the statements made therein were complete and/or true, in an effort to bolster the credibility of the document, and/or report.

d. The custom and/or practice of consistently referring to S.L. as Male, using "he" and "him" and "his" — i.e. Male pronouns. The purpose of such practice is to lend further weight and credibility to false and/or fabricated information the particular social worker presents to the Dependency Court.

329. At the time of the underlying events, the County failed to promulgate sufficient and/or adequate policies, processes, and procedures relating to requirement to be truthful, honest, and accurate, and to not suppress known exculpatory evidence in reports to the Juvenile Court. The County of Shasta did not have a written policy, procedure, custom, or practice requiring its social workers to be complete, honest, and accurate in their reports to the court.

330. When Defendants, and each of them, engaged in deception in the presentation of evidence to the Dependency Court, they were acting pursuant to and in accordance with the County's regularly established customs and/or practices. Indeed, the reports and/or other documents, filed with the juvenile court in the underlying dependency case at issue here, were reviewed and approved County's social worker supervisors. Defendants were acting within the training and standards Defendants received from the County, when they engaged in deception in the presentation of evidence to the Dependency Court.

331. For whatever reason, the County of Shasta never investigates or disciplines its social workers or sheriffs who actually do engage in deception in the presentation of evidence to the juvenile court. The County of Shasta consistently fails to investigate or discipline social

48

workers and their supervisors who are involved in alleged constitutional violations so that violations of citizen's constitutional rights have not only become accepted,but are customary.

332.    The County did not investigate or discipline the individual Defendants in this case for making false statements, and/or suppressing known exculpatory evidence, in reports or other documents they filed in the juvenile court.

333.    The County habitually refuses to admit that its social workers commit a constitutional violation when they make false statements, and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – and continues to do so. The County denies that the individual Defendants in this case violated Plaintiffs' rights when they made false statements, and/or suppressed exculpatory evidence, in reports or other documents filed in the juvenile court. The County ratified and/or approved the inclusion of false statements, and/or suppression of known exculpatory evidence, in reports or other documents filed in the juvenile court.

334.    The Defendant County of Shasta is aware that its social workers and sheriffs frequently make false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court. Yet, Defendant County of Shasta has made the knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct, and has consistently and knowingly failed to provide any training to their social workers to inform them of the rights of parents and children to not be lied about in court reports and the requirement that all material exculpatory evidence is required to be presented to the Dependency Court.

335.    The Defendant County of Shasta's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, i.e., the known need for a specific policy prohibiting the aforementioned misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

336. This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiffs' harm, in that individual Defendants, and each of them, followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures of the Shasta County Health and Human Services Agency when they made false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the Dependency Court – none of which was constitutionally permissible.

337. The County of Shasta apparently takes the position that it is not clearly established and/or understood that a social worker could not lie and/or fabricate evidence in proceedings before the juvenile court. (2:24-cv-02394-DAD-DMC *Dungan et al v. County of Shasta et al* filed 09/04/24 here in the Eastern District. See e.g. Doc. 32, 4:1 et. seq., "All claims arising from what occurred during the state [Dependency Court] proceedings are improper colateral[sic] attacks on those proceedings.").

338. The County of Shasta has also taken the position that a social worker does not violate constitutional rights when they suppress exculpatory evidence in juvenile proceedings. (See *Id.*) These "positions" constitute unwritten policies of the County.

339. Without such policies, procedures, customs and/or practices in place, the County of Shasta social workers and sheriffs have been allowed and permitted to engage in conduct that was in violation of Plaintiff's constitutional rights as more specifically set out in the facts stated above and incorporated herein by reference.

340. Defendant County's failure to adopt appropriately prophylactic policies and training was the moving force behind the violations of Plaintiffs' constitutional rights. Such failures include, but are not limited to the following:

    a. The County of Shasta did not have a written policy, procedure, custom, practice and/or recurrent training delineating the constitutional protections afforded to a parent and child by the First and Fourteenth Amendments.

b. The County of Shasta did not have a written policy, procedure, custom, practice and/or recurrent training instructing that a county social worker must disclose all known exculpatory evidence to the juvenile court.

c. The County of Shasta did not have a written policy, procedure, custom, practice and/or recurrent training instructing that a county social worker is precluded from knowingly including false statements in documents or reports to the Dependency Court.

d. The County of Shasta did not have a written policy, procedure, custom, or practice requiring its social workers to be complete, honest, and accurate in their reports (and other filings) with the court.

e. The County of Shasta did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to have personal knowledge of the facts and/or statements made in a petition, document, and/or report, when attesting to the veracity of those allegations, facts, and/or statements.

f. The Shasta did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to conduct an independent investigation to determine whether the allegations, facts, and/or statements in a petition, document, and/or report were true, before attesting to the veracity of those allegations, facts, and/or statements.

g. The County of Shasta did not have a policy or procedure that addressed California Government Code, §820.21, i.e. civil immunity for a social worker is lost if they commit perjury, fabricate evidence, or fail to provide known exculpatory evidence.

341. By deliberately refraining from promulgating any of the aforementioned policies, procedures, customs, practices and/or training, the County permitted the aforementioned basic policy decisions to be made by the lower level social workers in the field. As a result, the Defendant County of Shasta's policy, custom, and/or practice – as established, adopted,

51

and implemented by the individual Defendants in this case, and each of them, was to make false statements and/or suppress known exculpatory evidence in reports and documents filed with the juvenile court, and to continue to detain the children or otherwise cause the continued detention of the children even thought it was known that there was no legitimate "true" basis to do so.

342.    These policies, customs, and/or practices – that disregard the Plaintiffs' constitutional protections – were a substantial factor in causing harm to the Plaintiffs. Thus, as a matter of law, because there was no formal policy preventing the aforementioned misconduct, even though one was obviously needed, the social workers on the line acted on behalf of the County in making final policy decisions – which is exactly what they did when they made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the Dependency Court.

343.    The state of the law regarding the constitutional protections afforded to parents and a child by the First and Fourteenth Amendments was clearly established well before June 2019. As such, the Defendant County of Shasta knew before 2024 that its social workers and sherifs required recurrent training on the constitutional protections afforded to parents and children.

344.    Despite this knowledge, the Defendant County of Shasta deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its social workers and/or Sheriffs on the following constitutional protections:

   a.   That a social worker must disclose all known inculpatory and exculpatory evidence to the Dependency Court.

   b.   That a social worker must be truthful, honest, and accurate when reporting and/or presenting evidence to the Dependency Court.

   c.   That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents or reports to the Dependency Court.

d. That a social worker must disclose all known exculpatory evidence in documents and/or reports that will be relied upon by subsequent social workers.

e. That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents and/or reports that will be relied upon by subsequent social workers.

345.    The County does not adequately train its "social workers to be truthful, honest, accurate, and to not engage in deception in the presentation of evidence, and a parent-and-child's Constitutional Rights. The County does not provide training on all policy updates, and does not expect its social workers to know every policy or procedure.

346.    Defendant County of Shasta's deliberate failure to train its social workers on these established constitutional protections was a substantial factor in causing the Plaintiffs harm, in that social workers and sheriffs were unfamiliar with and oblivious to the Plaintiffs' constitutional rights, when they made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the Dependency Court, and then continued to detain the child from their Plaintiffs' care for over 20 months even though they knew there was no legitimate basis to do so.

347.    The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of children and parents with whom social workers and/or sheriffs can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First and Fourteenth Amendments to the United States Constitution.

348.    Defendant County of Shasta, including by and through its entities Shasta County Health and Human Services and Shasta County Sheriff's Office and its policymaking officials, breached its duties and obligations to Plaintiffs by, but not limited to, failing to establish, implement and follow the correct and proper constitutional policies, procedures,

53

customs and practices; by failing to properly select, supervise, train, control, and review its agents and/or employees as to their compliance with constitutional safeguards; and by deliberately permitting the individual Defendants, and each of them, to engage in the unlawful and unconstitutional conduct as herein alleged, with a total and deliberate indifference to Plaintiffs' rights.

349.    Defendant County of Shasta knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agency policies, practices, customs, and usages would, and did, directly cause Plaintiffs to be injured and damaged.

350.    These actions, and/or inactions, of the Defendant County of Shasta were the moving force behind, and direct and proximate cause of Plaintiffs' injuries. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.

### *Monell* Claim – Count Three
### *Unwarranted Medical Treatment*

351.    Plaintiff incorporates all of the above allegations as though fully set forth herein.

352.    As detailed above, County of Shasta regularly and systematically performed, and to this day continues to perform on a regular basis, non-consensual unwarranted invasive medical interventions upon children in relation to whom referrals of suspected child abuse have been received.

353.    Here, the medical interventions include, but may not be limited to – "gender affirming care," the provision of psychotropic medication, and the provision of birth control pills. The County knows or reasonably should know that parents have a constitutional right to refuse consent for their child's medical interventions. Shasta County regularly requests these medical interventions be undertaken without notifying either parent prior to the examination. Moreover the County regularly requests that parents be excluded from the process in violation of those same constitutional rights.

354. The County, at all relevant times, had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all its agents, officers, employees and those acting under them, so as to protect the constitutional rights of Plaintiffs and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

355. Based on the duties charged to the County of Shasta, its policymaking official knew or should have known of the need to establish such customs, policies, and practices as were required to protect the rights of children and parents to remain free of unwarranted non-consensual medical interventions.

356. At the time of the underlying events, the County failed to promulgate sufficient and/or adequate policies, processes, and procedures relating to medical interventions.

357. At the time of the underlying events, the regularly established customs and practices of the Defendant County that were followed, adhered to, complied with, and carried out by the individual Defendants in this case were the moving force that caused the violations of the Plaintiffs constitutional rights including, but not limited to the following policies, customs, and/or practices:

    a. The custom and/or practice of subjecting children to unwarranted, non-consensual medical interventions and/or investigatory medical assessments.

    b. The custom and/or practice to exclude parents from the "interfering" in the medial process.

    c. The custom and/or practice of barring a parent from access to the child's medical records even though the parent retains medical rights.

    d. The custom and/or practice of subjecting children to unwarranted nonemergency medical interventions, including "gender affirming care," psychotropic meds and birth control pills without a parent's knowledge and/or consent.

    e. The unwritten policy of acting with deliberate indifference to the rights of children and parents with whom Defendants' agents can regularly be expected

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT

to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise their respective officers, contractors, agents, and/or employees, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, relative to a parent and child's medical rights when performing actions related to child abuse investigations.

f. The custom and/or practice of improperly using the medical treatment consent form to perform investigatory medical examinations and/or procedures on a child – that are not designed and/or intended to treat or heal that child. (See, e.g., *Swartwood v. Cty. of San Diego*, 84 F. Supp. 3d 1093, 1123-1124 (S.D. Cal. 2014).)

g. The custom and/or practice getting a parent to sign a medical treatment consent form without the parent's informed consent, under duress, under coercive circumstances, by threatening to obtain a court order, and/or by threatening to ensure the child will never be returned to that parent's custody.

h. The custom and/or practice of performing investigatory medical examinations, assessments, and/or procedures without providing notice to parents.

358. When the individual Defendants "affirmed" S.L. as "Transgender," and made sure she was taking a variety of psychotropic meds, and made sure she had birth control pills, they were acting pursuant to and in accordance with Shasta County's customs, unwritten policies, and practices with regard to conducting such medical interventions without first obtaining a warrant or parental consent under non-emergency circumstances. Defendants were acting within the training and standards Defendants received from the County, when they performed and/or directed that S.L. be subjected to medical interventions including "gender affirming care," psychotropic meds and birth control pills.

359. As a matter of routine, the County of Shasta never investigates or disciplines its social workers who authorize medical interventions on children – without consent, court order,

exigency. Nor does the County as a matter of practice even inquire to determine whether there was a basis to perform the requested medical intervention.

360.    Here, Shasta County did not investigate or discipline the individual Defendants for advocating the unwarranted medical interventions on S.L., including "gender affirming care," psychotropic meds and birth control pills. The County did not investigate or discipline Defendants for the unauthorized, non-consensual, and non-emergent medical interventions even though Defendant Jennifer Szephegyi-Johnson stated in multiple emails that S.L. was undergoing medical treatment without parental consent.

361.    Defendant County of Shasta ratified and/or approved of S.L.'s non-consensual unwarranted medical interventions.

362.    Defendant County of Shasta knowingly and with deliberate indifference failed to train its social worker employees and/or agents on the constitutional rights of a parent and child, including but not limited to:

    a.    That a child cannot be examined outside the presence of his or her parent(s) – without judicial authorization or parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.

    b.    That a child cannot be subjected to an investigatory medical examination – without parental consent, court order, and/or exigent circumstances.

    c.    That an independent investigation and/or inquiry must be performed to determine whether or not there is a basis for performing an unwarranted and non-consensual investigatory medical examination on a child.

    d.    That a county social worker cannot condone or "affirm" a child's "Transgender" identity without parental consent or court order.

    e.    That a parent has a right to notice for and a right to be present at investigatory medical examinations, assessments, and/or procedures.

    f.    Getting a parent to sign a medical treatment consent form without the parent's informed consent, under duress, under coercive circumstances, by threatening

to obtain a court order, and/or by threatening to ensure the child will never be returned to that parent's custody.

363.   The County does not adequately train its "social workers as to medical interventions, and a parent-and-child's Constitutional Rights. The County does not provide training on all policy updates, and does not expect its social workers to know every policy or procedure.

364.   Without adequate training, the individual Defendants, and each of them, were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they subjected S.L. to medical interventions – without parental consent, court order, and/or exigency.

365.   Shasta County's non-consensual unwarranted investigatory medical interventions examination of S.L. was not an isolated incident specific to Plaintiffs' circumstances. On the contrary, such warrantless non-consensual medical examinations and procedures are routine, regular and recurring events, and are perpetrated by Shasta County and its social workers on a daily, or near daily, basis in the same or similar circumstances as alleged herein.

366.   Discovery will show how frequently Shasta County children are subjected to unwarranted medical interventions.

367.   The County of Shasta has engaged in each of the above customs and/or practices on an ongoing and continuous basis since well before the events described herein, and continues to engage in said practices on an ongoing basis, and will continue to do so until ordered to stop.

368.   These customs, policies, and/or practices and lack of adequate training and supervision of Defendant County were the moving force behind, and the direct and proximate cause of the injuries sustained by Plaintiffs. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven separately at trial.

### CLAIM FOR RELIEF No. 6.
*Intentional Infliction of Emotional Distress and Civil Conspiracy*

58

(Plaintiffs v. Shasta County Health and Human Services Agency (vicarious liability), Shasta County Sheriff's Office (vicarious liability), Patricia Dougherty, D.Ed., Michelle A. Sager, M.D., Margaret "Maggie" Kenefick, and Michael Horan)

369. Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

370. A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative. Cal Gov Code § 815.2 (a)

371. The emotional distress suffered by Plaintiffs was caused by County social workers Crystal Nelson, Jennifer Szephegyi-Johnson, Shannon Anderson, Nikki Quintana; and by Sheriff's Officer Jared Foster. In seizing and detaining S.L., all were acting within the scope of their employment.

372. Outrageous conduct is a factual question. *Cross v. Bonded Adjustment Bureau* (1996) 48 Cal. App. 4th 266, 283 ("outrageous conduct is a fact question where reasonable minds may differ"); *So v. Shin* (2013) 212 Cal.App.4th 652, 672 ("whether conduct is 'outrageous' is usually a question of fact.").

373. Here, each Defendant knew that human sex is an immutable biological trait, yet each pretended to believe that S.L. is "Transgender." Each Defendant knew this would cause the Lyashchenkos severe emotional distress. Note that where there is a dispute about the defendant's knowledge and "the existence of probable cause turns on resolution of that dispute," **a jury** must resolve the "threshold question of the defendant's factual knowledge or belief." *Litinsky v. Kaplan*, 40 Cal. App. 5th 970, 981

374. Each Defendant helped fabricate multiple falsehoods. At minimum, each Defendant knew that falsehoods had been fabricated.

375. Because the falsehoods were fabricated in order to (a) seize and detain S.L. and (b) to make money, Defendants' conduct was outrageous.

376.    Defendants and each of them intended to cause the Lyashchenkos emotional distress; or Defendants acted with reckless disregard of the probability that the Lyashchenkos would suffer emotional distress.

377.    Note that questions of subjective intent are considered **proper issues for the jury** and good or bad faith which are to be inferred from all the circumstances involved in the particular case are **inherently factual inquiries**. Subjective intent is usually a matter of inference to be derived from all of the objective facts and evidence. *Rosedale Plaza Group, LLC v. BP West Coast Products LLC*, 665 F. Supp. 2d 1118, 1134-1135, citing *Tiller v. Amerada Hess Corp.*, 540 F.Supp. 160, 165 (D.S.C.1981).

378.    The Lyashchenkos have suffered and continue to severe emotional distress over Defendants' seizing of S.L. They suffer depression, anger, and mental anguish, among other symptoms. The severe emotional distress may be permanent.

379.    Defendants' conduct was a substantial factor in causing the Lyashchenkos severe emotional distress.

380.    Under California law, liability for civil conspiracy generally requires three elements: (1) formation of the conspiracy (an agreement to commit wrongful acts); (2) operation of the conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of the conspiracy. *Timeshare Universe, Inc. v. Grossman*, 2003 U.S. Dist. LEXIS 22142, *1

381.    Here, as to (1), Defendants and each of them agreed between themselves to do whatever was necessary to seize and detain S.L. from her parents, including fabricating falsehoods as described above. All Defendants understood that taking a child away from parents will inflict emotional distress upon the parents.

382.    As to (2), Defendants operated the conspiracy since at least June 3, 2024 continuing to the present.

383.    As to (3), the direct and proximate result of Defendants' conduct is that, in addition to the emotional distress, the Lyashchenkos have been forced to expend money on attorney fees, and forced to incur medical expenses in amounts to be documented at trial.

384.   Punitive damages are appropriate because these Defendants acted with oppression, fraud, or malice. Cal. Civ. Code § 3294.

**CLAIM FOR RELIEF No. 7.** (*28 U.S.C. § 2201*)
*Declaratory Judgment Re First Amendment Free Speech*
**Facial and As-Applied Challenge to Judge Bigelow's Gag Orders**
(Plaintiffs v. The Office of the California Attorney General)

385.   Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein.

386.   The Lyashchenkos say that Judge Bigelow's Gag Orders have caused them to suffer constitutional injury under the First Amendment. The State of California evidently disagrees. In California's view, these Gag Orders represent a necessary exception to the First Amendment's guarantee of free speech. Thus, an actual legal controversy exists between the State of California and the Lyashchenkos.

**January 2026 Gag Order**

387.   On January 7, 2026, the website "reduxx.com" published an article by author Anna Slatz entitled "California Family Loses Custody Of Daughter After Refusing To Medically 'Affirm' Her Transgender Identity" (see https://reduxx.info/california-family-loses-custody-of-daughter-after-refusing-to-medically-affirm-her-transgender-identity/).   The article was about the Lyashchenko Dependency Court proceeding. Plaintiffs provided the author with information, although Alexandra used the pseudonym "Ellie."

388.   The redux article included excerpts from court documents. S.L. was not identified.

389.   At a Dependency Court Hearing on or about January 8, 2026, Judge Bigelow Ordered the Lyashchenkos to not publish court documents.

61

## Blanket Gag Order

390. Over and over again, in hearing after hearing, Judge Bigelow stated, "the Court admonishes the parties not to discuss these proceedings with anyone outside of the Courtroom."

391. The Lyashchenkos have published, and will continue to publish, their experiences in Dependency Court and with Defendants, and about their case. They have published, and will continue to publish, their opinions regarding Dependency Court in general, and regarding the entire "Transgender" issue in general.

392.

## Cease and Desist Threat

393. On or about 11-07-2025, the Lyashchenkos received a threatening "Cease and Desist" letter from Phoenix Charter Academy's attorney Lee Rosenberg. The letter alleges that the Lyashchenkos are engaging in publishing on social media "false and highly inflammatory claims" about Defendant Dr. Dougherty. Rosenberg demanded the Lyashchenkos stop posting, and immediately take down the previous posts.

394. In fact, the posts in question are not false, nor do they reveal any confidential information. Defendants may consider them "inflammatory," but all of the Lyashchenkos' statements and postings are constitutionally protected speech under *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (the "Brandenburg Test").

395. On 11-10-2025, the Lyashchenkos responded to Rosenberg with a detailed 5-page letter. The Lyashchenkos made legal arguments, and specifically requested that Rosenberg provide quotations of any material that he contended was defamatory and/or inflammatory. To date, Rosenberg has completely ignored the Lyashchenkos request for quotations.

396. The Lyashchenkos have not, and do not intend to take down any posts, nor do they wish to interfere with the redux article.

## Argument Regarding Gag Orders

397. Gag orders on trial participants are unconstitutional unless:

    a. the speech sought to be restrained poses a clear and present danger or serious and imminent threat to a protected competing interest;

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT

b. the order is narrowly tailored to protect that interest; and

c. no less restrictive alternatives are available.

398.   A trial court **must** make express findings showing it applied this standard, and considered and weighed the competing interests.

[*Hurvitz v. Hoefflin*, 84 Cal. App. 4th 1232, 1235, emphasis added]

399.   Judge Bigelow ordered the Lyashchenkos "not to discuss these proceedings with anyone outside of the Courtroom.," and to not publish court documents. "These proceedings" and "court documents" define the content that the Lyashchenkos are purportedly disallowed from speaking. Thus, Judge Bigelow's Blanket Gag Order and January 2026 Gag Order are the very essence of content-based prior restraints of free speech.

400.   At no time did Judge Bigelow consider or weigh any "competing interests" regarding the Gag Orders, i.e. the content-based prior restraint.

401.   Gag orders are not an appropriate method to protect confidential information from disclosure, no matter how damaging or private that information may be. *Maggi v. Superior Court*, 119 Cal. App. 4th 1218, 1219

402.   Prior restraints on speech are the most serious and the least tolerable infringement on First Amendment rights. Orders enjoining the right to speak on a particular topic [here, the Dependency Court proceedings] are disfavored and ***presumptively invalid***. However, courts have recognized a prior restraint may be permissible under certain limited circumstances. *Molinaro v. Molinaro*, 33 Cal. App. 5th 824, 825-826, emphasis added.

403.   The legal presumption is that this Blanket Gag Order is invalid. The burden is on The Office of the California Attorney General to demonstrate its constitutionality.

404.   To establish a valid prior restraint under the federal Constitution, a proponent has the heavy burden to show the countervailing interest is compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable. A permissible order restraining future speech must be couched in the narrowest

terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. *Id.*

405.   Here, Judge Bigelow did not attempt, let alone succeed, to explain California's interest in the Blanket Gag Order, nor did she explain how this prior restraint was couched in the narrowest terms possible. This lawsuit represents California's opportunity to now do so.

406.   The California Constitution is more protective of free speech rights than the federal Constitution, and California courts require extraordinary circumstances before a prior restraint may be imposed. Nonetheless, in determining the validity of a prior restraint, California courts engage in an analysis of various factors similar to the federal constitutional analysis, and injunctive relief restraining speech under the California Constitution may be permissible where the relief is necessary to protect private rights and further a sufficiently strong public policy. *Id.*

407.   At no time did Judge Bigelow or anyone explain what private rights are at issue, or what strong public policy is served by these Gag Orders.

408.   Judge Bigelow issued these Gag Orders upon no stated legal authority or reasoning whatsoever, and has effectively transformed the Shasta County Superior Court into a top-secret tribunal just like the infamously tyrannical Star Chamber of medieval England.

409.   The public have a strong interest in learning what takes place in a California Dependency Case. The public have a strong interest in learning what takes place at the Phoenix Charter Academy, a publicly funded school. The public are interested to learn the extent to which Gender Ideology has in our institutions become a "woke mind virus," to use Elon Musk's phrase.

410.   The State of California surely has an interest in protecting the privacy of S.L., a minor child, but a minor's privacy may be accomplished by far less restrictive means that Judge Bigelow's Gag Orders prohibiting the Lyashchenkos from discussing the Dependency proceedings at all, or from publishing court documents.

411.    Narrow tailoring would consist of an order that, until she reaches the age of majority, S.L.'s name and her photograph are not to be published or discussed with anyone outside the courtroom. In other words, S.L. must be "de-identified."

412.    Narrow tailoring might also consist of a discussion of S.L's medical records, which are covered by the California Confidentiality of Medical Information Act ("CMIA") and by the federal Health Insurance Privacy and Portability Act ("HIPPA").

413.    However, there are **_no_** restrictions on the use or disclosure of de-identified health information. See e.g. 45 C.F.R. §§ 164.502(d)(2), 164.514(a) and (b).

414.    Similarly, there are **_no_** restrictions on the use or disclosure of de-identified educational information either.

415.    As to the rest of the "proceedings" and the court documents — those consist of protected speech, and this Court should so find.

416.    Furthermore, the Sixth Amendment guarantees the right to a "public trial." The proceedings in Judge Bigelow's court are certainly not public. Rather, Judge Bigelow's courtroom is top-secret.

417.    Currently, Judge Bigelow's courtroom is highly reminiscent of the "Star Chamber" from medieval England. An act of the British Parliament abolished the Star Chamber in the year 1641. This is because it was widely appreciated that secrecy leads to tyranny.

418.    Like all United States citizens who have been prosecuted, hailed into court and forced to stand trial, the Lyashchenkos have a right to a fair and *public* trial. Those two terms — "fair" and "public" – are deeply related. The entirety of American jurisprudence holds that for a trial to be fair, it *must* be public.

419.    U.S. Supreme Court Justice Oliver Wendell Holmes wrote that public access to judicial proceedings was "of vast importance" because of "the security which publicity gives for the proper administration of justice." Trials "should take place **under the public eye**," continued Justice Holmes, "because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that **every citizen should be able to satisfy himself with his own eyes as to the mode in which a**

65

**public duty is performed.**" *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court*, 20 Cal. 4th 1178, 1198 (1999), bolding added, quoting *Cowley v. Pulsifer*, 137 Mass. 392 (1884).

420.    Judge Bigelow has thus failed in her public duty.

421.    Due to its constitutional significance and difficulty in proving prejudice, when a violation of the right to a public trial has occurred, as here, there is no requirement to prove any specific prejudice to the defendants. "The right to an open public trial is not the right of only the criminal defendant, but is rather *a shared right of the accused and the public*, the common concern being the assurance of fairness." *People v. Esquibel*, 143 Cal. App. 4th 645, 646 (emphasis added).

422.    The Lyashchenkos are criminal defendants in Dependency Court and thus have a fundamental right to an open, public trial.

### Conclusion to Declaratory Judgment

423.    Therefore, Judge Bigelow's Blanket Gag Order is unconstitutional under both the U.S and California constitutions. The Court should issue a Declaratory Judgment that the Lyashchenkos and all persons have the right to speak freely about these Dependency Court proceedings, so long as they de-identify S.L., i.e. do not mention S.L.'s name, publish her photograph, or publish identifying information.

## VIII.  PRAYER FOR RELIEF

424.    WHEREFORE, Andriy and Alexandra Lyashchenko pray for judgment against Defendants (except for The Office of the California Attorney Gender), and each of them, as to all causes of action, as follows:

      a.  General damages and special damages according to proof, but in no event less than $20,000,000;

      b.  As against the individual, human being, Defendants, punitive damages as allowed by law;

      c.  Attorneys fees and costs pursuant to 42 U.S.C. § 1988, and any other appropriate statute.

425.    As against the Office of California Attorney General, Plaintiffs pray for:

a. A Declaratory Judgment that Judge Bigelow's Gag Orders constitute an impermissible prior restraint and violates the First Amendment's guarantee of free speech; that all persons are prohibited from publishing a minor child's name, photo or identifying information, but that all other speech about a Dependency case is a matter in the public interest, and therefore protected speech.

b. A Permanent Mandatory Injunction ordering the California Attorney General and the California Department of Justice to remove Andriy Lyashchenko and Alexandra Lyashchenko from its Child Abuse Central Index ("CACI").

426. Plaintiff further seek:

a. Injunctive relief as allowed by law;

b. Such further relief as the Court deems just and proper.

## IX.    DEMAND FOR JURY TRIAL

427. Plaintiffs hereby demand a trial by jury on all issues so-triable.

Dated: January 13, 2026

_Andriy Lyashchenko_
Andriy Lyashchenko
Plaintiff *in pro per*

_Alexandra Lyashchenko_
Alexandra Lyashchenko
Plaintiff *in pro per*

67

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT

## X.   VERIFICATIONS

### ANDRIY LYASHCHENKO

I am a Plaintiff to this lawsuit, the husband of Alexandra. S.L. is our daughter. I have made a thorough review of all the factual allegations stated in the above complaint. These facts are within my personal knowledge, and I each attest to the accuracy thereof. As to those facts alleged on information and belief, I believe those things to be true, as reasonable inferences from the facts which are within my personal knowledge. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted on January 13, 2026,

*Andriy Lyashchenko*

Andriy Lyashchenko

### ALEXANDRA LYASHCHENKO

I am a Plaintiff to this lawsuit, the wife of Andriy. S.L. is our daughter. I have made a thorough review of all the factual allegations stated in the above complaint. These facts are within my personal knowledge, and I each attest to the accuracy thereof. As to those facts alleged on information and belief, I believe those things to be true, as reasonable inferences from the facts which are within my personal knowledge. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted on January 13, 2026,

*Alexandra Lyashchenko*

Alexandra Lyashchenko

LYASHCHENKO v. SHASTA COUNTY ET. AL. FIRST AMENDED COMPLAINT